Joseph A. **PHELAN**, Complainant,

v.

**MIDDLE STATES OIL CORPORATION** et al., Defendants.

United States District Court
S. D. New York.
Feb. 20, 1952.

See, also, 154 F.2d 978.

Meyer Kraushaar, New York City, for objectants.

Ralph Montgomery Arkush, New York City, for Middle States Petroleum Corp.

Leslie Kirsch, Glass & Lynch, New York City, for receiver Glass.

Joseph P. Tumulty, Jr., Washington, D. C., for receiver Tumulty.

SMITH, District Judge.

This matter involves the final accounting of the receivers of United Oil Producers Corporation. Objections thereto were filed by the executors of the estate of William W. Cohen, holder of some non-deposited United Oil Producers bonds and of shares in Southern States Oil Company, and individuals holding shares of stock and scrip in Oil Lease Development Company, and Southern States, two of the companies of the old Middle States Oil Corporation system.

The receivership grew out of the collapse of the system of oil, railroad, and land companies, security and holding companies, controlled by C. N. Haskell, formerly governor of Oklahoma. The system had comprised some fifty-five corporations, of which Middle States Oil Corporation and thirty-eight others which were, in August, 1924, wholly or partly owned by Middle States Oil directly or through sub-holding companies,

eventually were placed in receivership in this District. These were

| | Name of Company | Date of Receivership |
|---|---|---|
| 1. | Central States Oil and Gas Company | 1/21/25 |
| 2. | Columbia Petroleum Corporation | 8/22/24 |
| 3. | Corona Oil Company | 9/5/24 |
| 4. | Cotton Belt Petroleum Company | 9/5/24 |
| 5. | Diamond Pipe Line and Marketing Corp. | 9/5/24 |
| 6. | Dominion Oil Company | 10/4/24 |
| 7. | Eureka Producing Company | 8/22/24 |
| 8. | Federal Oil Marketing Corporation | 8/22/24 |
| 9. | Gulf Coast Refining Company | 8/22/24 |
| 10. | Gulf States Oil and Refining Corporation | 8/22/24 |
| 11. | Hobbs Oil Company | 2/13/25 |
| 12. | Imperial Oil Corporation | 8/22/24 |
| 13. | Judson Oil Company | 8/22/24 |
| 14. | Leahy Oil Company | 1/21/25 |
| 15. | Marr Oil Corporation | 8/22/24 |
| 16. | Middle States Oil Corporation | 8/15/24 |
| 17. | Midsig Corporation | 9/5/24 |
| 18. | Miles Oil Corporation | 9/5/24 |
| 19. | Number Eleven Oil Corporation | 9/5/24 |
| 20. | Number Nine Oil Corporation | 8/22/24 |
| 21. | Number One Oil Company | 8/22/24 |
| 22. | Number Seventy-Seven Oil Company | 9/5/24 |
| 23. | Oil Lease Development Company | 8/22/24 |
| 24. | O.L.D. Operating Company | 8/22/24 |
| 25. | Oliphant Petroleum Company | 9/5/24 |
| 26. | Pawnee Osage Oil and Gas Company | 1/21/25 |
| 27. | Peters Leahy Oil Company | 1/21/25 |
| 28. | Peters Oil Company | 9/5/24 |
| 29. | Plains Petroleum Company, Inc. | 8/22/24 |
| 30. | Ranger Texas Oil Company | 9/5/24 |
| 31. | Reliable Securities Corporation | 8/22/24 |
| 32. | Southern States Oil Corporation | 8/22/24 |
| 33. | Sure Oil Corporation | 8/22/24 |
| 34. | Texas Chief Oil Company | 8/22/24 |
| 35. | Turman Oil Company | 8/22/24 |
| 36. | United Oil Producers Corporation | 8/22/24 |
| 37. | Verland Oil and Gas Company | 8/22/24 |
| 38. | Western States Oil Corporation | 8/22/24 |
| 39. | Wichita Petroleum Company | 8/22/24 |

The receiver Glass is charged with having, in combination with the reorganization committee members, engineered the reorganization to obtain control of the res, with having, by the terms of the reorganization agreement allowing stockholder participation, by the fixing of the bids at the sale and by later handling of the sale of properties of subsidiaries, by the allocation of overhead expenses, by reshuffling of the intercorporate claims, by enforcement of the Westervelt Gulf Coast and fraud claims on behalf of the new company, by illegal use of funds of subsidiaries by the new company, and otherwise defrauded the United Oil Producers bondholders, particularly the non-depositors, and with having defrauded the minority shareholders in Southern States and other subsidiaries.

Practically every act of Glass in the receivership is attacked as in bad faith and in pursuance of the scheme or conspiracy to defraud. The identity of the other claimed conspirators is difficult to ascertain.

Glass' answers to the charges are that he acted throughout in entire good faith, that some of the actions attacked are those of committees or committees' counsel for which he has no responsibility, that in most cases court orders after sufficient notice protect him, that the bid prices at the sales were fair, that many of the actions attacked have no relation to United, as to which alone he is accounting here, and that in most instances the proportionate interest of any minority in the outcome of any particular transaction is so small as to be de minimis. He also asserts special defenses of failure to state a claim on which relief may be granted, estoppel, fraud, laches, payment, release, statute of limitations, waiver, res adjudicata, and transit in rem judicatam. Middle States Petroleum Corporation, the new corporation, depends also on laches, estoppel, and the statute of limitations, and counterclaims against Cohen's estate for alleged conversion of $24,700 in United Oil Producers bonds alleged to have been held by Cohen as trustee or agent of Reliable Securities Corporation and for the distributive values received by Cohen thereon.

## Findings of Fact

1. In June, 1924, or shortly thereafter, one Shivers, Haskell's secretary, as a stockholder of Middle States Oil Corporation, filed a stockholders' bill against that company, praying the appointment of a receiver.

2. The application for receiver was denied at the hearing in the stockholders' suit.

3. Shortly thereafter a creditors' suit was filed by Joseph A. Phelan who had claims against Middle States Oil Corporation and one of its subsidiaries.

4. John J. Curtin was attorney for Phelan.

5. On August 15, 1924, in the creditors' action, Joseph P. Tumulty and Julius Mayer were appointed receivers of the parent company, Middle States Oil Corporation.

6. Amended and supplemental bills were later filed, adding thirty-eight other companies in the system and the receivership was, on consent, extended to those companies.

7. Shivers formed a committee to represent Middle States Oil Corporation stockholders.

8. Joseph Glass was a junior member of the firm of Olcott, Olcott & Glass, which represented Shivers in the stockholders' action. This firm was also retained as counsel for the stockholders' committee. Olcott, Olcott & Glass and John J. Curtin were appointed as the co-attorneys for the temporary receivers. Thereupon Olcott, Olcott & Glass resigned as attorneys for the stockholders' committee,—Moore, Hall, Swan & Cunningham being retained in their place.

9. Judge Mayer died on November 30, 1925, and on January 27, 1926 Glass was appointed receiver in his place.

10. The receivers were faced with many complications, some ninety litigations against various of the corporations having been instituted, and tax claims totaling some $15,000,000 having been filed against the companies by the United States Government, based upon the false-and-inflated earnings statements which Haskell had caused to be issued to aid in sales of securities of the companies.

11. The books of the companies were either non-existent or inaccurate.

12. Advances had been made between the companies, proceeds from the sale of stock recorded as income from oil sales, and other irregularities existed.

13. None of the companies had ever actually made any net profits.

14. There were a number of producing subsidiaries which owned valuable oil leases, notably Turman, Marr, Federal, and Republic.

15. Some 80% of the stock of Turman was owned by Eureka which, in turn, was owned by United Oil Producers Corporation. United had outstanding bonds of over $2,000,000. A controversy also existed between the minority stockholders of Turman and the Middle States Oil Corporation for alleged failure to carry out the terms of the contract to transfer to Turman sufficient oil leases as required to furnish the agreed consideration for the acquisition of the majority stock in Turman.

16. The ownership in Marr was subject to attack because of the bribery of some of the directors of the Marr Corporation to obtain their agreement to the contract by which the Marr stock was acquired.

17. Under the leadership of one Paul Vitek, the former owners of properties furnished to the formation of Federal Oil Marketing Corporation by Southern States Oil and Middle States Oil also sought to recover them on grounds of fraud.

18. Another major controversy involved the validity of a serial-note issue of Middle States Oil Corporation, attacked as fraudulent by Shivers in his action. Haskell had been speculating in Southern States Oil Corporation stock and the price had been driven up to $32 a share when, in late December, 1923, he became over-extended, the market broke, the stock fell to about $8 a share, brokerage houses to which Haskell was indebted on the stock were in danger of collapse, and trading privileges in the stock were suspended on the stock exchange. The brokers were bailed out by the taking over of the Southern States Oil Corporation stock in their hands by the Middle States Oil Corporation at a price of $14.75 a share in exchange for Middle States Oil Corporation's serial notes in the amount of more than $5,000,000, secured by a pledge of the Southern States Oil Corporation stock acquired from the brokers. The Southern States Oil stock so acquired amounted to 65.52% of the Southern States Oil stock outstanding.

19. Among the contested claims against the corporations were claims for a principal amount of about $2,250,000, plus interest, on guarantees by Middle States Oil Corporation and Southern States Oil Corporation of two bonds of the Gulf Coast Refining Corporation held by a bondholders' committee known as the Westervelt Committee. The Westervelt Committee also asserted a claim for four million dollars against Middle States Oil Corporation and Southern States Oil Corporation for damages for fraud in contributing to the formation of Gulf States Oil & Refining Corporation properties represented of a certain value, but claimed to be substantially less in value than called for in the contract under which the Westervelt Committee, Middle States Oil Corporation and Southern States Oil Corporation had caused the formation of Gulf States Oil & Refining Corporation and Gulf Coast Refining Company.

20. The receiver Tumulty concerned himself primarily with the prosecution of the tax litigation before the Treasury.

21. Eventually the entire fifteen-million-dollar tax claims were defeated and refunds of approximately $450,000 obtained from the Government.

22. This entailed a very substantial amount of work by the accountants who reconstructed the books of the corporations from original sources, such as checkbook stubs, reports of oil runs, and corporate minute books, and on the part of tax counsel, covering some five years of work.

23. The receiver Mayer, and, later, his successor Glass, concerned themselves with the resolving of the various controversies in litigation and with the active management of the oil and other properties.

24. An accounting firm, Boyle & Fonteine, set up books reflecting the transactions between the companies and with outsiders for the period from January 1, 1924 until the time of receivership. A second accounting firm, Mattison & Davey, took up the task from that point and, in the course of the preparation of the tax briefs and tax reports, set up books reflecting all the discoverable transactions prior to January 1, 1924 as well as those which took place later. Books were kept of the transactions of the companies after the dates of receivership.

25. The companies were managed by the receivers as a unit although the receivers kept track of the inter-receivership transactions.

26. Court approval was obtained of a basis of allocation to the various estates of the operating expenses of the receiverships.

27. The Court pressed for action looking toward reorganization and termination of the receiverships, insisting in early 1929 that positive action be taken.

28. Committees were formed, two of which represented the old stockholders of the Middle States Oil Corporation, one the holders of the United Oil Producers Corporation bonds and the holders of certain Oil Lease Development Corporation bonds which were secured by deposits of United Oil Producers Corporation bonds as collateral, one the serial-note holders; one was the Westervelt Committee.

29. During 1928 there became available an appraisal by Ligon & Company of the physical properties of the oil-producing companies as of December 31, 1927.

30. This appraisal and the physical inventory on which it was based were made available to the various committees and to anyone else who expressed interest in purchasing the properties.

31. In the early stages of the receivership an attempt had been made to obtain a domiciliary receivership in Delaware which had been defeated primarily on the basis of testimony by Glass who had become one of the receivers, to the effect that the companies were solvent in the sense that they either had or could obtain whatever funds were needed to meet their admitted obligations.

32. The oil operations by the receivers were successful, particularly three leases of Turman in the new Seminole field which came in about the end of 1926.

33. The Louisiana and Northwest Railroad, a small railroad in Louisiana almost wholly owned by Middle States Oil Corporation, had had some exceptionally profitable years at the time of the discovery of the Haynesville field about 1921, prior to the coming of the pipe lines into the field. Its large cash holdings, however, were tied up by claims of the Interstate Commerce Commission to recapture a large part of its earnings under the then recapture provisions of 49 U.S.C.A.

34. Because of the unusually heavy expenses of the receivership, largely caused by the accounting and tax situations, and because of the accumulation of interest, particularly on the United Oil Producers Corporation bonds which had a prior claim on the most valuable portion of the producing properties, the Court continued its pressure for the termination of the receivership by reorganization.

35. A tentative reorganization committee, and later a definitive reorganization committee, were formed, consisting of representatives of the existing committees and a representative of the law firm which represented the corporate entities.

36. A plan of reorganization was developed which contemplated foreclosure under bond indentures of the United Oil Producers Corporation (of the pledged Eureka stock) and the Oil Lease Development Corporation (of the pledged O.L.D. Operating Company stock and pledged United Oil Producers bonds) and under the serial-note indenture (of the pledged Southern States Oil Corporation stock), and receivers' sales of the remaining assets of Middle States Oil Corporation, Imperial, United Oil Producers Corporation, and Oil Lease Development Corporation (the so-called free assets).

37. The plan provided participation by the depositors of United Oil Producers Corporation bonds, Oil Lease Development Corporation bonds, serial notes, the Gulf Coast Refining Company claim, and old Middle States Oil Corporation stock.

38. It also provided that holders of claims against Middle States Oil Corporation other than the inter-corporate claims might become parties on the same basis as the holders of the Gulf Coast Refining Company claim.

39. It did not provide for participation by the holders of stock in any of the associated companies, or for participation of the various inter-company claimants.

40. The necessary steps were taken to foreclose the indentures and obtain an order for sale of the free assets of certain of the corporations in receivership, Middle States Oil Corporation, Imperial Oil Corporation, United Oil Producers Corporation, and Oil Lease Development Corporation.

Neither United nor Imperial, guarantor of United's bonds, nor the two together, could have continued to pay the interest on the bonds at that time.

41. Counsel for the reorganization committee set the amount which the committee would bid on each parcel of assets.

42. The receiver Glass and his accountant Lind made available to the counsel for the reorganization committee all the facts at their disposal as to the value of the properties and the claims of the various corporations and, at one point, the amounts tentatively decided upon by counsel as the amounts to be bid were altered to conform to advice by receiver Glass, due to the change in his opinion as to the value of some of the inter-corporate claims.

43. The bidders who acted for the reorganization committee were the sole bidders on the sale.

44. The prices fixed by the reorganization committee's counsel as the amounts to be bid were the amounts bid and accepted by the Court in the sales.

45. The total amount of the various bids for the different parcels was approximately $4,000,000, plus the assumption of receivership liabilities which were approximately $650,000, most of which was composed of inter-receivership obligations. The amounts bid were fair bids on foreclosure and receivership sales.

46. The counsel who fixed the amounts to be bid considered that they were fair from the standpoint of bids upon foreclosure and receivership sales, although not so high as their opinion of the value of all the parcels (plus the stock and claims contributed by the Westervelt Committee) as a going concern for reorganization purposes, which they felt approximated $6,000,000.

47. The amount of the inter-company claims was fixed about a week prior to the sale on notice to the committees and parties to the cause on the basis of the Mattison & Davey reconstruction of the books of the corporations with, however, reservations of right to the receivers to apply for permission to reopen and re-determine items upon development of further information.

48. May 8, 1930, some months after the sales and the formation of the new company, a re-determination was made as to some substantial items upon similar notice.

49. The receiver Glass was named a director and impartial voting trustee under a voting trust set up in accordance with the reorganization plan.

50. A month and a half after the organization of the new company, and after ascertaining that the Court had no objection to Glass' serving as president of the new company, on an understanding with the company that, in any case in which the company's interest conflicted with his position as receiver, he would act as receiver and not for the company, Glass accepted election as president of the new company.

51. He had not actively sought election to the position, having made known his desire to terminate his management responsibilities although he hoped to continue to be associated in a legal capacity with the new corporation.

52. Search on the part of the members of the reorganization committee for an experienced oil man to head up the new company was, however, unsuccessful and by the offer of a salary of $50,000 a year, with the right to continue his law practice, Glass was induced to continue as the executive head of the reorganized company.

53. Litigation continued on the contested claims before the Special Master appointed in the case.

54. Monthly cash accountings were filed with the Master, and some outside litigation was continued, including the Marr and Vitek litigations, as a result of the decision in one of which, Marr v. Tumulty, 1931, 256 N.Y. 15, 175 N.E. 356, the majority of the Marr stock was lost to the corporation.

55. The Vitek claimants who had also raised issues of fraud in inducing the transfer of their properties were, however, unsuccessful and those properties were retained. Oakes v. Federal Oil Marketing Corp., 8 Cir., 1930, 42 F.2d 991.

56. An adjudication was obtained before the Special Master on the Westervelt Committee claims which were prosecuted by the new company although still formally in the name of the Westervelt claimants.

57. The claims on the $2,000,000 bond and $1,000,000 bond were allowed by the Master against both Middle States Oil Corporation and Southern States Oil Corporation although not for the full amount claimed.

58. The Westervelt fraud claim against Southern States Oil Corporation and Middle States Oil Corporation has not been tried or determined but is still asserted by the new company in the amount of some $4,000,000.

59. A policy was adopted of gradually liquidating the producing subsidiaries other than Turman, which alone was continued active in the field of acquiring, and developing, new oil properties.

60. Properties of the other producing subsidiaries were either sold off to strangers or sold to Turman which became Mid-States-Oil Corporation, or to another corporation, Mid-States Development Corporation, which was set up to hold properties of subsidiaries, the stock of which was not under the lien of the trust indenture on the new company's bonds.

61. The sales were accomplished by reopening, or instituting, ancillary proceedings in the districts in which the properties were located and by obtaining orders of sale.

62. The sales were made at fair prices after appraisal by an oil engineering firm which had done considerable work for the receivers in the past.

63. Glass has continued as president of the new company, Middle States Petroleum Corporation, to date.

64. The voting trust arrangement, which ran out after ten years, was renewed.

65. Starting in 1939, Glass and his family have acquired substantial amounts of voting trust certificates for stock in the new corporation, Middle States Petroleum Corporation, until he and his family now own voting trust certificates for some 8% of the stock of the corporation.

66. Glass' salary was reduced by successive steps during the depression years to $24,000 but has been increased since the recovery in business until it is now approximately $56,000 a year.

67. The boards of directors of the new corporation have been friendly to Glass' management and have contained several members who, by reason of employment by the corporation or by association with Glass in his law firm, have been closely connected with him.

68. The boards have, however, always contained men of independent thought and action, representing substantial amounts of stock ownership in the corporation.

69. William W. Cohen, a broker, had been active in the sale of securities in some of the Haskell companies. Haskell had maintained accounts with Cohen's firm in his own name and in the names of some of the companies controlled by him, including Reliable Securities, which was a family-owned corporation used by Haskell in securities dealings and in handling funds of the system companies.

70. In 1924, prior to receivership, Haskell had transferred to Middle States Oil Corporation ownership of Reliable.

71. Cohen had acquired deposit certificates for deposited United Oil Producers Corporation bonds in the amount of $11,000 under the plan, and had received new company securities therefor.

72. In 1935, after Haskell's death, Cohen presented $32,200 additional amount of United Oil Producers Corporation bonds on which the distributive values fixed by the Court were paid to him.

73. After Cohen's death in 1943, his executors, of whom Sophie Cohen and Meyer Kraushaar survive, attempted to learn the value of small amounts of stock in some of the Haskell companies found in Cohen's deposit boxes.

74. Because of Cohen's former Haskell connections or out of plain cussedness, Glass revealed little or nothing.

75. Thereafter, scenting the possibility of fraud, Kraushaar undertook to force accounting and disclosure causing Glass to file so-called final accountings and to bring on the United Oil Producers Corporation accounting for hearing on the accounting and application for discharge of the receivers.

76. Against objections by Kraushaar, the Court granted approval of the accounting and discharge.

77. The Court of Appeals reversed and remanded for hearing on the objections. Phelan v. Middle States Oil Corporation, 2 Cir., 1946, 154 F.2d 978.

78. Amended and supplemental objections were filed and extended hearings had.

79. The difficulties of comprehending the complexities of a highly involved sit-

uation have been multiplied by the charges and handling of the evidence on the objectants' part, and by the receivers' reluctance to provide access to the records of the companies involved beyond United Oil Producers Corporation itself until required to do so.

80. The receiver Tumulty has been physically incapacitated since 1941 and is not charged with any affirmative action in violation of his trust.

81. It is highly probable that appointment of thirty-eight separate receivers and litigation to the death on each major claim between them would have quickly consumed the estates of all.

82. So also delay in reorganization would have run the costs up so that the chance of any organization surviving would have disappeared.

83. A struggle of the new company followed in its early years to survive and to justify any dividends. Since 1940, however, the company has prospered.

84. Glass' firm, in lieu of separate fixing of fees for its services to the stockholders' committee in the early stages of the receivership prior to its appointment as one of counsel for the receivers, shared in the allowances to Moore, Hall, Swan & Cunningham, having first brought the arrangement to the attention of the Court.

85. One of the tax counsel who acted for the receivership in the tax litigation, in lieu of rental for a portion of the offices of Glass' firm used by him, shared his fee with Glass' firm, Glass having brought the arrangement to the attention of the Court prior to each application for allowance by the tax counsel.

86. In 1928 a controversy between the receivers and minority stockholders of Turman concerning the carrying out of the agreement under which the Turman majority stock was acquired was settled by the transfer to Turman as of December 31, 1927, of oil properties of other subsidiaries, Wichita, Cotton Belt and Eureka, holder of the Turman majority stock.

87. The share-ownership of the companies in receivership on December 31, 1927 was as follows:

## Middle States Oil Corporation and Affiliated Companies
### Corporate Relationship of Companies in Middle States Group as at December 31, 1927
#### (Note A)

| Companies | Owned by Affiliated Companies | % of Ownership | M.S.O. % of Ownership Direct | Total |
|---|---|---|---|---|
| Central States Oil and Gas Company (Note E) | Peters Oil Company | 100 | .... | 100 |
| Chic-Osage Oil and Gas Company (Note F) | Ranger Texas Oil Company | 100 | .... | 95.42 |
| Columbia Petroleum Corporation (Note D) | Southern States Oil Corporation | 94.74 | .... | 62.13 |
| Compania Mexicana Refinadora-Island, S. A. (Note C, D (?)) | Gulf Coast Refining Company | 99.50 | .... | 75.04 |
| Corona Oil Company | | .... | 100 | 100 |
| Cotton Belt Petroleum Company (Note G) | Turman Oil Company | 100 | .... | 82.27 |
| Diamond Pipe Line and Marketing Corporation (Note F) | Imperial Oil Corporation | 50 | 50 | 98.49 |
| Dominion Oil Company | | .... | 96.15 | 96.15 |
| Eureka Producing Company (Note H) | United Oil Producers Corporation | 100 | .... | 97.99 |
| Federal Oil Marketing Corporation (Note C, D (?)) | Gulf States Oil and Refining Corporation | 100 | .... | 75.42 |
| Gulf Coast Refining Company (Note C, D (?)) | Gulf States Oil and Refining Corporation | 100 | .... | 75.42 |
| Gulf States Oil and Refining Corporation (Note C, D (?)) | ( .......... ) | .... | "A" 74.15 ) "B" 100 ) | 75.42 |
| Hobbs Oil Company (Note E) | ( .......... ) | .... | 100 | 100 |
| Imperial Oil Corporation | ( .......... ) | .... | Pfd. 94.87) Com. 97.47 | 96.98 |
| Judson Oil Company (Note D) | Columbia Petroleum Corporation | 100 | .... | 62.13 |
| Leahy Oil Company (Note E) | Dominion Oil Company 50.46%, Peters Oil Company 49.54% | 100 | .... | 98.06 |
| The Louisiana and Northwest Railroad Company | | .... | 99.70 | 99.70 |
| Marr Oil Corporation (Note C, D (?)) | Gulf States Oil and Refining Corporation, Class "A" 100%, Class "B" 35.66% | 39.71 | .... | 29.95 |
| Midsig Corporation (Note D in part) | O. L. D. Operating Company | 51 | .... | 21.74 |
| Miles Oil Corporation (Note D) | Western States Oil Corporation | 100 | .... | 48.09 |
| Number Eleven Oil Corporation (Note D) | Western States Oil Corporation | 100 | .... | 48.09 |
| Number Nine Oil Corporation | | .... | 100 | 100 |
| Number One Oil Company | | .... | 100 | 100 |
| Number Seventy-Seven Oil Company | | .... | 100 | 100 |
| Oil Lease Development Company (Note D in part) | Southern States Oil Corporation | 25.35 | 26 | 42.63 |
| O. L. D. Operating Company (Note D in part) | Oil Lease Development Company | 100 | .... | 42.63 |
| Oliphant Petroleum Company (Note G) | Turman Oil Company | 100 | .... | 82.27 |
| Pawnee-Osage Oil and Gas Company | Ranger Texas Oil Company | 95.54 | .... | 91.16 |
| Peters-Leahy Oil Company (Note E) | Peters Oil Company | 100 | .... | 100 |
| Peters Oil Company (Note E) | | .... | 100 | 100 |
| Plains Petroleum Company, Inc. (Note D) | (Southern States Oil Corporation | 55.05) | .... | 48.81 |
| | (Sure Oil Corporation | 19.34) | .... | |

**Middle States Oil Corporation and Affiliated Companies**

Corporate Relationship of Companies in Middle States Group as at December 31, 1927

(Note A)

| Companies | Owned by Affiliated Companies | % of Ownership | M.S.O. % of Ownership Direct | M.S.O. % of Ownership Total |
|---|---|---|---|---|
| Ranger Texas Oil Company | | | 95.42 | 95.42 |
| Reliable Securities Corporation | | | 100 | 100 |
| Republic Producing Company (Note D) | (Western States Oil Corporation | Pfd. 97.50 | | 46.39 |
| | (Western States Oil Corporation | Com. 82.76 | | 39.80 |
| | Marr Oil Corporation | .34 | | 65.62 |
| | Southern States Oil Corporation | 100 | 65.52 | 65.62 |
| Southern States Oil Corporation (Note D) | | | | |
| Sure Oil Corporation (Note D) | | | | |
| Texas Chief Oil Company | | | 98.71 | 98.71 |
| Turman Oil Company (Note G) | (Eureka Producing Company | 80.99) | | |
| | (Reliable Securities Corporation | 1.08) | 1.83 | 82.27 |
| | Imperial Oil Corporation | 66.67 | 33.33 | 97.99 |
| United Oil Producers Corporation | Southern States Oil Corporation (Note B) | | ... | ... |
| Verland Oil and Gas Company of Delaware (Note B) | Verland Oil and Gas Company of Delaware | | ... | ... |
| Verland Oil and Gas Company of Oklahoma (Note B) | Southern States Oil Corporation (Note D) | 73.29 | ... | 48.09 |
| Western States Oil Corporation (Note D) | | | | |
| Wichita Petroleum Company (Note H) | Imperial Oil Corporation | 100 | ... | 96.98 |

NOTE A:—See notes F and J on Exhibit A.

NOTE B:—Ownership in these Companies sold during year 1927.

NOTE C:—The ownership is undetermined as between Middle States Oil Corporation and other Companies in the above schedule and the percentages here may vary in accordance with ultimate determination. See also note D.

NOTE D:—These Companies are in Southern States group, brought into Middle States group by 7% Serial Note transaction. If this note issue should be held to be invalid, Middle States Oil Corporation would have no further interest in these Companies. Southern States Oil Corporation claims an interest in Companies marked D (?); ownership not finally determined.

Note E:—Part of ownership of these Companies claimed by Texas Chief Oil Company is not determined or set out in percentages as being owned by Texas Chief Oil Company.

NOTE F:—Ownership in these Companies not finally determined.

NOTE G:—Stock ownership in these Companies is actually in Imperial Oil Corporation, but all properties of these Companies were ordered transferred to Turman Oil Company by reason of settlement with Turman minority stockholders.

NOTE H:—Producing properties of these Companies were ordered transferred to Turman Oil Company since December 31, 1927, by reason of settlement with Turman Oil Company minority stockholders.

88. Except in the case of the Turman minority and the Gulf stock held by the Westervelt Committee, individual minority holdings were small and widely scattered.

89. All claims against the operating subsidiaries in the ancillary jurisdictions, in the amount of approximately $1,800,000, were paid off between the date of receivership and the date of the sales in 1929.

90. Outside creditors' claims (other than inter-company) at the time of the sales were relatively minor, amounting to:

| Debtor Company | |
|---|---:|
| Central States Oil and Gas Company | $ 1,583.02 |
| Dominion Oil Company | 9,900.00 |
| Eureka Producing Company | 16,518.44 |
| Federal Oil Marketing Corporation | 11,090.31 |
| Gulf States Oil & Refining Corporation | 17,568.39 |
| Imperial Oil Corporation | 54,180.49 |
| Marr Oil Corporation | 9,017.42 |
| Middle States Oil Corporation | 2,168,457.03* |
| Number Seventy-Seven Oil Company | 653.93 |
| O.L.D. Operating Company | 19,586.99 |
| Plains Petroleum Company, Inc. | 519.34 |
| Ranger Texas Oil Company | 1,583.02 |
| Reliable Securities Corporation | 42,560.00 |
| Republic Producing Company | 528.59 |
| Southern States Oil Corporation | 20,842.43 |
| Sure Oil Corporation | 2,176.36 |
| Turman Oil Company | 20,317.76 |
| United Oil Producers Corporation | 28,310.89 |
| Western States Oil Corporation | 49,030.68 |
| Wichita Petroleum Company | 27,222.39 |

*Of which all but $71,850.12 were subsequently disallowed.

91. The inter-company claims, as fixed by the order of December 14, 1929, were:

Exhibit A

Middle States Oil Corporation
and Affiliated Companies

Intercompany Claims—New York
December 31, 1928
Summary of Exhibit B

| Receivable = Black—Payable = Red (-) | Middle States Oil Corporation |
|---|---:|
| Middle States Oil Corporation, | $ — — |
| Corona Oil Company, | — 25,423.32 |
| Number Nine Oil Corporation, | — — |
| Number One Oil Company, | — — |
| Number Seventy Seven Oil Company, | — — |
| Reliable Securities Corporation, | 67,049.94 |
| Peters Oil Company, | — 145,145.46 |
| Central States Oil and Gas Company, | — 4,697.39 |
| Peters Leahy Oil Company, | — 1,173.36 |
| Dominion Oil Company, | 1,788,786.81 |
| Leahy Oil Company, | — 3,429.92 |
| The Louisiana and North West Railroad Company, | — — |
| Ranger Texas Oil Company, | 531,159.17 |
| Pawnee Osage Oil and Gas Company, | — 225.80 |
| Texas Chief Oil Company, | 2,088,363.16 |
| Hobbs Oil Company, | 66,710.88 |
| Imperial Oil Corporation, | 806,160.82 |
| Wichita Petroleum Company, | 235,108.19 |
| United Oil Producers Corporation, | — 1,371,002.93 |
| Eureka Producing Company, | — 37,125.27 |
| Gulf States Oil and Refining Corporation, | — 55,481.47 |
| Federal Oil Marketing Corporation, | — 61,871.42 |
| Marr Oil Corporation, | — 60,402.84 |
| Oil Lease Development Company, | 65,701.52 |
| O. L. D. Operating Company, | 15,931.38 |
| Southern States Oil Corporation, | — 39,020.76 |
| Judson Oil Company, | — 23,624.98 |
| Plains Petroleum Company, Inc., | 3,424.64 |
| Sure Oil Corporation, | — 76,559.05 |
| Western States Oil Corporation, | 8,371.18 |
| Total Receivable Accounts, | $5,676,767.69 |
| Total Payable Accounts, | — 1,905,183.97 |
| Net, | $3,771,583.72 |

100% Owned Group
Intercompany Claims—New York
December 31, 1928
Summary of Exhibit C

Receivable = Black
Payable  = Red —

| | Corona Oil Company | Number Nine Oil Corporation | Number One Oil Company | Number Seventy-Seven Oil Company | Reliable Securities Corporation | Peters Oil Company | Central States Oil and Gas Company | Peters Leahy Oil Company |
|---|---|---|---|---|---|---|---|---|
| Middle States Oil Corporation, | $25,423.32 | $ — — | $ — — | $ — — | — $ 67,049.94 | $145,145.46 | $ 4,697.39 | $1,173.36 |
| Corona Oil Company, | — | | 37,354.43 | | 1,201.00 | 4,845.82 | — | — |
| Number Nine Oil Corporation, | | | | | 45,508.44 | — | — | — |
| Number One Oil Company, | 37,354.43 | | | | 47,023.62 | 41,571.72 | — 4,421.96 | 3,200.87 |
| Number Seventy Seven Oil Company, | — | | | | 62,052.68 | — | — | — |
| Reliable Securities Corporation, | — 1,201.00 | 45,508.44 | 47,023.62 | 62,052.68 | | 146,607.00 | — | — |
| Peters Oil Company, | — 4,345.82 | | 41,571.72 | | 146,607.00 | — | — | — |
| Central States Oil and Gas Company, | — | | 4,421.96 | | — | — | — | — |
| Peters Leahy Oil Company, | | | 3,200.87 | | — | — | — | — |
| Dominion Oil Company, | — | | 7,261.68 | 208.00 | 195,583.32 | — | — | — |
| Leahy Oil Company, | — | | 796.54 | | — | — | — | — |
| Ranger Texas Oil Company, | — | | 14,969.84 | | 17,294.05 | — | — | — |
| Pawnee Osage Oil and Gas Company, | — | | | | 115.35 | — | — | — |
| Texas Chief Oil Company, | — | | | | 701,422.00 | 53,289.24 | — | — |
| Hobbs Oil Company, | — | — 111,636.50 | | — 12,127.47 | 119,561.69 | — | — | — |
| Imperial Oil Corporation, | — | 4,421.03 | 9,755.60 | — | 1,945,982.08 | — 60,940.66 | — | — |
| Wichita Petroleum Company, | — | 12,787.60 | — | — 24,168.65 | — 2,019,964.24 | — | — | — |
| United Oil Producers Corporation, | — | | — | | — 786,693.50 | — | — | — |
| Eureka Producing Company, | — | 483.97 | — | | — 258,539.18 | — | — | — |
| Gulf States Oil and Refining Corporation, | — | | — | | 109,523.41 | — | — | — |
| Oil Lease Development Company, | — | — 6,250.00 | — | | 30,000.00 | — | — | — |
| O.L.D. Operating Company, | — | | — | | 212,078.22 | — | — | — |
| Southern States Oil Corporation, | — | | 252.87 | | 6,375.80 | — | — | — |
| Plains Petroleum Company, Inc., | — | | 178.97 | | — | — | — | — |
| Sure Oil Corporation, | — | | 880.40 | | — | — | — | — |
| Western States Oil Corporation, | 12,071.95 | | 8,693.36 | | 128,520.13 | — | 8,180.41 | 31.31 |
| Total Receivable Accounts, | $75,449.70 | $ — — | $ 53,434.33 | $62,052.68 | $3,450,665.65 | $349,367.52 | $12,877.80 | $4,405.54 |
| Total Payable Accounts, | — 5,546.82 | — 181,087.54 | — 122,927.53 | — 36,504.12 | — 3,450,429.95 | — 102,512.38 | — 4,421.96 | — |
| Net, | $69,902.88 | —$181,087.54 | —$ 69,493.20 | $25,548.56 | $ 235.70 | $246,855.14 | $ 8,455.84 | $4,405.54 |

**More Than 95% Owned Group**
**Intercompany Claims—New York**
**December 31, 1928**
**Summary of Exhibit D**

Receivable = Black
Payable  = Red —

| | Dominion Oil Company | Leahy Oil Company | Ranger Texas Oil Company | Chickosage Lease | Pawnee Osage Oil and Gas Company | Texas Chief Oil Company | Hobbs Oil Company |
|---|---|---|---|---|---|---|---|
| Middle States Oil Corporation, | —$1,788,786.81 | $ 3,429.92 | —$531,159.17 | $ — | $ 225.80 | —$2,088,363.16 | —$ 66,710.88 |
| Number Nine Oil Corporation, | — | | — | — | — | — | 111,636.50 |
| Number One Oil Company, | — | | 706.54 | — | 14,969.84 | — | — |
| Number Seventy Seven Oil Company, | 208.00 | 7,261.68 | — | — | — | — | 12,127.47 |
| Reliable Securities Corporation, | 195,583.32 | — | 17,294.05 | — | — | 701,422.00 | 119,561.69 |
| Peters Oil Company, | — | — | — | — | 115.35 | 53,269.24 | — |
| Dominion Oil Company, | | 93,548.08 | 2,800.00 | — | — | — | — |
| Leahy Oil Company, | —93,548.08 | | — | — | — | 13.80 | 73,974.73 |
| Ranger Texas Oil Company, | —2,800.00 | — | | —31,200.75 | — | — | 2,731.64 |
| Chickosage Lease, | — | — | 31,200.75 | | — | — | — |
| Texas Chief Oil Company, | —13.80 | — | — | — | — | — | — |
| Hobbs Oil Company, | —73,974.73 | — | 2,731.64 | — | — | — | — |
| Imperial Oil Corporation, | —30,000.00 | — | 408.55 | — | 14.35 | 611,815.70 | 9,629.96 |
| Wichita Petroleum Company, | 70,992.23 | — | 3,695.52 | — | — | — | 355,548.97 |
| Eureka Producing Company, | — | — | — | — | — | — | 91,640.04 |
| Southern States Oil Corporation, | — | — | | — | — | — | 95.00 |
| Western States Oil Corporation, | — | 6,476.13 | — | — | — | — | — |
| Total Receivable Accounts, | $ 145,174.96 | $103,454.13 | $ 35,205.84 | $ — | $15,195.64 | $ 13.80 | $573,684.62 |
| Total Payable Accounts, | —2,110,732.01 | —7,261.68 | —554,880.38 | —31,200.75 | —129.70 | —3,454,870.10 | —269,972.26 |
| Net, | —$1,965,557.05 | $ 96,192.45 | —$519,675.54 | —$31,200.75 | $15,065.94 | —$3,454,856.30 | $303,712.36 |

**Imperial and U. O. P. Bond Group**
Intercompany Claims—New York
December 31, 1928
Summaries of Exhibits E and F

Receivable = Black
Payable    = Red —

| | Imperial Oil Corporation | Wichita Petroleum Company | United Oil Producers Corporation | Eureka Producing Company |
|---|---|---|---|---|
| Middle States Oil Corporation, | —$ 806,160.82 | —$ 235,108.19 | $1,371,002.93 | $ 37,125.27 |
| Number Nine Oil Corporation, | 4,421.03 | 12,787.60 | — — | 483.97 |
| Number One Oil Company, | 9,755.60 | — — | — — | — — |
| Number Seventy Seven Oil Company, | — — | 24,168.65 | — — | — — |
| Reliable Securities Corporation, | —1,945,982.03 | 2,019,964.24 | 786,693.50 | 255,539.18 |
| Peters Oil Company, | 60,940.66 | — — | — — | — — |
| Dominion Oil Company, | 30,000.00 | 70,992.23 | — — | — — |
| Ranger Texas Oil Company, | 408.55 | 3,695.52 | — — | — — |
| Pawnee Osage Oil and Gas Company, | 14.35 | — — | — — | — — |
| Texas Chief Oil Company, | 611,815.70 | — — | — — | — — |
| Hobbs Oil Company, | 9,629.96 | 355,548.97 | — — | 91,640.04 |
| Imperial Oil Corporation, | — — | — — | 2,236,564.06 | 22,704.00 |
| Wichita Petroleum Company, | —2,236,564.06 | — — | — — | 95,241.95 |
| United Oil Producers Corporation, | 22,704.00 | 95,241.95 | — — | — — |
| Eureka Producing Company, | — — | — — | — — | — — |
| Gulf States Oil and Refining Corporation, | 99.16 | 46,627.96 | — — | — — |
| Federal Oil Marketing Corporation, | — — | 98,205.51 | — — | — — |
| Marr Oil Corporation, | 24,262.76 | 26,747.79 | — — | — — |
| Oil Lease Development Company, | 79.88 | 1,014.00 | — — | — — |
| O. L. D. Operating Company, | 8,734.65 | 58,969.06 | — — | — — |
| Southern States Oil Corporation, | 28,897.30 | 95.00 | — — | 95.00 |
| Judson Oil Company, | 1,357.37 | 2,634.57 | — — | — — |
| Plains Petroleum Company, Inc., | 3,038.13 | — — | — — | — — |
| Sure Oil Corporation, | 57,947.01 | 1,404.00 | — — | — — |
| Western States Oil Corporation, | 38,227.50 | — — | — — | — — |
| Total Receivable Accounts, | $ 882,928.60 | $2,313,032.53 | $4,394,260.49 | $296,148.42 |
| Total Payable Accounts, | —5,018,111.92 | 740,172.71 | — | —209,680.99 |
| Net, | —$4,135,183.32 | $1,572,859.82 | $4,394,260.49 | $ 86,467.43 |

**Gulf States and Oil Lease Groups**
Intercompany Claims—New York
December 31, 1928
Summaries of Exhibits G and H

Receivable = Black
Payable = Red

| | Gulf States Oil and Refining Corporation | Federal Oil Marketing Corporation | Marr Oil Corporation | Oil Lease Development Company | O.L.D. Operating Company |
|---|---|---|---|---|---|
| Middle States Oil Corporation, | $ 55,481.47 | $ 61,871.42 | $ 60,402.84 | —$ 65,701.52 | —$ 15,931.38 |
| Number Nine Oil Corporation, | — | — | — | 6,250.00 | — |
| Reliable Securities Corporation, | 109,523.41 | — | — | 30,000.00 | 212,078.22 |
| Imperial Oil Corporation, | 99.16 | — | 24,262.76 | 79.88 | 8,734.65 |
| Wichita Petroleum Company, | 46,627.96 | 98,205.51 | 26,747.79 | 1,014.00 | 58,969.06 |
| Gulf States Oil and Refining Corporation, | — | 3,423.64 | 28,816.82 | 15,000.00 | — |
| Federal Oil Marketing Corporation, | 3,423.64 | — | 21,516.28 | — | — |
| Marr Oil Corporation, | 28,816.82 | 21,516.28 | — | — | 22.76 |
| Oil Lease Development Company, | 15,000.00 | — | — | — | 114,969.18 |
| O.L.D. Operating Company, | — | — | 22.76 | 114,969.18 | — |
| Southern States Oil Corporation, | 30,531.25 | 45,082.06 | 18,178.30 | 303,115.80 | 61,857.63 |
| Plains Petroleum Company, Inc., | 1,084.91 | — | 2,511.39 | — | — |
| Western States Oil Corporation, | — | — | — | 22,500.00 | 9,000.00 |
| Total Receivable Accounts, | $227,766.91 | $ 86,811.34 | $118,501.60 | $332,879.80 | $123,969.18 |
| Total Payable Accounts, | 62,821.71 | 143,287.57 | 63,957.34 | 225,750.58 | 357,593.70 |
| Net, | $164,945.20 | $ 56,476.23 | $ 54,544.26 | $107,129.22 | $233,624.52 |

Receivable = Black
Payable   = Red —

Southern and Western States Groups
Intercompany Claims—New York
December 31, 1928
Summary of Exhibit J

| | Southern States Oil Corporation | Columbia Petroleum Corporation | Judson Oil Company | Plains Petroleum Company, Inc. | Sure Oil Corporation | Western States Oil Corporation |
|---|---|---|---|---|---|---|
| Middle States Oil Corporation, | $ 39,020.76 | $ — | $ 23,624.98 | —$ 3,424.64 | $76,559.05 | —$ 8,371.18 |
| Corona Oil Company, | — | — | — | — | — | 12,671.95 |
| Number One Oil Company, | 252.87 | — | — | 178.97 | 880.40 | 8,693.36 |
| Reliable Securities Corporation, | —6,375.80 | — | — | — | — | —128,520.13 |
| Central States Oil and Gas Company, | — | — | — | — | — | 8,180.41 |
| Peters Leahy Oil Company, | — | — | — | — | — | 31.31 |
| Leahy Oil Company, | — | — | — | — | — | 6,476.13 |
| Hobbs Oil Company, | 95.00 | — | — | — | — | — |
| Imperial Oil Corporation, | 28,897.30 | — | 1,557.37 | —3,038.13 | —57,947.01 | 38,227.50 |
| Wichita Petroleum Company, | 95.00 | — | 2,634.57 | — | 1,404.00 | — |
| Eureka Producing Company, | 95.00 | — | — | — | — | — |
| Gulf States Oil and Refining Corporation, | 30,581.25 | — | — | —1,034.91 | — | — |
| Federal Oil Marketing Corporation, | 45,082.06 | — | — | — | — | — |
| Marr Oil Corporation, | 18,178.30 | — | — | — | — | 2,511.39 |
| Oil Lease Development Company, | —303,115.80 | — | — | — | — | 22,500.00 |
| O.L.D. Operating Company, | 61,857.63 | — | — | — | — | 9,000.00 |
| Southern States Oil Corporation, | — | 207,443.95 | —222,486.38 | —18,578.78 | — | 393,857.49 |
| Columbia Petroleum Corporation, | 207,443.95 | — | —104,478.91 | — | — | — |
| Judson Oil Company, | 222,486.38 | 104,478.91 | — | — | 3,100.39 | — |
| Plains Petroleum Company, Inc., | 18,578.78 | — | — | — | 4.50 | 48,071.07 |
| Sure Oil Corporation, | — | — | —3,100.39 | 4.50 | — | — |
| Western States Oil Corporation, | 393,857.49 | — | — | —48,071.07 | — | — |
| Total Receivable Accounts, | $859,077.82 | $311,922.86 | $ 26,259.55 | $ 4.50 | $81,943.84 | $ 56,764.43 |
| Total Payable Accounts, | —516,935.55 | — | —331,423.05 | —74,326.50 | —57,951.51 | —630,347.49 |
| Net, | $342,142.27 | $311,922.86 | —$305,163.50 | —$74,322.00 | $23,992.33 | —$573,583.06 |

92 As amended by the order of May, 1930, the inter-company claims were as follows:

Exhibit A—Amended
Middle States Oil Corporation
And Affiliated Companies

Intercompany Claims—New York
December 28. 1929
Summary of Exhibit B

Receivable = Black
Payable = Red —

| | Middle States Oil Corporation |
|---|---|
| Corona Oil Company, | —$ 25,423.32 |
| Number One Oil Company, | 2,489.13 |
| Reliable Securities Corporation, | 49,054.08 |
| Peters Oil Company, | — 145,145.46 |
| Central States Oil and Gas Company, | — 4,697.39 |
| Peters Leahy Oil Company, | — 1,173.36 |
| Dominion Oil Company, | 385,056.62 |
| Leahy Oil Company, | — 3,429.92 |
| Pawnee Osage Oil and Gas Company, | — 225.80 |
| Texas Chief Oil Company, | 2,088,363.16 |
| Hobbs Oil Company, | 90,348.39 |
| Imperial Oil Corporation, | 806,457.59 |
| Wichita Petroleum Company, | 231,614.53 |
| United Oil Producers Corporation, | — 1,371,002.93 |
| Eureka Producing Company, | — 37,125.27 |
| Gulf States Oil and Refining Corporation, | — 55,481.47 |
| Federal Oil Marketing Corporation, | — 61,871.42 |
| Marr Oil Corporation, | — 60,402.84 |
| Oil Lease Development Company, | 65,701.52 |
| O.L.D. Operating Company, | 15,931.38 |
| Southern States Oil Corporation, | — 39,020.76 |
| Judson Oil Company, | — 23,624.98 |
| Plains Petroleum Company, Inc., | 3,424.64 |
| Sure Oil Corporation, | — 76,559.05 |
| Western States Oil Corporation, | 8,371.18 |
| Total Receivable Accounts, | $3,746,803.22 |
| Total Payable Accounts, | — 1,905,183.97 |
| Net, | $1,841,619.25 |

**100% Owned Group**
**Intercompany Claims—New York**
**December 28, 1929**

Receivable = Black
Payable = Red —

| | Corona Oil Company | Hobbs Oil Company | Number Nine Oil Corporation | Number One Oil Company | Number Seventy Seven Oil Company | Reliable Securities Corporation | Peters Oil Company | Central States Oil and Gas Company | Peters Leahy Oil Company |
|---|---|---|---|---|---|---|---|---|---|
| Middle States Oil Corporation, | $25,423.32 | —$90,348.39 | $ — | —$2,480.13 | $ — | —$49,054.08 | $145,145.46 | $4,697.39 | $1,173.36 |
| Corona Oil Company, | | | | —37,354.43 | | 1,201.00 | 4,345.82 | | |
| Number Nine Oil Corporation, | | 53,508.24 | | | | | | | |
| Number One Oil Company, | 37,354.43 | | | | | 47,023.62 | —41,571.72 | —4,421.96 | 3,200.87 |
| Number Seventy Seven Oil Company, | | | | | | —5,826.32 | | | |
| Reliable Securities Corporation, | —1,201.00 | —122,545.38 | | —47,023.62 | 5,826.32 | | 146,607.00 | | |
| Peters Oil Company, | —4,345.82 | | | | | —146,607.00 | | | |
| Central States Oil and Gas Company, | | | | 4,421.96 | | | | | |
| Peters Leahy Oil Company, | | | | —3,200.87 | | | | | |
| Dominion Oil Company, | | —13,966.87 | | 7,261.68 | —208.00 | 181,179.90 | | | |
| Leahy Oil Company, | | | | | | 115.35 | | | |
| Pawnee Osage Oil and Gas Company, | | | | 1,683.59 | | | | | |
| Ranger Texas Oil Company, | | | | —14,969.84 | | | | | |
| Pawnee Osage Oil and Gas Company, | | | | | | | | | |
| Texas Chief Oil Company, | | | | | | 701,422.00 | 53,269.24 | | |
| Hobbs Oil Company, | | | —53,508.24 | | | 122,545.38 | | | |
| Imperial Oil Corporation, | | —13,989.21 | | —9,755.60 | | 1,945,982.03 | —60,940.66 | | |
| Wichita Petroleum Company, | | 346,633.09 | | | | —2,019,964.24 | | | |
| United Oil Producers Corporation, | | 91,156.07 | | | | —786,693.50 | | | |
| Eureka Producing Company, | | | | | | —258,539.18 | | | |
| Gulf States Oil and Refining Corporation, | | | | | | —109,523.41 | | | |
| Oil Lease Development Company, | | —6,250.00 | | | | 30,000.00 | | | |
| O. L. D. Operating Company, | | | | | | 212,078.22 | | | |
| Southern States Oil Corporation, | | —95.00 | | —252.87 | | 6,375.80 | | | |
| Plains Petroleum Company, Inc., | | | | 178.97 | | | | | |
| Sure Oil Corporation, | | | | —880.40 | | | | | |
| Western States Oil Corporation, | 12,671.95 | | | —8,693.36 | | 128,520.13 | | 8,180.41 | 31.31 |
| Total Receivable Accounts, | $75,449.70 | $491,297.40 | $ — | $55,117.92 | $5,826.32 | $3,376,448.43 | $349,367.52 | $12,877.80 | $4,405.54 |
| Total Payable Accounts, | —5,546.82 | —247,144.85 | —53,508.24 | —124,611.12 | —208.00 | —3,376,207.73 | —102,512.38 | —4,421.96 | |
| Net, | $69,902.88 | $244,152.55 | —$53,508.24 | —$69,493.20 | $5,618.32 | $235.70 | $246,855.14 | $8,455.84 | $4,405.54 |

**More Than 95% Owned Group**
**Intercompany Claims—New York**
**December 28, 1929**

Receivable = Black
Payable = Red —

| | Dominion Oil Company | Leahy Oil Company | Ranger Texas Oil Company | Chickosage Lease | Pawnee Osage Oil and Gas Company | Texas Chief Oil Company |
|---|---|---|---|---|---|---|
| Middle States Oil Corporation, | —$385,056.62 | $ 3,429.92 | $ — — | $ — — | $ 225.80 | —$2,088,363.16 |
| Number One Oil Company, | | —7,261.68 | —1,683.59 | — | 14,969.84 | |
| Number Seventy Seven Oil Company, | 208.00 | | | | | — |
| Reliable Securities Corporation, | —181,179.90 | | | | —115.35 | 701,422.00 |
| Peters Oil Company, | — | | | | | —53,269.24 |
| Dominion Oil Company, | — | 93,548.08 | | | | |
| Leahy Oil Company, | —93,548.08 | | | | | 13.80 |
| Ranger Texas Oil Company, | | | | —31,200.75 | | |
| Chickosage Lease, | —13.80 | | 31,200.75 | | | |
| Texas Chief Oil Company, | —13,966.87 | | | | | |
| Hobbs Oil Company, | 13,966.87 | | | | | |
| Imperial Oil Corporation, | —30,000.00 | | | | 14.35 | 611,815.70 |
| Wichita Petroleum Company, | 42,750.00 | | | | | |
| Eureka Producing Company, | | | | | | |
| Western States Oil Corporation, | | 6,476.13 | | | | |
| Total Receivable Accounts, | $ 56,924.87 | $103,454.13 | $31,200.75 | $ — — | $15,195.64 | $ 13.80 |
| Total Payable Accounts, | —689,798.40 | —7,261.68 | —1,683.59 | —31,200.75 | —129.70 | —3,454,870.10 |
| Net, | —$632,873.53 | $ 96,192.45 | $29,517.16 | —$31,200.75 | $15,065.94 | —$3,454,856.30 |

**Imperial and U. O. P. Bond Group**
Intercompany Claims—New York
December 28, 1929

Receivable = Black
Payable = Red (—)

| | Imperial Oil Corporation | Wichita Petroleum Company | United Oil Producers Corporation | Eureka Producing Company |
|---|---|---|---|---|
| Middle States Oil Corporation, | —$ 806,457.59 | —$ 231,614.53 | $1,371,002.93 | $ 37,125.27 |
| Number One Oil Company, | 9,755.60 | — | — | — |
| Reliable Securities Corporation, | —1,945,982.03 | 2,019,964.24 | 786,693.50 | 258,539.18 |
| Peters Oil Company, | 60,940.66 | — | — | — |
| Dominion Oil Company, | 30,000.00 | 42,750.00 | — | — |
| Pawnee Osage Oil and Gas Company, | 14.35 | — | — | — |
| Texas Chief Oil Company, | 611,815.70 | — | — | — |
| Hobbs Oil Company, | 13,989.21 | — 346,633.09 | — | — 91,156.07 |
| Imperial Oil Corporation, | — | — | 2,236,564.06 | — |
| Wichita Petroleum Company, | — | — | — | 22,704.00 |
| United Oil Producers Corporation, | —2,236,564.06 | 95,241.95 | — | — 95,241.95 |
| Eureka Producing Company, | 22,704.00 | — | — | — |
| Gulf States Oil and Refining Corporation, | — | 46,627.96 | — | — |
| Federal Oil Marketing Corporation, | — | 98,205.51 | — | — |
| Marr Oil Corporation, | 24,163.60 | 26,747.79 | — | — |
| Oil Lease Development Company, | 79.88 | 1,014.00 | — | — |
| O. L. D. Operating Company, | 8,734.65 | 58,969.06 | — | — |
| Southern States Oil Corporation, | — | 95.00 | — | 95.00 |
| Judson Oil Company, | 1,357.37 | 2,634.57 | — | — |
| Plains Petroleum Company, Inc., | 3,038.13 | — | — | — |
| Sure Oil Corporation, | 29,049.71 | 1,404.00 | — | — |
| Western States Oil Corporation, | 38,227.50 | — | — | — |
| Total Receivable Accounts, | $ 853,820.36 | $2,272,380.76 | $4,394,260.49 | $295,664.45 |
| Total Payable Accounts, | —4,989,003.68 | — 699,520.94 | — | 209,197.02 |
| Net, | —$4,135,183.32 | $1,572,859.82 | $4,394,260.49 | $ 86,467.43 |

Reeeivable = Black
Payable = Red —

**Gulf States and Oil Lease Groups**
**Intercompany Claims—New York**
**December 28, 1929**

| | Gulf States Oil and Refining Corporation | Federal Oil Marketing Corporation | Marr Oil Corporation | Oil Lease Development Company | O.L.D. Operating Company |
|---|---|---|---|---|---|
| Middle States Oil Corporation, | $ 55,481.47 | $ 61,871.42 | $ 60,402.84 | —$ 65,701.52 | —$ 15,931.38 |
| Reliable Securities Corporation, | 109,523.41 | — — | — — | — 30,000.00 | — 212,078.22 |
| Hobbs Oil Company, | — — | — — | — — | 6,250.00 | — — |
| Imperial Oil Corporation, | — — | — — | 24,163.60 | 79.88 | 8,734.65 |
| Wichita Petroleum Company, | 46,627.96 | 98,205.51 | 26,747.79 | 1,014.00 | 58,960.06 |
| Gulf States Oil and Refining Corporation, | | 3,423.64 | 28,717.66 | —15,000.00 | — — |
| Federal Oil Marketing Corporation, | — 3,423.64 | — — | 21,516.28 | — — | — — |
| Marr Oil Corporation, | — 28,717.66 | 21,516.28 | — — | — — | 22.76 |
| Oil Lease Development Company, | 15,000.00 | — — | 22.76 | — — | 114,969.18 |
| O.L.D. Operating Company, | — — | — — | 22.76 | —114,969.18 | — — |
| Southern States Oil Corporation, | — 30,531.25 | 45,082.06 | 18,178.30 | 303,115.80 | 61,857.63 |
| Plains Petroleum Company, Inc., | 1,034.91 | — — | — — | — — | — — |
| Western States Oil Corporation, | — — | — — | 2,511.39 | 22,500.00 | 9,000.00 |
| Total Receivable Accounts, | $227,667.75 | $ 86,811.34 | $118,402.44 | $332,879.80 | $128,969.18 |
| Total Payable Accounts, | 62,722.55 | — 143,287.57 | — 63,858.18 | — 225,750.58 | — 357,593.70 |
| Net, | $164,945.20 | —$ 56,476.23 | $ 54,544.26 | $107,129.22 | —$233,624.52 |

Southern and Western States Groups
Intercompany Claims—New York
December 28, 1929

Receivable = Black
Payable = Red —

| | Southern States Oil Corporation | Columbia Petroleum Corporation | Judson Oil Company | Plains Petroleum Company, Inc. | Sure Oil Corporation | Western States Oil Corporation |
|---|---|---|---|---|---|---|
| Middle States Oil Corporation, | $ 39,020.76 | — | $ 23,624.98 | —$ 3,424.64 | $76,559.05 | —$ 8,371.18 |
| Number Nine Oil Corporation, | | — | — | — | — | — 12,671.95 |
| Number One Oil Company, | 252.87 | — | — | 178.97 | 880.40 | 8,693.36 |
| Reliable Securities Corporation, | — 6,375.80 | — | — | — | — | — 128,520.13 |
| Central States Oil and Gas Company, | — | — | — | — | — | — 8,180.41 |
| Peters Leahy Oil Company, | — | — | — | — | — | — 31.31 |
| Leahy Oil Company, | — | — | — | — | — | — 6,476.13 |
| Hobbs Oil Company, | 95.00 | — | — | — | — | — |
| Imperial Oil Corporation, | — | — | 1,337.37 | — 3,088.13 | — 29,049.71 | 38,227.50 |
| Wichita Petroleum Company, | 95.00 | — | 2,634.57 | — | 1,404.00 | — |
| Eureka Producing Company, | 95.00 | — | — | — | — | — |
| Gulf States Oil and Refining Corporation, | 30,581.25 | — | — | 1,034.91 | — | — |
| Federal Oil Marketing Corporation, | 45,082.06 | — | — | — .5 | — | — |
| Marr Oil Corporation, | 18,178.30 | — | — | — | — | — 2,511.39 |
| Oil Lease Development Company, | — 303,115.80 | — | — | — | — | — 22,500.00 |
| O.I.D. Operating Company, | — 61,857.63 | — | — | — | — | — 9,000.00 |
| Southern States Oil Corporation, | — | 207,443.95 | — 222,486.38 | — 18,578.78 | — 28,897.30 | — 399,857.49 |
| Columbia Petroleum Corporation, | 207,443.95 | — | — 104,478.91 | — | — | — |
| Judson Oil Company, | 222,486.38 | 104,478.91 | — | — | — | — |
| Plains Petroleum Company, Inc., | 18,578.78 | — | — | — | 3,100.39 | 48,071.07 |
| Sure Oil Corporation, | 28,897.30 | — | 3,100.39 | 4.50 | 4.50 | — |
| Western States Oil Corporation, | 399,857.49 | — | — | 48,071.07 | — | — |
| Total Receivable Accounts, | $859,077.82 | $311,922.86 | $ 26,259.55 | $ 4.50 | $81,943.84 | $ 56,764.43 |
| Total Payable Accounts, | — 516,935.55 | — | — 331,423.05 | — 74,326.50 | — 57,951.51 | — 630,347.49 |
| Net, | $342,142.27 | $311,922.86 | —$305,163.50 | —$74,322.00 | $23,992.33 | —$573,583.06 |

### Dominion Oil Company

#### Intercompany Claims

| | As Filed Originally | Adjustment | Amended |
|---|---|---|---|
| Middle States Oil Corporation, | —$1,788,786.81 | $1,403,730.19 | —$385,056.62 |
| Number Seventy Seven Oil Company, | 208.00 | – – | 208.00 |
| Reliable Securities Corporation, | — 195,583.32 | 14,403.42 | — 181,179.90 |
| Leahy Oil Company, | — 93,548.08 | – – | — 93,548.08 |
| Ranger Texas Oil Company, | — 2,800.00 | 2,800.00 | – – |
| Texas Chief Oil Company, | — 13.80 | – – | 13.80 |
| Hobbs Oil Company, | 73,974.73 | 60,007.86 | 13,966.87 |
| Imperial Oil Corporation, | — 30,000.00 | – – | — 30,000.00 |
| Wichita Petroleum Company, | 70,992.23 | 28,242.23 | 42,750.00 |
| Total Receivable Claims, | $ 145,174.96 | $1,420,933.61 | $ 56,924.87 |
| Total Payable Claims, | — 2,110,732.01 | 88,250.09 | — 689,798.40 |
| **Net,** | —$1,965,557.05 | $1,332,683.52 | —$632,873.53 |

### Eureka Producing Company

#### Intercompany Claims

| | As Filed Originally | Adjustment | Amended |
|---|---|---|---|
| Middle States Oil Corporation, | $ 37,125.27 | $ – – | $ 37,125.27 |
| Number Nine Oil Corporation, | 483.97 | — 483.97 | – – |
| Reliable Securities Corporation, | 258,539.18 | – – | 258,539.18 |
| Hobbs Oil Company, | — 91,640.04 | 483.97 | — 91,156.07 |
| Imperial Oil Corporation, | — 22,704.00 | – – | — 22,704.00 |
| Wichita Petroleum Company, | — 95,241.95 | – – | — 95,241.95 |
| Southern States Oil Corporation, | 95.00 | – – | — 95.00 |
| Total Receivable Claims, | $296,148.42 | | $295,664.45 |
| Total Payable Claims, | — 209,680.99 | | — 209,197.02 |
| **Net,** | $ 86,467.43 | | $ 86,467.43 |

### Gulf States Oil and Refining Corporation

#### Intercompany Claims

| | As Filed Originally | Adjustment | Amended |
|---|---|---|---|
| Middle States Oil Corporation, | $ 55,481.47 | $ – – | $ 55,481.47 |
| Reliable Securities Corporation, | 109,523.41 | – – | 109,523.41 |
| Imperial Oil Corporation, ' | 99.16 | — 99.16 | – – |
| Wichita Petroleum Company, | 46,627.96 | – – | 46,627.96 |
| Federal Oil Marketing Corporation, | — 3,423.64 | – – | — 3,423.64 |
| Marr Oil Corporation, | — 28,816.82 | 99.16 | — 28,717.66 |
| Oil Lease Development Company, | 15,000.00 | – – | 15,000.00 |
| Southern States Oil Corporation, | — 30,581.25 | – – | — 30,581.25 |
| Plains Petroleum Company, Inc., | 1,034.91 | – – | 1,034.91 |
| Total Receivable Claims, | $227,766.91 | | $227,667.75 |
| Total Payable Claims, | — 62,821.71 | | — 62,722.55 |
| **Net,** | $164,945.20 | | $164,945.20 |

## Hobbs Oil Company

### Intercompany Claims

|  | As Filed Originally | Adjustment | Amended |
|---|---|---|---|
|  | $ | $ 92.68 } | $ |
| Middle States Oil Corporation, | — 66,710.88 | — 23,730.19 } | — 90,348.39 |
| Number Nine Oil Corporation, | 111,636.50 | — 58,128.26 | 53,508.24 |
| Number Seventy Seven Oil Company, | 12,127.47 | — 12,127.47 | — — |
| Reliable Securities Corporation, | — 119,561.69 | — 2,983.69 | — 122,545.38 |
| Dominion Oil Company, | — 73,974.73 | 60,007.86 | — 13,966.87 |
| Ranger Texas Oil Company, | 2,731.64 | — 2,731.64 | — — |
| Imperial Oil Corporation, | — 9,629.96 | — 4,309.25 | — 13,939.21 |
| Wichita Petroleum Company, | 355,548.97 | — 8,915.88 | 346,633.09 |
| Eureka Producing Company, | 91,640.04 | — 483.97 | 91,156.07 |
| Oil Lease Development Company, | — — | — 6,250.00 | — 6,250.00 |
| Southern States Oil Corporation, | — 95.00 | — — | — 95.00 |
| Total Receivable Claims, | $573,684.62 | $ 60,100.54 | $491,297.40 |
| Total Payable Claims, | — 269,972.26 | — 119,660.35 | — 247,144.85 |
| Net, | $303,712.36 | —$ 59,559.81 | $244,152.55 |

## Imperial Oil Corporation

### Intercompany Claims

|  | As Filed Originally | Adjustment | Amended |
|---|---|---|---|
| Middle States Oil Corporation, | —$ 806,160.82 | —$ 296.77M | —$ 806,457.59 |
| Number Nine Oil Corporation, | 4,421.03 | — 4,421.03H | — — |
| Number One Oil Company, | 9,755.60 | — — | 9,755.60 |
| Reliable Securities Corporation, | — 1,945.982.03 | — — | — 1,945,982.03 |
| Peters Oil Company, | 60,940.66 | — — | 60,940.66 |
| Dominion Oil Company, | 30,000.00 | — — | 30,000.00 |
| Ranger Texas Oil Company, | — 408.55 | { 296.77M { 111.78H | — — |
| Pawnee Osage Oil and Gas Company, | 14.35 | — — | 14.35 |
| Texas Chief Oil Company, | 611,815.70 | — — | 611,815.70 |
| Hobbs Oil Company, | 9,629.96 | 4,309.25H | 13,939.21 |
| United Oil Producers Corporation, | — 2,236,564.06 | — — | — 2,236,564.06 |
| Eureka Producing Company, | 22,704.00 | — — | 22,704.00 |
| Gulf States Oil and Refining Corporation, | — 99.16 | 99.16 | — — |
| Marr Oil Corporation, | 24,262.76 | — 99.16 | 24,163.60 |
| Oil Lease Development Company, | 79.88 | — — | 79.88 |
| O.L.D. Operating Company, | 8,734.65 | — — | 8,734.65 |
| Southern States Oil Corporation, | — 28,897.30 | 28,897.30 | — — |
| Judson Oil Company, | 1,357.37 | — — | 1,357.37 |
| Plains Petroleum Company, Inc., | 3,038.13 | — — | 3,038.13 |
| Sure Oil Corporation, | 57,947.01 | — 28,897.30 | 29,049.71 |
| Western States Oil Corporation, | 38,227.50 | — — | 38,227.50 |
| Total Receivable Claims, | $ 882,928.60 |  | $ 853,820.36 |
| Total Payable Claims, | — 5,018,111.92 |  | — 4,989,003.68 |
| Net, | —$4,135,183.32 |  | $4,135,183.32 |

## Marr Oil Corporation

### Intercompany Claims

| | As Filed Originally | Adjustment | Amended |
|---|---|---|---|
| Middle States Oil Corporation, | $ 60,402.84 | $ – – | $ 60,402.84 |
| Imperial Oil Corporation, | (1)— 24,262.76 | 99.16 | — 24,163.60 |
| Wichita Petroleum Company, | 26,747.79 | – – | 26,747.79 |
| Gulf States Oil and Refining Corporation, | 28,816.82 | — 99.16 | 28,717.66 |
| Federal Oil Marketing Corporation, | — 21,516.28 | – – | — 21,516.28 |
| O.L.D. Operating Company, | 22.76 | – – | 22.76 |
| Southern States Oil Corporation, | — 18,178.30 | – – | — 18,178.30 |
| Western States Oil Corporation, | 2,511.39 | – – | 2,511.39 |
| Total Receivable Claims, | $118,501.60 | $ 99.16 | $118,402.44 |
| Total Payable Claims, | — 63,957.34 | — 99.16 | — 63,858.18 |
| Net, | $ 54,544.26 | $ – – | $ 54,544.26 |

(1) Claim of $24,262.76 not to be paid until $99.16 has been liquidated by Imperial Oil Corporation to Gulf States Oil and Refining Corporation.

## Middle States Oil Corporation

### Intercompany Claims

| | As Filed Originally | Adjustment | Amended |
|---|---|---|---|
| Corona Oil Company, | —$ 25,423.32 | $ – – | —$ 25,423.32 |
| Number One Oil Company, | – – | 2,480.13 | 2,480.13 |
| Reliable Securities Corporation, | 67,049.94 | — 17,995.86 | 49,054.08 |
| Peters Oil Company, | — 145,145.46 | – – | — 145,145.46 |
| Central States Oil and Gas Company, | — 4,697.39 | – – | — 4,697.39 |
| Peters Leahy Oil Company, | — 1,173.36 | – – | — 1,173.36 |
| Dominion Oil Company, | 1,788,786.81 | — 1,403,730.19 | 385,056.62 |
| Leahy Oil Company, | — 3,429.92 | – – | — 3,429.92 |
| Ranger Texas Oil Company, | 531,159.17 | — 531,159.17 | – – |
| Pawnee Osage Oil and Gas Company, | — 225.80 | – – | — 225.80 |
| Texas Chief Oil Company, | 2,088,363.16 | – – | 2,088,363.16 |
| Hobbs Oil Company, | 66,710.88 | { 23,730.19 / — 92 68 | 90,348.39 |
| Imperial Oil Corporation, | 806,160.82 | 296.77 | 806,457.59 |
| Wichita Petroleum Company, | 235,108 19 | — 3,493.66 | 231,614.53 |
| United Oil Producers Corporation, | — 1,371,002.93 | – – | — 1,371,002.93 |
| Eureka Producing Company, | — 37,125.27 | – – | — 37,125.27 |
| Gulf States Oil and Refining Corporation, | — 55,481.47 | – – | — 55,481.47 |
| Federal Oil Marketing Corporation, | — 61,871.42 | – – | — 61,871.42 |
| Marr Oil Corporation, | — 60,402.84 | – – | — 60,402.84 |
| Oil Lease Development Company, | 65.701.52 | – – | 65,701.52 |
| O.L.D. Operating Company, | 15,931.38 | – – | 15,931.38 |
| Southern States Oil Corporation, | — 39,020.76 | – – | — 39,020.76 |
| Judson Oil Company, | — 23,624.98 | – – | 23,624 98 |
| Plains Petroleum Company, Inc., | 3,424.64 | – – | 3,424.64 |
| Sure Oil Corporation, | — 76,559.05 | – – | — 76,559.05 |
| Western States Oil Corporation, | 8,371.18 | – – | 8,371.18 |
| Total Receivable Claims, | $5,676,767.69 | $ 26,507.09 | $3,746,803.22 |
| Total Payable Claims, | — 1,905,183.97 | — 1,956,471.56 | — 1,905,183.97 |
| Net, | $3,771,583.72 | —1,929,964.47 | $1,841,619.25 |

## Number Nine Oil Corporation

### Intercompany Claims

|  | As Filed Originally | Adjustment | Amended |
|---|---|---|---|
| Reliable Securities Corporation, | —$ 45,508.44 | $ 45,508.44 | $  —  — |
| Hobbs Oil Company, | — 111,636.50 | 53,128.26 | — 53,508.24 |
| Imperial Oil Corporation, | —  4,421.03 | 4,421.03 | —  — |
| Wichita Petroleum Company, | — 12,787.60 | 12,787.60 | —  — |
| Eureka Producing Company, | —  483.97 | 483.97 | —  — |
| Oil Lease Development Company, | —  6,250.00 | 6,250.00 | —  — |
| Total Payable Claims, | $181,087.54 | $127,579.30 | —$53,508.24 |

## Number Seventy Seven Oil Company

### Intercompany Claims

|  | As Filed Originally | Adjustment | Amended |
|---|---|---|---|
| Reliable Securities Corporation, | $62,052.68 | —$56,226.36 | $5,826.32 |
| Dominion Oil Company, | —  208.00 | —  — | —  208.00 |
| Hobbs Oil Company, | — 12,127.47 | 12,127.47 | —  — |
| Wichita Petroleum Company, | — 24.168.65 | 24,168.65 | —  — |
| Total Receivable Claims, | $62,052.68 | $36.206.12 | $5,826.32 |
| Total Payable Claims, | — 36,504.12 | — 56,226.36 | —  208.00 |
| Net, | $25,548.56 | —$19,930.24 | $5,618.32 |

## Number One Oil Company

### Intercompany Claims

|  | As Filed Originally | Adjustment | Amended |
|---|---|---|---|
| Middle States Oil Corporation, | $  —  — | —$2,480.13 | —$  2,480.13 |
| Corona Oil Company, | — 37,354.43 | —  — | — 37,354.43 |
| Reliable Securities Corporation, | — 47,023.62 | —  — | — 47,023.62 |
| Peters Oil Company, | 41,571.72 | —  — | 41,571.72 |
| Central States Oil and Gas Company, | 4,421.96 | —  — | 4,421.96 |
| Peters Leahy Oil Company, | — 3,200.87 | —  — | — 3,200.87 |
| Leahy Oil Company, | 7,261.68 | —  — | 7,261.68 |
| Ranger Texas Oil Company, | —  796.54 | 2,480.13 | 1,683.59 |
| Pawnee Osage Oil and Gas Company, | — 14,969.84 | —  — | — 14,969.84 |
| Imperial Oil Corporation, | — 9,755.60 | —  — | — 9,755.60 |
| Southern States Oil Corporation, | —  252.87 | —  — | —  252.87 |
| Plains Petroleum Company, Inc., | 178.97 | —  — | 178.97 |
| Sure Oil Corporation, | 880.40 | —  — | 880.40 |
| Western States Oil Corporation, | — 8,693.36 | —  — | — 8,693.36 |
| Total Receivable Claims, | $ 53,434.33 |  | $ 55,117.92 |
| Total Payable Claims, | — 122,927.53 |  | — 124,611.12 |
| Net, | —$ 69,493.20 |  | —$ 69,493.20 |

## Oil Lease Development Company

### Intercompany Claims

| | As Filed Originally | Adjustment | Amended |
|---|---|---|---|
| Middle States Oil Corporation, | —$ 65,701.52 | $ — — | —$ 65,701.52 |
| Number Nine Oil Corporation, | 6,250.00 | — 6,250.00 | — — |
| Reliable Securities Corporation, | — 30,000.00 | — — | — 30,000.00 |
| Hobbs Oil Company, | — — | 6,250.00 | 6,250.00 |
| Imperial Oil Corporation, | — 79.88 | — — | — 79.88 |
| Wichita Petroleum Company, | 1,014.00 | — — | 1,014.00 |
| Gulf States Oil and Refining Corporation, | — 15,000.00 | — — | — 15,000.00 |
| O.L.D. Operating Company, | — 114,969.18 | — — | — 114,969.18 |
| Southern States Oil Corporation, | 303,115.80 | — — | 303,115.80 |
| Western States Oil Corporation, | 22,500.00 | — — | 22,500.00 |
| Total Receivable Claims, | $332,879.80 | | $332,879.80 |
| Total Payable Claims, | — 225,750.58 | | — 225,750.58 |
| Net, | $107,129.22 | | $107,129.22 |

## Ranger Texas Oil Company,

### Intercompany Claims

| | As Filed Originally | Adjustment | Amended |
|---|---|---|---|
| Middle States Oil Corporation, | —$531,159.17 | $531,159.17M | $ — — |
| Number One Oil Company, | 796.54 | — 2,480.13M | — 1,683.59 |
| Reliable Securities Corporation, | — 17,294.05 | { — 701.81H / 17,995.86M | — — |
| Dominion Oil Company, | 2,800.00 | — 2,800.00M | — — |
| Chickosage Lease, | 31,200.75 | — — | 31,200.75 |
| Hobbs Oil Company, | — 2,731.64 | 2,731.64H | — — |
| Imperial Oil Corporation, | 408.55 | { — 296.77M / — 111.78H | — — |
| Wichita Petroleum Company, | — 3,695.52 | M 3,493.66 } / H 201.86 } | — — |
| Total Receivable Claims, | $ 35,205.84 | $555,582.19 | $31,200.75 |
| Total Payable Claims, | — 554,880.38 | — 6,390.49 | — 1,683.59 |
| Net, | —$519,674.54 | $549,191.70 | $29,517.16 |

## Reliable Securities Corporation

### Intercompany Claims

| | As Filed Originally | Adjustment | Amended |
|---|---|---|---|
| Middle States Oil Corporation, | —$ 67,049.94 | $17,995.86M | —$ 49,054.08 |
| Corona Oil Company, | 1,201.00 | — — | 1,201.00 |
| Number Nine Oil Corporation, | 45,508.44 | — 45,508.44H | — — |
| Number One Oil Company, | 47,023.62 | — — | 47,023.62 |
| Number Seventy Seven Oil Company, | — 62,052.68 | 56,226.36H | — 5,826.32 |
| Peters Oil Company, | — 146,607.00 | — — | — 146,607.00 |
| Dominion Oil Company, | — 195,583.32 | — 14,403.42H | 181,179.90 |
| Ranger Texas Oil Company, | 17,294.05 | 701.81H } — 17,995.86M } | — — |
| Pawnee Osage Oil and Gas Company, | 115.35 | — — | 115.35 |
| Texas Chief Oil Company, | 701,422.00 | — — | 701,422.00 |
| Hobbs Oil Company, | 119,561.69 | 2,983.69H | 122,545.38 |
| Imperial Oil Corporation, | 1,945,982.03 | — — | 1,945,982.03 |
| Wichita Petroleum Company, | — 2,019,964.24 | — — | — 2,019,964.24 |
| United Oil Producers Corporation, | — 786,693.50 | — — | — 786,693.50 |
| Eureka Producing Company, | — 258,539.18 | — — | — 258,539.18 |
| Gulf States Oil and Refining Corporation, | — 109,523.41 | — — | — 109,523.41 |
| Oil Lease Development Company, | 30,000.00 | — — | 30,000.00 |
| O. L. D. Operating Company, | 212,078.22 | — — | 212,078.22 |
| Southern States Oil Corporation, | 6,375.80 | — — | 6,375.80 |
| Western States Oil Corporation, | 128,520.13 | — — | 128,520.13 |
| Total Receivable Claims, | $3,450,665.65 | | $3,376,443.43 |
| Total Payable Claims, | — 3,450,429.95 | | — 3,376,207.73 |
| Net, | $ 235.70 | | $ 235.70 |

## Southern States Oil Corporation

### Intercompany Claims

| | As Filed Originally | Adjustments | Amended |
|---|---|---|---|
| Middle States Oil Corporation, | $ 39,020.76 | $ — — | $ 39,020.76 |
| Number One Oil Company, | 252.87 | — — | 252.87 |
| Reliable Securities Corporation, | — 6,375.80 | — — | — 6,375.80 |
| Hobbs Oil Company, | 95.00 | — — | 95.00 |
| Imperial Oil Corporation, | 28,897.30 | — 28,897.30 | — — |
| Wichita Petroleum Company, | 95.00 | — — | 95.00 |
| Eureka Producing Company, | 95.00 | — — | 95.00 |
| Gulf States Oil and Refining Corporation, | 30,581.25 | — — | 30,581.25 |
| Federal Oil Marketing Corporation, | 45,082.06 | — — | 45,082.06 |
| Marr Oil Corporation, | 18,178.30 | — — | 18,178.30 |
| Oil Lease Development Company, | — 303,115.80 | — — | — 303,115.80 |
| O. L. D. Operating Company, | 61,857.63 | — — | 61,857.63 |
| Columbia Petroleum Corporation, | — 207,443.95 | — — | — 207,443.95 |
| Judson Oil Company, | 222,486.38 | — — | 222,486.38 |
| Plains Petroleum Company, Inc., | 18,578.78 | — — | 18,578.78 |
| Sure Oil Corporation, | — — | 28,897.30 | 28,897.30 |
| Western States Oil Corporation, | 393,857.49 | — — | 393,857.49 |
| Total Receivable Claims, | $859,077.82 | | $859,077.82 |
| Total Payable Claims, | — 516,935.55 | | — 516,935.55 |
| Net, | $342,142.27 | | $342,142.27 |

### Sure Oil Corporation

#### Intercompany Claims

| | As Filed Originally | Adjustment | Amended |
|---|---|---|---|
| Middle States Oil Corporation, | $76,559.05 | $ – – | $76,559.05 |
| Number One Oil Company, | 880.40 | – – | 880.40 |
| Imperial Oil Corporation, | (1)— 57,947.01 | 28,897.30 | — 29,049.71 |
| Wichita Petroleum Company, | 1,404.00 | – – | 1,404.00 |
| Southern States Oil Corporation, | – – | — 28,897.30 | — 28,897.30 |
| Judson Oil Company, | 3,100.39 | – – | 3,100.39 |
| Plains Petroleum Company, Inc., | — 4.50 | – – | 4.50 |
| Total Receivable Claims, | $81,943.84 | | $81,943.84 |
| Total Payable Claims, | — 57,951.51 | | — 57,951.51 |
| Net, | $23,992.33 | | $23,992.33 |

(1) Claim of $57,947.01 not to be paid until $28,897.30 has been liquidated to Southern States Oil Corporation by Imperial Oil Corporation.

### Wichita Petroleum Company

#### Intercompany Claims

| | As Filed Originally | Adjustment | Amended |
|---|---|---|---|
| Middle States Oil Corporation, | —$ 235,108.19 | $ 3,493.66M | —$ 231,614.53 |
| Number Nine Oil Corporation, | 12,787.60 | — 12,787.60H | – – |
| Number Seventy Seven Oil Company, | 24,168.65 | — 24,168.65H | – – |
| Reliable Securities Corporation, | 2,019,964.24 | – – | 2,019,964.24 |
| Dominion Oil Company, | — 70,992.23 | 28,242.23H | — 42,750.00 |
| Ranger Texas Oil Company, | 3,695.52 | { — 3,493.66M { — 201.86H | – – |
| Hobbs Oil Company, | — 355,548.97 | 8,915.88H | — 346,633.09 |
| Eureka Producing Company, | 95,241.95 | – – | 95,241.95 |
| Gulf States Oil and Refining Corporation, | — 46,627.96 | – – | — 46,627.96 |
| Federal Oil Marketing Corporation, | 98,205.51 | – – | 98,205.51 |
| Marr Oil Corporation, | — 26,747.79 | – – | — 26,747.79 |
| Oil Lease Development Company, | — 1,014.00 | – – | 1,014.00 |
| O. L. D. Operating Company, | 58,969.06 | – – | 58,969.06 |
| Southern States Oil Corporation, | — 95.00 | – – | — 95.00 |
| Judson Oil Company, | — 2,634.57 | – – | — 2,634.57 |
| Sure Oil Corporation, | — 1,404.00 | – – | — 1,404.00 |
| Total Receivable Claims, | $2,313,032.53 | | $2,272,380.76 |
| Total Payable Claims, | — 740,172.71 | | — 699,520.94 |
| Net, | $1,572,859.82 | | $1,572,859.82 |

93. Still in litigation before the Special Master at the time of the sales were claims of the Haskells, Unity, Cannon, Saklatvala, the Gulf Coast claims on the bond guarantees against Middle States Oil Corporation and Southern States Oil Corporation, the Westervelt Committee fraud claim.

94. The Saklatvala claims were withdrawn, the Cannon, Haskell and Unity claims denied.

95. The Gulf Coast claims grew out of the so-called Westervelt agreement of September 25, 1923, between Southern States, Middle States and one Westervelt, representing a committee of bondholders of Island Refining Corporation then in receivership, under which agreement Gulf States and Gulf Coast had been formed.

96. Island Oil and Transport Corporation had contracted to furnish certain annual quantities of oil to its subsidiary, Island Refining Corporation, operator of a refinery built in 1920 at Good Hope, Louisiana. Island Refining Corporation had mortgaged the refinery to secure its bonds in the amount of $5,500,000. Also included under the lien of the mortgage were the contract with Island Oil

and Transport Corporation and the stock of two other refining companies, one in Cuba and one in Mexico.

97. Island Oil and Transport Corporation defaulted on its contract and went into receivership. Island Refining Corporation later went into receivership.

98. The Westervelt Committee of Bondholders, in June, 1923, foreclosed on the Island Refining Corporation mortgage and bid in for $400,000 the refinery and other mortgaged assets, ostensibly including the $12,000,000 contract claim against Island Oil and Transport Corporation.

99. The refinery, in 1923, was appraised at a going-concern value of slightly over $2,000,000.

100. On September 25, 1923 the Westervelt Committee entered into a contract with Middle States Oil Corporation and Southern States Oil Corporation under which two companies were to be formed, an operating oil company and a refining company.

101. The Westervelt Committee agreed to transfer to the refining company (which became the Orleans, later the Gulf Coast Refining Company) the Louisiana refinery and the stock in the Mexican refinery.

102. The Westervelt Committee agreed to transfer to the operating company (which became the Gulf States Oil and Refining Corporation) the stock in the Cuban refinery, stock in the Island Refining Corporation of Louisiana, Inc., and the rights represented by the claim for $12,000,000 filed against the receivers of the Island Oil and Transport Corporation for breach of the oil-supply contract, and rights to a tank-car purchase contract.

103. Southern States Oil Corporation and Middle States Oil Corporation agreed to furnish to the operating company or to its subsidiary, leases on 12,000 acres of oil lands in Arkansas with wells capable of producing 12,000 barrels of oil daily, of an estimated value of leases, property and equipment of $8,000,000.

104. The refining company was to issue $3,000,000 in bonds, $2,000,000 for the old Westervelt bondholders, $1,-000,00 to secure $250,000 cash to be paid the Westervelt Committee.

105. The two bonds were to be guaranteed by Middle States Oil Corporation and Southern States Oil Corporation.

106. All stock in the refining company was to be issued to the Westervelt Committee, transferred to Middle States Oil Corporation and Southern States Oil Corporation for the guarantee of the bonds, and transferred by them to the operating company for all the operating company's B Stock, and 2,300,000 shares of A stock, the remaining 250,000 shares of A stock to go to the Westervelt Committee.

107. Gulf Coast Refining Company and Gulf States Oil and Refining Corporation were formed.

108. Temporary bonds of Gulf Coast Refining Company were issued in the amounts of $2,000,000 and $1,000,000 with attached guaranties executed by Middle States Oil Corporation and Southern States Oil Corporation.

109. Stock in Marr and Federal, operating subsidiaries, was transferred to Gulf States Oil and Refining Corporation by Middle States Oil Corporation, Southern States Oil Corporation and Western, a subsidiary of Southern States Oil Corporation.

110. The Westervelt Committee executed transfer instruments as agreed.

111. Gulf Coast Refining Company failed to meet the first interest due on its bonds May 1, 1924 and, on July 3, 1924, the principal was declared due.

112. Foreclosure proceedings were instituted, later in July, 1924, in the Eastern District of Louisiana.

113. A decree of foreclosure was entered March 10, 1925, directing sale of the mortgaged properties. Westervelt bought in the properties for $725,000.

114. The sale was confirmed over the opposition of the receivers of Middle States Oil Corporation and Southern States Oil Corporation.

115. After expenses, $706,342.87 was left for distribution, of which the distributive share of the $1,000,000 bond was $235,447.62, and of the $2,000,000 bond, $470,895.25.

116. The receivers of Gulf States recovered judgment on the claim against Island Oil and Transport Corporation in an amount of more than $700,000 in this court. Both sides appealed, Gulf States contending that the amount was inadequate, Island Oil and Transport that Gulf States had no standing to sue.

117. The Court of Appeals for the Second Circuit reversed and dismissed, New York Trust Co. v. Island Oil & Transport Corp., 1929, 34 F.2d 649.

118. Later efforts to realize on the claim for Gulf States through the receiver of Island Refining were also unsuccessful.

119. December 19, 1924 Westervelt filed claims against Middle States Oil Corporation and Southern States Oil Corporation for $250,000 for breach of the agreement for the $250,000 cash payment. American Trust Company filed proof of claim against Middle States Oil Corporation and Southern States Oil Corporation for $3,210,000 for breach of the guarantees on the bonds. American Trust Company also filed proof of claim against Gulf Coast Refining Company for $3,279,212.50 on the bonds.

120. After the sales, in accordance with the plan of reorganization Westervelt and American Trust Company assigned these claims to Middle States Petroleum Corporation, the new company.

121. The claims were brought on for hearing before the Special Master appointed in this case, on June 2, 8, and 29, 1932, after notice by publication in the New York Evening Post once a week for two weeks and after notice by mail to all stockholders and creditors of Middle States Oil Corporation and Southern States Oil Corporation, mailed on May 19, 1932.

122. Notices were received by stockholders and creditors whose addresses were known, including Cohen & Company, Levy Brothers, one Samuels, and Mrs. Cohen.

123. At the hearings Middle States Petroleum Corporation was represented by C. E. Cooper, the receivers by C. H. G. Heinfelden, an associate of John J. Curtin. Haskell, his son's estate, and his family held corporation, Unity Securities Corporation, which had large claims pending against Middle States Oil Corporation, were represented by Mr. Buckley.

124. Four stockholders of Southern States Oil Corporation, two of whom were also stockholders of Western and one of whom was also a stockholder of Middle States Oil Corporation, appeared in person.

125. Heinfelden was not fully prepared and asked more time on the first hearing. He was assured he would be given later opportunity to cross-examine. He did not choose to advance any serious defense of the claims. He had sufficient opportunity to do so and was familiar with their background from participation in other litigation in the receivership. At the time of the trial herein, he had no memory of the hearings on the claims.

126. The Special Master, on May 5, 1933, recommended that the claim of Middle States Petroleum Corporation as assignee of Westervelt against Middle States Oil Corporation and Southern States Oil Corporation for $250,000 and interest be disallowed, that the claim of Middle States Petroleum Corporation as assignee of American Trust Company against Gulf Coast Corporation for $3,279,212.50 (which had been abandoned by Middle States Petroleum) be disallowed, that the claim of Middle States Petroleum as assignee of American Trust Company against Southern States Oil Corporation for $3,210,000 be allowed in the sum of $1,656,605.68, and that the claim of Middle States Petroleum Corporation as assignee of American Trust Company against Middle States Oil Corporation for $3,210,000 be allowed in the amount of $1,654,137.33.

127. Objections were filed by Middle States Petroleum Corporation to the Special Master's recommendation of disallowance of the $250,000 claim and to his reducing the $3,210,000 claims by deducting the credits for payments of the proceeds of the Gulf Coast Corporation foreclosure sale before the computation of dividends.

128. Exceptions were filed by Unity and C. J. Haskell to the recommendations for allowance of the claims in favor of Middle States Petroleum Corporation because of Middle States Petroleum Corporation's relationship with Middle States Oil Corporation, and Southern States Oil Corporation, and to the failure to recommend that Middle States Petroleum Corporation's claims be subordinated to those of Unity and Haskell because of the relationship of Middle States Petroleum Corporation with Southern States Oil Corporation and Middle States Oil Corporation.

129. The exceptions and objections were overruled and the claims allowed by the Court in the amounts recommended by the Special Master.

130. A claim was also filed on behalf of the Westervelt Committee against Middle States Oil Corporation and Southern States Oil Corporation for $4,000,000 for damages for fraud in misrepresenting the extent and value of the oil properties to be furnished toward the formation of Gulf States Oil and Refining Corporation.

131. This claim was assigned to Middle States Petroleum Corporation in accordance with the plan, but has never been brought on for hearing.

### Chatham-Phenix Note

132. At the inception of the receiverships the Chatham-Phenix National Bank held a promissory note of Middle States Oil Corporation for $250,000 executed to the Midland Trust Company dated April 29, 1924, interest 6% per annum.

133. As collateral security Middle States Oil Corporation had deposited with the Midland Trust Company three promissory notes of $75,000 each, totaling $225,000, executed by Peters Petroleum Corporation and guaranteed by Charles B. Peters, and certificates representing 22,855 shares of stock of Louisiana & Northwest Railroad Company.

134. The Peters notes, although held at the time by Middle States Oil Corporation, were subject to a claim of ownership by Western States Oil Corporation.

135. There was also assigned as collateral any equity which Middle States Oil Corporation had in collateral securing the notes of the Unity Securities Corporation then with the bank, the collateral consisting of $350,000 in Louisiana & Northwest Railroad bonds and $285,000 of Middle States Oil Corporation 7% notes.

136. Pursuant to an order of the Court in the receivership entered December 23, 1925, under an agreement between the receivers, the bank, the Peters Petroleum Corporation and Peters, the Peters Petroleum Corporation notes were surrendered by the bank to Peters Petroleum Corporation in consideration of the delivery by the Peters Petroleum Corporation of seven oil and gas leases and by Peters of 34,031 shares of the common stock of Western States, which assignments and stock were deposited with the bank as collateral in substitution for the Peters Petroleum Corporation notes.

137. By the application of the bank balance and the income from the leases to the loan, the net balance due the bank on the note, with bank charges due, was, on February 23, 1927, $179,747.50, with interest.

138. The bank agreed to reduce the interest rate from 6% to 4% on condition of payment of the loan.

139. The receivers, on consent of the attorneys for the stockholders' protective committee and the serial-note holders' protective committee, petitioned the Court for an order which was granted, allowing the receivers of Western States Oil Corporation to pay the balance due the bank on the loan and take assign-

ment of the Middle States Oil Corporation note together with the collateral securities, the note to be held by the Western States Oil Corporation receivers and to bear interest at 4% per annum.

140. In applying for the order, the receivers represented that Western States Oil Corporation had $331,484.83 on deposit in New York banks, drawing interest at 2½% per annum, and that the stock of the Louisiana & Northwest Railroad held as collateral was worth very substantially more than the amount still due on the bank loan, and that the oil leases held as collateral had been appraised for the receiver—at a value of $338,000.

141. The railroad had been enjoying substantial earnings, particularly in the years immediately following the discovery of the Haynesville field through which it ran.

142. The railroad had a bond issue outstanding, due in 1935, of over $2,-000,000.

143. The railroad had substantial cash on hand, although the cash was tied up by a claim for recapture of earnings by the Interstate Commerce Commission which was in the process of establishing the value of the railroad property for rate-making purposes.

144. Negotiations were had from time to time concerning the sale of the stock of the railroad.

145. The oil leases which were substituted for the Peters notes and which were claimed to be the property of Western States Oil Corporation, aside from the collateral agreement, were held in the name of N. T. Gilbert, Agent, and later transferred to a newly-organized corporation, M. S. O. Oil Corporation.

146. If the Western claim to the leases is finally determined to have validity, the proceeds received from them, both while in the hands of the bank and while in the hands of Gilbert, Agent, and M. S. O. Oil Corporation, should be credited to Western States Oil Corporation directly and not upon the note obligation.

147. In 1926 Glass considered that the stock of the railroad had a substantial value, holding it for trading purposes at a figure of $1,000,000 but being willing to accept substantially less.

148. Offers were made by the Couch interests, who controlled a competing railroad, to purchase the railroad stock, plus a claim held by the receiver of Reliable in the amount of $94,000 and approximately $93,000 in first mortgage bonds of the railroad held by one of the receiverships, for the sum of $260,000 cash. This offer was made in February, 1926, subject to verification of the balance sheets, earnings statement, and accounts of the railroad.

149. An offer was made by one McNear in April, 1926, subject to a satisfactory investigation of the property, of $350,000 for the stock and the claim of Reliable against the railroad for $94,000 odd.

150. John K. Sague, in June, 1926, made an offer for a client of $425,000 cash for the railroad stock. This was not a firm offer but a representation that the client would be willing to pay such an amount. The receivers replied that they did not feel the offer adequate but that they would be glad to consider a more substantial offer.

151. In June, 1928, Cannon extended to the receivers, reported to Glass, a proposal from a Mr. Watkins, offering $400,000 for the stock of the railroad, the debts against the railroad held by the "oil company", and the $94,000 in railroad bonds held by Gulf States Corporation, the offer to be in the form of a 60-day option to enable his people to acquire at the then present market $500,000 worth of bonds from third parties.

152. Glass did not consider the Watkins offer reasonable and Watkins was so advised.

153. Later, in 1932 and 1933, efforts were made by Glass to sell the railroad

stock or trade it for oil properties, without success.

154. The efforts to sell the railroad stock were not successful and when the bond issue in 1935 matured, railroad earnings had fallen drastically.

155. The value placed upon the railroad property by the Interstate Commerce Commission was approximately $1,600,000, which was less than the face amount of the railroad bonds outstanding; the railroad went through a section 77 reorganization from which it emerged in 1939, the receivers of Western States Oil Corporation receiving for the entire capital stock of the railroad which had been held as collateral for the Chatham-Phenix note, a relatively small percentage of capital stock of the reorganized railroad.

156. This new stock was sold December 31, 1942 by the receiver of Western States Oil Corporation to Middle States Petroleum Corporation, which now controls the railroad partly through other stock received by it for bonds of the railroad either held by the various companies at the time of the receivership or later acquired by them or by Middle States Petroleum Corporation.

157. The receivers of Western States Oil Corporation received $31,399.79 for the stock, a fair price for the stock on the date of its sale to Middle States Petroleum.

158. Had they received the amount due upon the Chatham-Phenix note, Western States Oil Corporation would have been solvent and its stock would have had some value.

### The Advances or Diversions of Funds of the Corporations in Receivership to MSP

159. During the receiverships, prior to reorganization, temporary loans were made by the receivers Mayer and Tumulty, and later by Glass and Tumulty, from one receivership estate to another.

160. This was done without Court order in reliance upon the order of appointment requiring the properties and business of all the companies to be administered as an entirety.

161. After reorganization the practice of making loans continued in the form of loans or advances to Middle States Petroleum Corporation.

162. Until December 31, 1933, these advances were included in the receivers' accountings filed with the Special Master through the receivers' twenty-fifth accounting, at which time they totaled $769,634.34.

163. Thereafter, the advances continued until, on December 31, 1947, they amounted to a total of $1,454,578.52, not including amounts advanced by Eureka and Mid-states Oil Corporation.

164. The amounts advanced to Middle States Petroleum Corporation were as follows:

| | |
|---|---|
| Columbia Petroleum Corporation | 41,553.85 |
| Dominion Oil Company | 18,025.31 |
| Federal Oil Marketing Corporation | 532,730.59 |
| Gulf States Oil and Refining Corporation | 305,935.04 |
| Pawnee Osage Oil and Gas Company | 59,021.79 |
| Plains Petroleum Company, Inc. | 34,279.95 |
| Ranger Texas Oil Company | 540.63 |
| Southern States Oil Corporation | 301,195.59 |
| Sure Oil Corporation | 26,765.71 |
| Western States Oil Corporation | 134,530.06 |
| | $1,454,578.52 |

### Values

165. The receivers and the reorganizers estimated the going-concern fair market value at the time of the sales of all the assets of the corporations in receivership less the minority interests therein and plus the assets to be contributed under the plan by the Westervelt Committee to be approximately $6,000,000.

166. They considered a fair bid for the assets at the sales which were held, to be the amount bid at the sales which was as follows:

| | |
|---|---|
| On the United Oil Producers Corporation bond foreclosure sale, for the Eureka stock | $1,450,000 |
| On the O.L.D. bond foreclosure sale, for the pledged United Oil Producers Corporation bonds and O.L.D. Operating Company stock | 225,000 |
| On the serial-note foreclosure sale of the pledged Southern States Oil Corporation stock | 500,000 |
| On the Phelan suit sale for the unpledged assets of Middle States Oil Corporation | 1,300,071 |
| On the Phelan suit sale for the unpledged assets of Imperial | 175,009 |
| On the Phelan suit sale for the unpledged assets of United Oil Producers Corporation | 200,010 |
| On the Phelan suit sale for the unpledged assets of O.L.D. | 150,008 |
| a total of ..$4,000,100 | |
| Plus the assumption of receivers' liabilities and costs amounting to approximately .................... | 650,000 |

most of which was composed of interreceivership obligations.

167. The bidders acting for the reorganization committee bid in the foreclosure sale on the United Oil Producers Corporation bond indenture $1,450,000 for 100% of the stock of Eureka, whose principal asset was 82.44% of the stock of Turman. Turman was solvent and, during the receivership, highly valuable wells had been brought in on three leases in the Seminole field in Oklahoma, of which three leases Turman was part owner.

168. Bid prices for $10 par value stock of Turman during the period January 1, 1929 to April 10, 1929 had ranged from $4 to $7 per share, asked prices from $6 to $11. During the period April 10, 1929 to October 10, 1929 bid prices ranged from $2 to $5, asked from $4 to $8. During the period October 10, 1929 to April 10, 1930 bid prices ranged from $1 to $4.50, asked $4 to $6. $4 per share was a fair market price for Turman stock at the time of the sale.

169. Turman had a net income in 1929 of $311,972.24; an average annual net income for the five years January 1, 1925 to December 31, 1929 of $198,-519.57, an average annual net income for the five years January 1, 1930 to December 31, 1934 of $81,403.38.

170. Including the Eureka-owned Turman stock at $4 per share, the fair market value of Eureka's assets, less its liabilities at the time of the sale, was $1,399,841.27.

171. Including the Eureka-owned Turman stock at a capitalization of ten times its average annual earnings for the five-year period 1924 to 1929 inclusive, the fair market value of Eureka's assets, less its liabilities at the time of the sale, was $1,504,938.78.

172. The inclusion in the income produced of the income from assets acquired in the Turman settlement only from the date of their acquisition, as of January 1, 1928, does not materially affect the value of the Turman stock on a capitalized earnings basis.

173. The 1929 income tax balance sheet of Turman shows a net value applicable to capital stock of $2,725,415.11. Applying adjustments such as discount to present value of future recoveries of salvage values, deduction of actual interim oil recoveries from an engineering estimate of future recoverable oil as of two years previous, and 50% of the engineers' earlier estimated value applied to remaining undeveloped acreage, the receiver Glass at the time of trial, valued the assets of Turman on December

31, 1929 at an amount $2,446,104.24 in excess of its liabilities.

174. Including the Eureka-owned Turman stock on the basis of that figure for Turman's net value applicable to stock, the fair market value of Eureka's assets, less its liabilities at the time of the sale, was $1,520,435.93.

175. Without those adjustments, the income tax return balance sheet, if adjusted in accordance with Schedule 6A (Rec. Exhibit 201) to reflect accrual of interest, provision for receivership expense and general creditor claims pending on December 31, 1929, showed a figure available for stock in Eureka of $2,375,086.15, which, adjusted by reducing the claims receivable to estimated distributive values and eliminating the claims payable pending on December 31, 1929 (which were finally disallowed) gave a figure available for stock in Eureka of $1,971,814.58.

176. Of the various balance sheets in evidence, those entitled to most weight in determining value are those based on capitalized earnings and contemporaneous market values of stock.

177. The bid of $1,450,000 for the stock of Eureka on the foreclosure sale was a fair bid at such a sale.

178. The bidders in the serial-note foreclosure sale bid $500,000 for the 372,821 shares of Southern, representing 65.52% of the shares of Southern States Oil Corporation outstanding, Southern States at the time was insolvent although its stock had some speculative value in view of the uncertainty as to the validity and amount of the Westervelt claims against it, and in view of its stock control over the producing properties of Republic, Plains, Western, and Sure, and of its claim to stock ownership, directly and through Western States, in Gulf States which owned Federal Oil Marketing Corporation and at that time still asserted claim to a controlling interest in Marr, later lost in the New York courts, and to the $12,000,000 Island Refining Corporation claim, lost in June, 1929, in the Court of Appeals for the Second Circuit, further efforts to collect on which were still being pursued by suit through Island Refining's receivers.

179. The price of Southern States Oil Corporation stock during the period April 10, 1929 to October 10, 1929 ranged from a low bid of $1 to a high bid of $2.75, from a low asked of $1.25 to a high asked of $3.50; during the period October 10, 1929 to April 10, 1930, from a low bid of $1 to a high bid of $1.50, from a low asked of $1 to a high asked of $3.25.

On October 9, 1929 for 100 shares, $1 was bid, $1.50 asked.

On March 7, 1930 for 100 shares, $1 was bid, $1 asked.

180. The price of $500,000 bid for 372,821 shares of Southern States Oil Corporation at the serial-note foreclosure sale was a fair price.

181. The bidders on the Oil-Lease-Development bond indenture foreclosure sale purchased for $225,000 the assets pledged under the indenture, consisting of $389,900 face amount of United Oil Producers Corporation bonds and 100% of the stock of O.L.D. Operating Company.

182. O.L.D. Operating Company was then insolvent by a substantial margin.

183. The price paid for the pledged Oil-Lease-Development assets was a fair price on foreclosure sale.

184. In the Phelan cause, the bidders purchased the four parcels of free assets for $1,825,100, plus receivers' liabilities assumed, allocated as follows: the free (unpledged) assets of Middle States Oil Corporation for $1,300,071, plus receivers' liabilities of approximately $640,000; the free (unpledged) assets of Imperial for $175,009, plus receivers' liabilities of $902.02; the free (unpledged) assets of United Oil Producers Corporation for $200,010, plus receivers' liabilities of $361.61; and the free (unpledged) assets of Oil Lease Development for $150,008, plus receivers' liabilities of $16,064.45.

185. The free assets of Middle States Oil Corporation consisted principally of accounts receivable from other companies in the receivership, claims for income tax refund and other current assets totalling about $940,000, claims against, and stock in, other companies in receivership. Receivership liabilities assumed by the purchasers approximated $640,000, owing principally to other companies in the receivership.

186. $1,300,071, plus assumption of the receivership liabilities of approximately $640,000, ($555,729.30 to other companies in the receivership, $81,775.19 for receivership expenses) was a fair price for the free assets of Middle States Oil Corporation on a forced sale in receivership.

187. The free assets of Imperial Oil Corporation consisted of claims receivable from associated companies and stock in United Oil Producers Corporation and Wichita, both insolvent.

188. $175,009, plus assumption of receivership liabilities of $902.02, was a fair price for the free assets of Imperial on a forced sale in receivership.

189. The free assets of United Oil Producers Corporation consisted of claims receivable from associated companies.

190. $200,010, plus assumption of receivership liabilities of $361.61, was a fair price for the free assets of United Oil Producers Corporation on a forced sale in receivership.

191. The free assets of Oil Lease Development consisted of cash accounts receivable of $25,700, of claims against associated companies and of a claim to stock of Gulf States.

192. $150,008.22, plus assumption of receivership liabilities of $16,064.45, was a fair price for the free assets of Oil Lease Development on a forced sale in receivership.

193. Timely notice was given by publication of the sales, in accordance with Court order. The order (decree dated November 22, 1929) required the filing of a statement by the receivers of the assets to be sold and liabilities to be assumed.

194. The statement filed (Receivers' Exhibit 122) was wholly inadequate to inform bidders as to the assets to be sold, the receivers' liabilities to be assumed by the bidders, and the status of the government tax claims and receivers' claims for tax refunds.

195. The first, second and third reports of the receivers dated June 29, 1925, April 11, 1927 and May 7, 1928 had outlined the then progress of the tax situation.

196. The plan of reorganization available since June, 1929, had made it plain that all or almost all the tax claims were expected to be defeated and refunds of substantial amounts obtained.

197. The statement filed in court was in itself misleading in that it listed large government tax claims without reference to the favorable progress of the tax litigation.

198. It is unlikely that any prospective bidder would stop at perusal of the statement without further inquiry of the receivers.

199. Tentative valuation balance sheets, the Ligon (engineers') appraisal of physical properties as of December 31, 1927, and the books of the receivers, were available to anyone inquiring for the purpose of bidding.

200. The complexities of the intercorporate relationships, and of bringing down to date the valuations of physical assets and adjusting them to their book listing for the intervening periods were so great that no prospective bidder could have obtained sufficient information to judge independently without assistance from someone in the receivers' organization the value of the assets sold within the period from the filing of the statement to the sales.

201. Prior to confirmation of the sales on December 24, 1929, the Court, without the knowledge of the receivers, had obtained from Cannon, assistant to the receivers, Cannon's analysis of the plan and of the value of the assets of

the corporations in receivership. Cannon felt that the plan was based on too high an estimate of the underlying values.

202. So far as it is possible to determine values now, it appears that the bid prices were fair and that the general impression held by the reorganizers of a going-concern value of approximately $6,000,000 for all the assets to be acquired by the sales and otherwise by the new company was justified.

203. The receivers made no affirmative effort to inform non-depositing United bondholders of facts upon which the bondholders could determine for themselves whether acceptance of securities under the plan or cash distributive values would be in the bondholders' best interests.

### Sales in the Ancillary Jurisdictions

204. In 1933 various of the operating subsidiaries still in receivership, Plains, Corona, Central States, Number One, Leahy, and Peters Leahy, possessing scattered properties in Oklahoma, were assessed $1,000 tax assessment per year each for the period 1926–1934 by officials known as tax ferrets. No franchise or license taxes had been paid in Oklahoma for some years on the theory that operation was by the receivers rather than by the corporation.

205. The corporations referred to in the preceding paragraph had relatively small operating properties, nearing the end of their economic usefulness. Decision was reached to terminate their operations as separate corporations. Similar decisions were reached as to other subsidiaries.

206. Ancillary receiverships were either reopened or begun in the districts where the properties lay in the Northern and Eastern Districts of Oklahoma.

207. One Blackburn, as agent for Middle States Petroleum Corporation, bid in most of the properties on the sales. Blackburn was an employee of Gilbert, vice president of Middle States Petroleum Corporation and ancillary receiver.

208. The sales were held on adequate notice after appraisal and at a fair price.

209. Two non-productive royalties of Plains in the western District of Oklahoma were sold on order of the judge in the primary jurisdiction for $15, a fair price.

210. Various properties of Judson, MSO and Dominion, located in Texas, were sold to Middle States Petroleum Corporation's subsidiary, Mid-states Operating Corporation, on July 29, 1935, at appraised value, which was a fair price, to help effectuate the liquidation of the assets of these corporations.

211. From time to time orders were obtained authorizing distribution of moneys in part or full payment of the allowed claims against many of the corporations in receivership, as follows:

Claims Ordered Distributed and Paid up to and
Including Order of May 28, 1931*

| | |
|---|---|
| Central States Oil and Gas Co. | 100.000% with interest in full |
| Corona Oil Co. | 100.000% with interest in full |
| Federal Oil Marketing Corp. | 100.000% with interest in full |
| Hobbs Oil Co. | 100.000% with interest in full |
| Marr Oil Corp. | 100.000% with interest in full |
| Pawnee Osage Oil and Gas Co. | 100.000% with interest in full |
| Turman Oil Co. | 100.000% with interest in full |
| Plains Petroleum Co., Inc. | 100.000% of principal |
| Dominion Oil Co. | 11.000% of principal and interest |
| Eureka Producing Co. | 60.000% of principal and interest |
| Judson Oil Co. | 35.500% of principal and interest |
| Number Nine Oil Co. | 50.000% of principal |
| Number One Oil Co. | 10.000% of principal |
| Number Seventy-seven Oil Co. | 100.000% of principal and interest |
| Peters Oil Co. | 17.000% of principal and interest |
| Ranger Texas Oil Co. | 100.000% of principal and interest |
| Reliable Securities Corp. | 9.100% of principal and interest |
| Sure Oil Co. | 46.000% of principal |
| Western States Oil Co. | 10.000% of principal |
| Wichita Petroleum Co. | 83.900% of principal and interest |

*Payments may have been made on later orders which the Court is unable to locate in the record.

212. A number of sales to Middle States Petroleum Corporation was made by the receivers of subsidiary or associated companies of securities or claims of companies which were or had been in receivership. These included the railroad stock held as collateral for Middle States Oil Corporation's note.

213. None of these sales was presented to the Court for approval.

214. The prices paid were fair at the time of the sales.

215. The sellers suffered losses by reason of some of the sales.

216. The taking-over of the Chatham-Phenix note of Middle States Oil Corporation, and the purchases of shares of stock and other securities by various of the receiverships, were for the benefit of the system as a whole, and of the new company to be formed or already formed.

217. The figures at which the assets were carried in the income tax balance sheets were book, cost or historical figures having no relationship to values either for sale or reorganization purposes at the time of any of the sales.

218. At the time of default on the United Oil Producers Corporation bonds, United, Imperial and Middle States Oil Corporation were insolvent and unable to continue payment of interest on the United Oil Producers Corporation bonds.

219. At the time of default on the serial notes, Middle States Oil Corporation was insolvent and unable to meet the payments called for by the serial-note trust indenture.

220. At the time of default on the Oil Lease Development bonds, Oil Lease Development was insolvent and unable to meet payments called for by the Oil Lease Development bond indenture.

221. Securities of the new company, Middle States Petroleum Corporation, were issued as follows:

|  | Bonds | Shares of Stock |
|---|---|---|
| To depositing United Oil Producers Corporation bondholders | Yes | A |
| To depositing Oil Lease Development bondholders: see R. 269 for number of shares | Yes | A |
| To depositing serial-note holders see R. 269 for number of shares | No | A & B |
| To depositing Westervelt Committee see R. 269 for number of shares | No | A & B |
| To old stockholders | No | B only |

222. The new corporation, Middle States Petroleum Corporation, paid the interest on its bonds and retired them through purchases for sinking-fund purposes during their lifetime, paying off the balance outstanding at their maturity, January 1, 1945.

223. Middle States Petroleum Corporation declared and paid dividends on its stock as follows:

| | | | |
|---|---|---|---|
| 1930 | A stock | | $0.22 per share |
| 1931 | Showed net loss | | No dividend |
| 1932 | Showed net loss | | No dividend |
| 1933 | Showed net loss | | No dividend |
| 1934 | Showed consolidated net loss | | No dividend |
| 1935 | Showed net loss | | No dividend |
| 1936 | Showed consolidated net loss | | No dividend |
| 1937 | | | No dividend |
| 1938 | | | No dividend |
| 1939 | On earnings for 1937-1938 | A— | $1.25 per share |
| | | B— | .20 per share |
| 1940 | | A— | .37 per share |
| | | B— | .95 per share |
| 1941 | | A— | .31 per share |
| | | B— | .05 per share |
| 1942 | | A— | .45 per share |
| 1943 | | A— | .51 per share |
| 1944 | | A— | .51 per share |
| 1945 | | | .72 per share |
| 1946 | On 1944 earnings.....A stock | | 1.20 per share |
| | On 1945 earnings.....A stock | | 1.20 per share |
| 1947 | | A stock | 1.20 per share |
| | | B stock | .25 per share |

224. Since 1947 the A stock outstanding has been converted into B stock, which now constitutes the sole class of security of Middle States Petroleum Corporation outstanding, approximately 8% of which is owned by Glass or his family, the balance by some 16,000 other holders.

### The Plan of Reorganization

225. The holders of the United Oil Producers Corporation and of Oil Lease Development bonds who deposited under the plan received new Middle States Petroleum Corporation 6½% bonds for the face value of the bonds turned in, with A stock in Middle States Petroleum Corporation for the amount of interest due on their bonds, the A stock being preferred as to dividends and on dissolution.

226. Depositing holders of the serial notes received A stock for the principal amount of their claims and B stock for accrued interest, each reduced to 70% of par.

227. The depositors of the Gulf Coast claim received A stock for the principal amount of their claim and B stock for accrued interest, each reduced to 80% of par.

228. The depositing stockholders of Middle States Oil Corporation received B stock for their Middle States Oil Corporation stock, 1 to 4.

229. Other creditors of Middle States Oil Corporation were entitled to participate on the same basis as the holders of the Gulf Coast claim.

230. It was not contemplated that the receivers of the other companies, other than Middle States Oil Corporation, would participate in the plan as creditors of Middle States Oil Corporation on the inter-company claims.

231. The plan declared that no action was necessary on the part of holders of stock of the associated companies.

232. As of June 30, 1929, the outstanding amounts of securities to participate in the plan were as follows:

|  | Principal | Interest to July 1, 1929 |
|---|---|---|
| United Oil Producers Bonds | $2,044,100.00* | $ 806,887.47 ..8% |
| Oil Lease Development Bonds | 389,800.00 | 166,343.15 ..8% |
| Serial Notes | 5,144,519.25 | 1,800,765.57 ..7% |
| Gulf Coast Claim | 1,529,104.75 | 658,261.99 ..7% |
| Old Stock | Number of Shares 2,980,386 | |

*Exclusive of bonds pledged under Oil Lease Development Indenture.

Plus claims of general creditors of Middle States Oil Corporation (not including inter-company claims) pending at December 31, 1929, in the amount of $2,168,457.03, of which $71,850.12 was subsequently allowed.

233. The new company was to authorize the following securities: $5,000,-000 of new bonds of not to exceed 6½% interest, of which $2,433,900 were to be issued to the old United Oil Producers Corporation and Oil Lease Development bondholders at 6½% interest, callable at 105, maturing not later than January 1, 1945, with a provision for a 3% annual sinking-fund requirement. The balance was to be reserved for future development of the company.

234. Of these authorized bonds, $2,-559,800 were issued to depositing bondholders, the interest and sinking-fund requirements were met, and the balance outstanding paid off on January 1, 1945.

235. The new company was to have authorized capital stock of 2,300,000 shares, no par, of which 300,000 shares were to be Class A, preferred as to dividends up to $1.20 a share, participating thereafter up to one-half the consolidated net earnings.

The remaining 2,000,000 shares were to be B stock.

The A stock was to be convertible to B at 1½ B for 1 A, and callable at 30.

236. The A stock was to be issued for the interest due on the United Oil Producers Corporation and Oil Lease Development bonds at 5 shares per $100, and for the principal of the Gulf Coast claim at the rate of 5 shares per $100 reduced to 80%, and for the principal of

the serial notes at the rate of 5 shares per $100 reduced to 70%.

237. The B stock was to be issued for the interest due on the Gulf Coast claim and serial notes by apportioning 150,281 shares of B stock between the serial notes and the Gulf Coast claim in the ratio of 70% of the accrued interest on the serial notes to 80% of the accrued interest on the Gulf Coast claim. B stock was also to be issued to the old Middle States Oil Corporation stockholders on the basis of one share of B stock for four shares of old stock.

238. Depositing holders of other claims against Middle States Oil Corporation, not including inter-company claims, were to be treated on a par with the Gulf Coast claim. These claims were minor in amount. There was also a minor provision for issue of bonds to the Bondholders' Committee for interest from July 1, 1929 to the date interest should start on the new bonds, to be used for Committee expenses.

239. Except for these two minor provisions, the authorized disposition of the new securities was to be as follows:

| | Principal Amount New Bonds | Number of Shares A Stock | B Stock |
|---|---|---|---|
| Authorized | $5,000,000 | 300,000 | 2,000,000 |
| United Oil Producers | 2,044,100 | 48,441 | |
| Oil Lease Development | 389.800 | 9,979 | |
| Serial Notes | | 180,059 | 108,007 |
| Gulf Coast Claim | | 61,165 | 43,274 |
| Old Stock | | | 745,097 |
| Total | | | |
| Presently to be issued | $2,433,900 | 299,649 | 895,378 |

240. For each share of the old stock tendered, 5¢ deposit for stockholders' committee expenses was required.

241. All the A and B stock was to be issued to trustees, under a ten-year voting trust, and voting trust certificates issued therefor to the depositing participants in the plan.

242. The plan also provided for payment of $100,000 to the Westervelt Committee upon the transfer of its Gulf States stock and of any other claims other than the defined Gulf Coast claim against any of the system companies held by the Committee, as well as its Island Refining claim.

243. The new company was also to assume payment of the reorganization expenses, including such amounts for the various committees and counsel as the reorganization committee should approve.

244. The plan stated that no action was necessary on the part of the holders of shares of stock of any of the associated companies.

245. The receivers, in a letter to Sague, chairman of the reorganization committee, circulated with the plan, stated that in their personal opinion the plan for reorganization does accomplish substantial justice to all of the interests involved, and strongly urged the prompt consummation of reorganization.

246. The plan set a limit for deposit of securities thereunder of September 15, 1929, or such later date as the reorganization committee should determine. The cut-off date was extended from time to time until May 14, 1930.

247. The new company was obligated to pay the distributive value of undeposited bonds. The distributive values of United Oil Producers Corporation bonds were fixed July 25, 1933 at $698.-55 per $1,000.

248. Prior to May 14, 1930, the major portion of eligible securities was deposited and new company securities were issued therefor under the plan.

249. Thereafter, undeposited securities were presented for payment of distributive values as follows: See Column 3, R. 269—"Held by others" (Column 2 includes not only securities deposited

under the plan, but also a relatively minor amount of securities acquired by M. S. P. after the closing of deposits but prior to the fixing of distributive values).

Reorganization Securities, Including General Claims against
Middle States Oil Corporation, Held by
Middle States Petroleum Corporation and by Others
as of 11/12/48

| | Total Principal Amount | Stamped Distributive Value Paid | | |
| --- | --- | --- | --- | --- |
| | | Held by Middle States Petroleum Corporation | Held by Others | Not Yet Presented for Payment of Distributive Value Held by Others |
| United Oil Producers Corporation Bonds, | $2,433,900.00 | $2,382,600.00 | $45,300.00* | $ 6,000.00 |
| Oil Lease Development Company Bonds, | 389,800.00 | 366,200.00 | 6,400.00 | 17,200.00 |

| | Total Principal Amount or Shares | Held by Middle States Petroleum Corporation | Held by Others | |
| --- | --- | --- | --- | --- |
| Middle States Oil Corporation 7% Notes: | | | | |
| Serial Notes | $5,114,800.00 | $5,097,350.00 | $17,450.00 | |
| Scrip due 8/1/24 | 29,719.25 | 26,694.16 | 3,025.09 | |
| Middle States Oil Corporation General Claims | 53,383.22 | 29,365.89 | 24,017.33 | |
| Middle States Oil Corporation Capital Stock | 2,980,386 shs. | 2,606,772 shs. | 373,614 shs. | |

*Includes $32,200.00 principal amount upon which distributive value has been collected by W. W. Cohen.

250. No determination has yet been made of the distributive value of the claims against Middle States Oil Corporation.

251. November 11, 1929 United Oil Producers Corporation bonds sold at $72. Bonds, or certificates of deposit therefor, rose to $85, March 13, 1930 and $100 April 28, 1930.

252. Thereafter the securities of the new company issued in exchange for United Oil Producers Corporation bonds sold at (R.Ex. 146, copy of which is attached hereto):

Market Value of Securities of Middle States Petroleum Corporation Issued in Exchange for Certificate of Deposit Representing $10,000 Principal Amount of Bonds of United Oil Producers Corporation under Plan and Agreement of Reorganization of Middle States Oil Corporation, June, 1930, to December, 1944, Inclusive.

(Certificate of Deposit Exchanged for $10,000. Principal Amount of Bonds and 237 Shares of Class A Stock of Middle States Petroleum Corporation.)

| Date | Price, Bonds | Amount, Bonds | Price, Stock | Amount, Stock | Total Amount |
|------|------|------|------|------|------|
| **1930** | | | | | |
| June | 71 | $ 7,100.00 | 8¾ | $2,073.75 | $ 9,173.75 |
| July | 60⅛ | 6,012.50 | 6 | 1,422.00 | 7,434.50 |
| August | 66¼ | 6,625.00 | 5⅝ | 1,333.13 | 7,958.13 |
| September | 62⅛ | 6,212.50 | 6⅞ | 1,629.38 | 7,841.88 |
| October | 57½ | 5,750.00 | 4½ | 1,066.50 | 6,816.50 |
| November | 54¼ | 5,425.00 | 3 | 711.00 | 6,136.00 |
| December | 51 | 5,100.00 | 3 | 711.00 | 5,811.00 |
| **1931** | | | | | |
| January | 44 | 4,400.00 | 2½ | 592.50 | 4,992.50 |
| February | 48 | 4,800.00 | 3¼ | 770.25 | 5,570.25 |
| March | 50⅞ | 5,087.50 | 3⅞ | 918.38 | 6,005.88 |
| April | 50½ | 5,050.00 | 3⅜ | 799.88 | 5,849.88 |
| May | 47 | 4,700.00 | 3¼ | 770.25 | 5,470.25 |
| June | 50 | 5,000.00 | 2⅝ | 622.13 | 5,622.13 |
| July | 49 | 4,900.00 | 2¾ | 651.75 | 5,551.75 |
| August | 44 | 4,400.00 | 2⅝ | 622.13 | 5,022.13 |
| September | 41 | 4,100.00 | 2¾ | 651.75 | 4,751.75 |
| October | 30 | 3,000.00 | 1½ | 355.50 | 3,355.50 |
| November | 29⅝ | 2,962.50 | 1½ | 355.50 | 3,318.00 |
| December | 30 | 3,000.00 | 1¼ | 296.25 | 3,296.25 |
| **1932** | | | | | |
| January | 30 | 3,000.00 | 1 | 237.00 | 3,237.00 |
| February | 35 | 3,500.00 | 1 | 237.00 | 3,737.00 |
| March | 31½ | 3,150.00 | 1 | 237.00 | 3,387.00 |
| April | 31 | 3,100.00 | 1 | 237.00 | 3,337.00 |
| May | 25 | 2,500.00 | ⅝ | 148.13 | 2,648.13 |
| June | 25 | 2,500.00 | ⅞ | 207.38 | 2,707.38 |
| July | 28 | 2,800.00 | ¾ | 177.75 | 2,977.75 |
| August | 28 | 2,800.00 | ⅞ | 207.38 | 3,007.38 |
| September | 32 | 3,200.00 | 1½ | 355.50 | 3,555.50 |
| October | 33 | 3,300.00 | ⅞ | 207.38 | 3,507.38 |
| November | — | — | ⅞ | — | — |
| December | 27⅛ | 2,712.50 | ¾ | 177.75 | 2,890.25 |
| **1933** | | | | | |
| January | 44¾ | 4,475.00 | ⅝ | 148.13 | 4,623.13 |
| February | 33 | 3,300.00 | ⅝ | 148.13 | 3,448.13 |
| March | 27¼ | 2,725.00 | ¾ | 177.75 | 2,902.75 |
| April | 30¼ | 3,025.00 | ¾ | 177.75 | 3,202.75 |
| May | 39 | 3,900.00 | 1 | 237.00 | 4,137.00 |
| June | 45 | 4,500.00 | 1⅝ | 385.13 | 4,885.13 |
| July | 57½ | 5,750.00 | 2⅞ | 681.38 | 6,431.38 |
| August | 48 | 4,800.00 | 2 | 474.00 | 5,274.00 |
| September | 51 | 5,100.00 | 2¼ | 533.25 | 5,633.25 |
| October | 46 | 4,600.00 | 2¼ | 533.25 | 5,133.25 |
| November | 54 | 5,400.00 | 1¼ | 296.25 | 5,696.25 |
| December | 50 | 5,000.00 | 1⅞ | 444.38 | 5,444.38 |
| **1934** | | | | | |
| January | 54¾ | 5,475.00 | 1¼ | 296.25 | 5,771.25 |
| February | 57 | 5,700.00 | 1⅞ | 444.38 | 6,144.38 |
| March | 59 | 5,900.00 | 1¾ | 414.75 | 6,314.74 |
| April | 65⅞ | 6,587.50 | 2¾ | 651.75 | 7,239.25 |
| May | 70 | 7,000.00 | 2⅝ | 622.13 | 7,622.13 |
| June | 70 | 7,000.00 | 2⅜ | 562.88 | 7,562.88 |
| July | 72½ | 7,250.00 | 2⅞ | 681.38 | 7,931.38 |
| August | 70 | 7,000.00 | 1⅞ | 444.38 | 7,444.38 |
| September | 71 | 7,100.00 | 1⅞ | 444.38 | 7,544.38 |
| October | 69 | 6,900.00 | 1⅜ | 325.88 | 7,225.88 |
| November | 65 | 6,500.00 | 1⅛ | 266.63 | 6,766.63 |
| December | 65 | 6,500.00 | 1⅛ | 266.63 | 6,766.63 |

| Date | Price, Bonds | Amount, Bonds | Price, Stock | Amount, Stock | Total Amount |
|---|---|---|---|---|---|
| **1935** | | | | | |
| January | 66 | $ 6,600.00 | 1½ | $ 355.50 | $ 6,955.50 |
| February | 71 | 7,100.00 | 1⅝ | 385.13 | 7,485.13 |
| March | 71 | 7,100.00 | 1¼ | 296.25 | 7,396.25 |
| April | 74⅞ | 7,487.50 | 1⅜ | 325.88 | 7,813.38 |
| May | 73 | 7,300.00 | 1¼ | 296.25 | 7,596.25 |
| June | 80¾ | 8,075.00 | 1⅞ | 444.38 | 8,519.38 |
| July | 80½ | 8,050.00 | 1⅝ | 385.13 | 8,435.13 |
| August | 87½ | 8,750.00 | 1½ | 355.50 | 9,105.50 |
| September | 85 | 8,500.00 | 1½ | 355.50 | 8,855.50 |
| October | 90½ | 9,050.00 | 1⅜ | 325.88 | 9,375.88 |
| November | 91½ | 9,150.00 | 1⅝ | 385.13 | 9,535.13 |
| December | 91 | 9,100.00 | 3⅜ | 799.88 | 9,899.88 |
| **1936** | | | | | |
| January | 91½ | 9,150.00 | 3 | 711.00 | 9,861.00 |
| February | 101½ | 10,150.00 | 5½ | 1,303.50 | 11,453.50 |
| March | 100 | 10,000.00 | 4½ | 1,066.50 | 11,066.50 |
| April | 98½ | 9,850.00 | 4⅛ | 977.63 | 10,827.63 |
| May | 99⅞ | 9,987.50 | 3⅜ | 799.88 | 10,787.38 |
| June | 100 | 10,000.00 | 3⅜ | 799.88 | 10,799.88 |
| July | 99½ | 9,950.00 | 3 | 711.00 | 10,661.00 |
| August | 99¼ | 9,925.00 | 3¾ | 888.75 | 10,813.75 |
| September | 98 | 9,800.00 | 3½ | 829.50 | 10,629.50 |
| October | 97 | 9,700.00 | 4¼ | 1,007.25 | 10,707.25 |
| November | 99 | 9,900.00 | 4½ | 1,066.50 | 10,966.50 |
| December | 98⅝ | 9,862.50 | 5⅝ | 1,333.13 | 11,195.63 |
| **1937** | | | | | |
| January | 99½ | 9,950.00 | 6 | 1,422.00 | 11,372.00 |
| February | 97¾ | 9,775.00 | 6⅛ | 1,451.63 | 11,226.63 |
| March | 94½ | 9,450.00 | 6½ | 1,540.50 | 10,990.50 |
| April | 92 | 9,200.00 | 5⅞ | 1,392.38 | 10,592.38 |
| May | 91½ | 9,150.00 | 5¼ | 1,244.25 | 10,394.25 |
| June | 92 | 9,200.00 | 4½ | 1,066.50 | 10,266.50 |
| July | 90 | 9,000.00 | 4⅝ | 1,096.13 | 10,096.13 |
| August | 90½ | 9,050.00 | 4⅞ | 1,155.38 | 10,205.38 |
| September | 90 | 9,000.00 | 4¼ | 1,007.25 | 10,007.25 |
| October | 79½ | 7,950.00 | 3⅛ | 740.63 | 8,690.63 |
| November | 82 | 8,200.00 | 3 | 711.00 | 8,911.00 |
| December | 82 | 8,200.00 | 3¼ | 770.25 | 8,970.25 |
| **1938** | | | | | |
| January | 75½ | 7,550.00 | 3⅛ | 740.63 | 8,290.63 |
| February | 88 | 8,800.00 | 3¼ | 770.25 | 9,570.25 |
| March | 81½ | 8,150.00 | 2¾ | 651.75 | 8,801.75 |
| April | 95 | 9,500.00 | 2 | 474.00 | 9,974.00 |
| May | 84 | 8,400.00 | 3 | 711.00 | 9,111.00 |
| June | 81 | 8,100.00 | 3 | 711.00 | 8,811.00 |
| July | 82½ | 8,250.00 | 3⅜ | 799.88 | 9,049.88 |
| August | 89 | 8,900.00 | 4¼ | 1,007.25 | 9,907.25 |
| September | 88½ | 8,850.00 | 4 | 948.00 | 9,798.00 |
| October | 87 | 8,700.00 | 4⅜ | 1,036.88 | 9,736.88 |
| November | 88 | 8,800.00 | 3½ | 829.50 | 9,629.50 |
| December | 93 | 9,300.00 | 5 | 1,185.00 | 10,485.00 |
| **1939** | | | | | |
| January | 93¼ | 9,325.00 | 4⅞ | 1,155.38 | 10,480.38 |
| February | 96½ | 9,650.00 | 5 | 1,185.00 | 10,835.00 |
| March | 96¾ | 9,675.00 | 5½ | 1,303.50 | 10,978.50 |
| April | 96½ | 9,650.00 | 4 | 948.00 | 10,598.00 |
| May | 95½ | 9,550.00 | 4¼ | 1,007.25 | 10,557.25 |
| June | 97½ | 9,750.00 | 3⅝ | 859.13 | 10,609.13 |
| July | 97½ | 9,750.00 | 3½ | 829.50 | 10,579.50 |
| August | 98 | 9,800.00 | 3⅜ | 799.88 | 10,599.88 |
| September | 96½ | 9,650.00 | 2¾ | 651.75 | 10,301.75 |
| October | 99½ | 9,950.00 | 4¾ | 1,125.75 | 11,075.75 |
| November | 99⅝ | 9,962.50 | 4½ | 1,066.50 | 11,029.00 |
| December | 100⅜ | 10,037.50 | 4⅞ | 1,155.38 | 11,192.88 |
| **1940** | | | | | |
| January | 100⅜ | 10,037.50 | 4 | 948.00 | 10,985.50 |
| February | 100 | 10,000.00 | 3¾ | 888.75 | 10,888.75 |
| March | 100 | 10,000.00 | 3½ | 829.50 | 10,829.50 |
| April | 100 | 10,000 00 | 3⅞ | 918.38 | 10,918.38 |
| May | 99⅛ | 9,912.50 | 3½ | 829.50 | 10,742.00 |
| June | 93 | 9,300.00 | 3⅛ | 740.63 | 10,040.63 |
| July | 94 | 9,400.00 | 3 | 711.00 | 10,111.00 |
| August | 94½ | 9,450.00 | 2¾ | 651.75 | 10,101.75 |
| September | 98 | 9,800.00 | 3 | 711.00 | 10,511.00 |
| October | 99¼ | 9,925.00 | 3⅛ | 740.63 | 10,665.63 |
| November | 98½ | 9,850.00 | 3½ | 829.50 | 10,679.50 |
| December | 101½ | 10,150.00 | 3⅛ | 740.63 | 10,890.63 |

| Date | Price, Bonds | Amount, Bonds | Price, Stock | Amount, Stock | Total Amount |
|---|---|---|---|---|---|
| **1941** | | | | | |
| January | 102½ | $10,250.00 | 3 | $ 711.00 | $10,961.00 |
| February | 103¾ | 10,375.00 | 2¾ | 651.75 | 11,026.75 |
| March | 101 | 10,100.00 | 2⅝ | 622.13 | 10,722.13 |
| April | 102 | 10,200.00 | 2⅞ | 681.38 | 10,881.38 |
| May | 102 | 10,200.00 | 2¾ | 651.75 | 10,851.75 |
| June | 102⅛ | 10,212.50 | 3¼ | 770.25 | 10,982.75 |
| July | 102⅝ | 10,262.50 | 3⅛ | 740.63 | 11,003.13 |
| August | 101⅞ | 10,187.50 | 4⅛ | 977.63 | 11,165.13 |
| September | 101⅞ | 10,187.50 | 4 | 948.00 | 11,135.50 |
| October | 101 | 10,100.00 | 3¾ | 888.75 | 10,988.75 |
| November | 100¼ | 10,025.00 | 3⅜ | 799.88 | 10,824.88 |
| December | 100 | 10,000.00 | 2⅞ | 681.38 | 10,681.38 |
| **1942** | | | | | |
| January | 99½ | 9,950.00 | 2⅝ | 622.13 | 10,572.13 |
| February | 99½ | 9,950.00 | 3 | 711.00 | 10,661.00 |
| March | 100 | 10,000.00 | 2⅝ | 622.13 | 10,622.13 |
| April | 101 | 10,100.00 | 2⅜ | 562.88 | 10,662.88 |
| May | 100½ | 10,050.00 | 2¾ | 651.75 | 10,701.75 |
| June | 99⅞ | 9,987.50 | 2¾ | 651.75 | 10,639.25 |
| July | 99 | 9,900.00 | 2¾ | 651.75 | 10,551.75 |
| August | 99½ | 9,950.00 | 3 | 711.00 | 10,661.00 |
| September | 100⅛ | 10,012.50 | 4 | 948.00 | 10,960.50 |
| October | 99½ | 9,950.00 | 3¾ | 888.75 | 10,838.75 |
| November | 100½ | 10,050.00 | 3¾ | 888.75 | 10,938.75 |
| December | 99¾ | 9,975.00 | 3⅞ | 918.38 | 10,893.38 |
| **1943** | | | | | |
| January | 101 | 10,100.00 | 4 | 948.00 | 11,048.00 |
| February | 100¾ | 10,075.00 | 4 | 948.00 | 11,023.00 |
| March | 100⅞ | 10,087.50 | 5 | 1,185.00 | 11,272.50 |
| April | 101½ | 10,150.00 | 6 | 1,422.00 | 11,572.00 |
| May | 102½ | 10,250.00 | 6 | 1,422.00 | 11,672.00 |
| June | 101⅜ | 10,137.50 | 6⅛ | 1,451.63 | 11,589.13 |
| July | — | —— | 7⅞ | 1,866.38 | —— |
| August | 102 | 10,200.00 | 6½ | 1,540.50 | 11,740.50 |
| September | 102½ | 10,250.00 | 7¼ | 1,718.25 | 11,968.25 |
| October | 102⅛ | 10,212.50 | 7½ | 1,777.50 | 11,990.00 |
| November | 101½ | 10,150.00 | 7½ | 1,777.50 | 11,927.50 |
| December | 101 | 10,100.00 | 6⅞ | 1,629.38 | 11,729.38 |
| **1944** | | | | | |
| January | 102⅜ | 10,237.50 | 8¾ | 2,073.75 | 12,311.25 |
| February | 102½ | 10,250.00 | 8⅛ | 1,925.63 | 12,175.63 |
| March | 102¾ | 10,275.00 | 10 | 2,370.00 | 12,645.00 |
| April | 103⅜ | 10,337.50 | 10 | 2,370.00 | 12,707.50 |
| May | 102½ | 10,250.00 | 11¼ | 2,666.25 | 12,916.25 |
| June | 102½ | 10,250.00 | 13¼ | 3,140.25 | 13,390.25 |
| July | — | —— | 12½ | 2,962.50 | —— |
| August | 100 | 10,000.00 | 12½ | 2,962.50 | 12,962.50 |
| September | 100⅛ | 10,012.50 | 12⅜ | 2,932.88 | 12,945.38 |
| October | 100 | 10,000.00 | 13¼ | 3,140.25 | 13,140.25 |
| November | 99¾ | 9,975.00 | 12¼ | 2,903.25 | 12,878.25 |
| December | — | —— | 13 | 3,081.00 | —— |

Source of Prices: Record compiled by employees of Middle States Petroleum Corporation from press reports. Prices shown are closing prices on the first day of each month on which there were dealings in the stock or bonds, respectively.

Calculations based on securities received for certificate of deposit for $10,000 principal amount of United Oil Producers Corporation bonds to eliminate fractions of Class A stock which would result if calculations were based on smaller amount.

253. The voting trust certificates for B stock sold on the Curb Exchange for the following prices:

| | | |
|---|---|---|
| 1930 | Low ⅝ | High 6 |
| 1931 | ⅛ | 1½ |
| 1932 | ⅛ | ⅝ |
| 1933 | ¼ | 1½ |
| 1934 | ¼ | 1⅛ |
| 1935 | ¼ | 1⁵⁄₁₆ |
| 1936 | 1¹⁄₁₆ | 2⅝ |
| 1937 | ⅞ | 2 |
| 1938 | ⅜ | 1¼ |
| 1939 | ½ | 1 |
| 1940 | ½ | 1³⁄₁₆ |
| 1941 | ⁵⁄₁₆ | ¾ |
| 1942 | ¼ | ½ |
| 1943 | ⅜ | 2⅛ |
| 1944 | 1⅝ | 3½ |
| 1945 | 2¼ | 5 |
| 1946 | 3½ | 6 |
| 1947 | 3½ | 7¾ |
| 1948 | 5¾ | 8⅞ |

254. The number of shares traded annually was as follows (M.S.P. Ex. No. 3— copy of which is attached hereto).

Middle States Petroleum Corporation
Number of Shares Traded Annually

| Year | Voting Trust Certificates A | Voting Trust Certificates B |
|---|---|---|
| 1930 | 129,100 | 69,650 |
| 1931 | 44,600 | 33,500 |
| 1932 | 21,700 | 16,800 |
| 1933 | 46,300 | 34,467 |
| 1934 | 40,300 | 32,700 |
| 1935 | 64,000 | 35,300 |
| 1936 | 140,900 | 179,600 |
| 1937 | 96,700 | 92,700 |
| 1938 | 79,000 | 48,638 |
| 1939 | 45,800 | 56,700 |
| 1940 | 26,050 | 36,400 |
| 1941 | 26,200 | 33,500 |
| 1942 | 15,200 | 27,400 |
| 1943 | 100,300 | 190,300 |
| 1944 | 77,200 | 204,000 |
| 1945 | 107,400 | 306,300 |
| 1946 | 42,800 | 322,900 |
| 1947 | 44,800 | 287,400 |
| 1948 | 80,700 | 410,400 |

255. The great improvement in earnings in the mid-40's brought a realization of the awkwardness of the preferential dividend provisions.

256. The voting trust had been extended on its expiration and after payment of the bonds still outstanding on January 1, 1945, Middle States Petroleum Corporation's only securities outstanding were the voting trust certificates for A and B stock. Holders of A, (of whom Glass' family was one of the largest, with more than 39,000 shares,) were naturally unwilling to convert to B at 1½ to 1, but the earnings of the company were approaching the point where the call price of 30 for the A stock was no longer academic. In 1948, therefore, the charter was amended to provide for conversion' of A stock to B at one A for four B, which was accomplished by the use of the unissued balance of the originally authorized 2,000,000 shares of B stock and the use of a small amount of treasury B shares. Except for any small amount of A stock which may not have been converted, the B stock is the sole outstanding security of Middle States Petroleum Corporation.

257. It is not possible to determine from the evidence as we recall it, the total number of shares now outstanding. It is safe to say, however, that the voting-trust certificates originally issued to the old Middle States Oil Corporation stockholders with any stock dividends thereon represent the ownership of slightly more than one-third of the ownership of Middle States Petroleum, subject to no secured debt and little or no preferred stock interest. It is, of course, impossible to tell whether any part of the B voting-trust certificates remain in the hands of those of the original holders who were Middle States Oil Corporation stockholders.

258. Depositing United Oil Producers Corporation and Oil Lease Development bondholders received in securities of Middle States Petroleum the substantial equivalent of the debt owing to them, both principal and interest, although the nature of the securities was changed, increasing the amount of security behind the principal amount, decreasing the interest rate on the principal, and substituting shares of stock, preferred as to dividends and as to participation in the proceeds of distribution of assets on dissolution, for the past due interest on their old bonds.

259. Non-depositing United Oil Producers Corporation and Oil Lease Development bondholders received a distributive value in cash equivalent to the fair value at forced sale, of the security behind their old bonds, and of their

proportionate share of the free assets of their obligors.

## The Cohen Bonds

260. W. W. Cohen & Company, Cohen's brokerage firm, had been active in trading in securities of companies of the Middle States system on behalf of Haskell, maintaining a number of accounts in various names for Haskell.

261. The executors of Cohen's estate, following his death on October 10, 1940, found in his vault $32,200 face amount of undeposited United Oil Producers Corporation bonds.

262. Of these, $24,700 face amount of bonds were on January 25, 1924 in the possession of William W. Cohen & Company as trustee or agent for Reliable, then owner of the bonds.

263. On May 20, 1924, Cohen refused to give Reliable a statement of its account, stating that he considered the Reliable, Kelly, and Middle States account all one. He did offer to let one of Reliable's men look at his books and copy what he wanted.

264. Reliable did not discover that Cohen had possession of the $24,700 bonds which had been in Reliable's ownership. The receivers of Reliable first discovered that fact during the preparation for the trial of these objections.

265. The remaining $7,500 of undeposited United Oil Producers Corporation bonds were in Cohen's possession at least as early as December 31, 1928.

266. Cohen also held a certificate of deposit for $11,000 face amount of United Oil Producers Corporation bonds which he exchanged under the plan and agreement of reorganization for bonds and voting-trust certificates for A stock in the new company.

267. Wachsman & Wassell, a brokerage firm of which Cohen was a partner, held certificates of deposit for some $86,000 face amount of Middle States Oil Corporation serial notes, which they exchanged under the plan for voting-trust certificates for A and B stock in the new company.

268. Cohen, William W. Cohen & Company, and Mrs. Cohen had actual notice by mail of the sales to be held in December, 1929, and of the hearings on confirmation.

269. Time for deposit of bonds under the plan was cut off on May 14, 1930.

270. Notice of the availability of the distributive values on the United bonds was published shortly after July 25, 1933.

271. January 11, 1935, after the death of Haskell in 1933, Cohen presented the $32,200 face amount of United bonds for payment of the distributive values thereon.

272. January 13, 1935 Cohen was paid $22,493.31, the distributive values on the $32,200 face amount of United bonds, of which $17,207.99 represented the distributive value of the $24,700 face amount of bonds which had been the property of Reliable.

## Conclusions of Law

1. The Court has jurisdiction over the receivers Glass and Tumulty, the receivership estate of United Oil Producers Corporation, the objectants, and Middle States Petroleum Corporation and over the subject matter of the final accounting of the receivers of United and of the counterclaim of Middle States Petroleum Corporation against the estate of William W. Cohen.

2. Objectants have failed to establish any right to surcharge against the receivers or recovery against Middle States Petroleum Corporation in favor of the estate of United Oil Producers Corporation or any of those claiming through said estate.

3. Middle States Petroleum Corporation has failed to establish, by a fair preponderance of the evidence, that it did not have knowledge or means of knowledge of the alleged fraud of Cohen at its occurrence in 1935 and is, therefore, debarred from recovery on the cross-claim by the applicable New York statute of limitations.

4. The Court should not grant final discharge of Glass the receiver of one of some 39 corporations in receivership in this action where the same receivers have acted in all the receiverships, where the receiverships have been treated for many purposes as a unit, while unresolved controversies exist between some of the receiverships and a corporation, formed under a plan of reorganization of some of the corporations in receivership, in which the receiver Glass is substantially interested and of which he is the executive head.

5. The receiver Tumulty, physically incapacitated from taking part in the conduct of the receiverships since 1941, should be granted a discharge.

A memorandum of decision is filed herewith and is hereby made a part of these findings of fact and conclusions of law.

Memorandum of Decision

Rulings on Evidence

The Corporate Minute Books

■ Certain of the minute books of the corporations involved were not marked in evidence, failing specification of the portions claimed to be relevant and material and of the ground of claimed relevance and materiality. It is true that much in the minute books, both of the old companies, if in the receivers' possession, and of the new company, might be relevant and material on some of the points in issue. The purported specification received May 1, 1950 is, however, far too vague. To dump into evidence additional volumes or portions thereof without proper specification of relevance and materiality would merely further overload an already unmanageable record to no useful purpose. No portions of corporation minute books not specifically admitted in evidence will be considered, therefore.

The Boston Stock Exchange Prints

The Court reserved ruling on the admissibility of the Boston Stock Exchange prints, Objectants' Exhibits No. 510a, b, and c for identification pending argument in the briefs on their admissibility. The prints were dated May 17, August 18 and December 5, 1923. There is no showing in the evidence that they came to the attention of the receivers at any time prior to the trial of the objections to the final accounting herein. They may be excluded from evidence.

The Objections to Discharge of the Receivers

■ The principal objections to acceptance of the receivers' final accounting and discharge of the receivers in the United Oil Producers Corporation receivership are the claimed conspiracy on the part of Glass and others to strip the receivership estates of assets for the benefit of Middle States Petroleum, the new company, and to obtain and profit by control of the new company, and a claimed violation of the Boyd Rule in the reorganization which allowed Middle States Oil stockholders to participate in the reorganized company while the United Oil Producers bondholders were not offered payment in full.

The principal charges of fraud and conspiracy, of collusion to obtain sales by an unnecessary default on the U.O.P. bond obligations and of inadequate prices on the 1929 sales are not supported by the evidence. Objectants' accountants proved of no assistance in this regard on the accounting and valuation questions. So far as United itself is concerned, if the Court's conclusions are correct, there can be no recovery against M.S.P. or surcharge of the receivers or of Glass alone, for where the receivers have failed in their duty of full information and diligence on the sales, no harmful result has been shown.

Objectants' thrashing around through the history of the group of receiverships has, however, revealed still unresolved questions whose solution may result in benefit to some of the shareholders and creditors of the old companies.

There have been brought to the attention of the Court thereby on the trial of the objections various unresolved controversies in the receiverships which al-

so require the attention of the Court whether or not their solution is required in passing upon the conspiracy and Boyd Rule charges.

The charges of fraud and the unresolved controversies may be outlined as follows:

1. Fraud and Conspiracy. In general.
2. Specific Claims of fraud and conspiracy.
   a. Failure of receivers to attack the serial-note issue.
   b. Participation by the receivers in the formulation of a fraudulent reorganization plan for the benefit of M.S.A. stockholders.
   c. Failure of the receivers to insist on the application of the corporate instrumentality doctrine in the establishment of the intercorporate claims.
   d. Establishment and readjustment of the inter-corporate claims to benefit M.S.P.
   e. Chilling of bidding on the sales, lack of appraisals and of balance sheets.
   f. Fraudulent allocation of overhead.
   g. Liquidation of subsidiaries, purchase of properties of subsidiaries at inadequate prices, illegal advance of receivership funds to M.S.P. all for the benefit of M.S.P. and to the detriment of the receivership estates.
   h. Fraudulent allowance of the Gulf Coast claim on insufficient notice of hearing and without bona fide defense by the receivers.
   i. Failure of receivers to prosecute claims against the former management.
3. Matters Remaining Undetermined.
   a. Validity of the pending so-called $4,000,000 claim.
   b. Undetermined ownership of Gulf States stock.
   c. Undetermined ownership of M.S.O. Oil Corporation assets.
   d. Allocation of overhead. (See 2f)

   e. Treatment of post-receivership inter-company advances. (See 2g)
   f. The responsibility of receivers or M.S.P. to minorities under the Boyd Rule because of the failure to allow participation of inter-company creditors of M.S.O. in the reorganization. (See 2b)
   g. Accountability of receivers or M.S.P. for the losses suffered by Western's estate on the Chatham-Phenix notes.
   h. Ditto re the losses suffered by the Sure or other estates, on the purchase of Plains or other securities.

There is also the question of whether the Court may pass upon the counterclaim of M.S.P. against the Cohen estate based on the alleged conversion by Cohen of $24,700 face amount of U.O.P. bonds belonging to Reliable.

There remain also for consideration special defenses of the receivers and of M.S.P.

General Allegations of Fraud

There are a number of factors in the situation disclosed by the evidence presented in this case which require caution in applying the ordinary tests to the behavior of the parties, both the receivers, in the conduct of the receivership estates, and the objectants, in making accusations of irregularities, without complete proof or, indeed, complete understanding of all the facts and factors involved. Some of these factors will be found to have justified the Court in some apparent departures from what would be normal practice in simple receivership matters and some of these factors, by reason of these departures or by reason of the absence of information or the difficulty of making information available, created grounds for suspicion on the part of the objectants.

Perhaps the first among such factors is the inadequacy of the old equity receivership methods as means of corpo-

rate reorganization. Machinery adequate to the foreclosure of a lien on a small parcel of real estate lacked means for protecting all the interests in the wreck of the Haskell companies. The complexities of the corporate structures in this case were further complicated by the manipulations of the assets of all the various corporations by the Haskells and the non-creation or destruction of records of the transactions of the corporations with the Haskells, with their brokers, and with each other, and the long period of time necessary for the development of reasonably reliable figures on these relationships and transactions.

Faced with the complexities of the situation, it was proper for the Court to appoint Olcott, Olcott & Glass, who had been counsel for the original plaintiff in the Shivers action and for the original stockholders' committee, as one of counsel for the receivers, and to appoint Glass of that firm who had been counsel for the plaintiff and, thereafter, for the receivers as one of the receivers to take the place of Judge Mayer upon his death.

The Court thereby made use of Glass' understanding of the complexities of the situation acquired at great expenditure of time and effort. The change from the second capacity to the third left Glass or Glass' firm, of course, with some interest in the fees earned in earlier capacities, including service to the stockholders' committee, prior to his becoming directly connected with the receivership as one of the firm which was one of counsel for the receivers. There was also an interest in the fees of one of tax counsel who acted in the tax litigation for the receivership, which interest grew out of the rental of a portion of the Glass firm's offices to Hamburg on a fee-sharing basis. This was fully disclosed to the Court and was considered each time the Court allowed any fees for services to the Hamburg firm. Following the reorganization and creation of the new company, there was Glass' dual position as president, voting trustee, and director of the new company while still carrying on the receiverships, and throughout the entire course of the receiverships there was always the duality of the position of receivers as receivers of both corporations when any two of the corporations in receivership had any conflicting interests. There was never any concealment from the Court of any of these dual positions and some were entered into upon the appointment or approval of the Court. The only interest which was not disclosed at the time it arose was the acquisition of voting-trust certificates for stock in the new company by Glass and his family, beginning in 1939, which has continued until some 8% of the voting-trust certificates are now held by Glass' family group and some additional amounts by members of his law firm.

There are also a number of instances of impatience of Glass with requests for full information made by minority security holders of some of the companies in receivership. Glass took the stand then and upon the witness stand that the interests involved were not of sufficient importance to require the laying aside of other tasks and devotion of considerable time to the development of information for such minor claimants. It may be that there were times when other matters of more immediate importance to the receivership estates prevented the expenditure of substantial time and money on the development of information for those who would probably turn out to have no financial interest remaining in the receivership estates. At the very least, however, access to the records and some assistance from the receivers' staff in understanding them would have been prudent on Glass' part. A fear in the beginning of the receivership of attempts on the part of the Haskell interests operating through someone else to regain a foothold in the picture, or a fear in the later stages that information might lead to strike suits or to useless litigation founded on inability to understand the complications, may be explanations of Glass' reluctance to make full

disclosures but do not excuse that reluctance; or, even if we might say that they do excuse it, they certainly remove any cause for Glass to complain about the burdens to which he has been put by reason of the objectants' attempts to develop the full story and to produce information which the objectants believed would substantiate their suspicions of wrongdoing.

Even though Glass may have been a receiver of perfect probity, there is no gainsaying the fact that he was one of a group who turned up after one of the old equity reorganizations with control and management of the reorganized entity and that he has profited greatly over the years from his association with the reorganized entity. It also, in all fairness, has profited greatly by Glass' association with it. It cannot be denied that of the twenty years that have elapsed since reorganization, some fifteen of which had passed before the beginning of these proceedings by objectants to force an accounting, only the first three years approximately were occupied in active litigation to resolve the undecided conflicts among the receiverships or between the receiverships and the new corporation. The first ten years of operation of the new entity were undoubtedly filled with great difficulty. The survival of the new corporation in those days had a first call on Glass' time and energy. Thereafter the critical oil problems of the early days of World War II faced the industry. His duty to the Court, however, so long as any of the receiverships remained open, was to complete the work of resolving the undecided conflicts and of winding up the affairs of all the estates so that any minorities which had any surviving interest might have an opportunity to be heard on his discharge from his receivership duties.

The delay alone would give some basis for objectants' suspicions. A great deal depends upon the honesty and good faith of Glass in his inaction here as with his actions in every respect.

On the whole, he gave the impression, during his extended testimony, of sincerity and honesty of purpose. He was unconvincing on two subjects,—the explanation of his erroneous testimony that his M.S.P. salary was not included in the overhead allocated to the corporations in receivership, and in his testimony as to the meaning of his statements on the Manning trial in Delaware. With these possible exceptions, he appeared through the long weeks on the stand, frank and honest in testimony and thoroughly convinced of the good faith of his every action in the receiverships. Moreover, many of the individual actions attacked by the objectants turned out to be convincing illustrations of Glass' good faith in dealing with his trust. The readjustment of inter-corporate claims after reorganization, in May, 1930, for instance, operated to the disadvantage rather than to the advantage of M.S.P. The appraisals and the eventual realization by M.S.P.'s subsidiaries from the sales in the ancillary jurisdictions are convincing proof of meticulous care that the sellers be treated fairly. So also with the comparative prices paid receivership estates and outsiders for similar securities purchased by M.S.P.

Some of Glass' transactions may have been harmful to some of the receivership estates. If so, the Court is convinced that they were not the result of active fraud or attempts to despoil the receiverships for his own benefit or that of M.S.P. It may be, however, that in some instances such as failure earlier to realize on the collateral behind the Chatham-Phenix note he was unconsciously influenced by a desire to benefit the group of receiverships as a whole and later M.S.P., rather than to act solely for the benefit of the estate of Western. That was a danger incurred by the Court in order to avoid the expense of some thirty-eight additional receiverships. If it did occur and cause damage to the estate of Western, some means must be found to rectify it.

The general charges of fraud and conspiracy are not proved.

Some of the specific items of claimed fraud may be taken up separately.

### The Serial-Note Issue—2(a)

It is somewhat difficult to determine the exact position taken by the objectants on the serial-note issue. They claim that Glass' position as receiver in not opposing the participation of the serial-note holders in the reorganization is inconsistent with his position as attorney for Shivers in attacking the serial-note issue in the original Shivers action. It may be that they also contend that Glass' failure to oppose the participation of the serial-note holders in the plan grew out of the interest of Glass' firm in a fee from the stockholders' committee for work done prior to the connection of the firm with the receiverships, that is, that Glass failed to oppose the participation of the serial-note holders in return for their agreeing to permit the participation of the stockholders of M.S.O., in claimed violation of the Boyd Rule, at the expense of the bondholders and the minority stockholders of corporations which were intercompany claimants. The serial notes issued by Middle States Oil were of doubtful validity, to say the least. They were issued primarily to bail out the brokers whose solvency was endangered by Haskell's long position with the brokers in Southern stock when his speculation in Southern stock ended disastrously. Two major considerations appear to have entered into the determination of the receivers Mayer and Tumulty, and later of Glass and Tumulty, to abandon serious contest of their validity. One of these, and perhaps the principal one, was the practical consideration that a number of what were, in the early stages of the receivership, considered to be the most valuable producing properties, were a part of the M.S.O. receivership res and available for possible reorganization purposes only by reason of the ownership by M.S.O. of the stock in S.S.O. which had been obtained through the serial-note transaction.

The other major reason which appears to have influenced the receivers at that stage of the proceedings was the possibility that a large proportion of the serial notes was not subject to successful attack because in the hands of bona fide holders for value. It does not appear what proportion of the notes were in the hands of such holders, who could only be holders in due course if they acquired the notes prior to default or receivership, but it is evident that a very substantial proportion of notes was still in the hands of the brokers to whom they had been originally issued, notably the Byrne firm, and were there, therefore, subject to attack. There does not appear, however, any evidence of evil intent or design influencing the decisions of the receivers not to attack the validity of the serial notes. Such an attack would have added substantially to the confusion and expense of litigation, caused further delay, and lessened the possibility of salvaging any reorganized entity from the shambles Haskell had left.

The taking of a practical rather than purely legalistic course in this regard as in many others in resolving the extraordinary difficulties of these receiverships, without full participation by all those involved through the interests of the minority bondholders and minority stockholders, particularly in view of the repeated representations by the receivers as to fairness of the plan and consideration for the rights of minorities, placed an extraordinary burden not only upon the receivers but also upon the participants in the plan who became security holders in the new company, to see that substantial and not only technical, protection was given the minorities no matter how small their proportional interest in any given situation might be. The solution of the problems raised by the plan in this case may perhaps best be resolved not by invalidation of the plan but by some early and fair determination and settlement of any obligations which may exist to minorities.

2(b) Was the Reorganization Plan Fraudulent as to any Creditor's or Stockholder's Interests?

While there appears to have been no attempt to defraud, or evil intent, in the formulation and adoption of the reorganization plan, it may have been legally fraudulent, either because in violation of the so-called Boyd Rule or because it gave a false impression to minority stockholders or creditors of corporations in the group, other than M.S.O., that the status of those corporations as functioning producing, or holding, companies would not be changed. Taking this second possibility first, it would appear that the lack of provision for the minority stockholders and the inter-company creditors in the plan, as well as the assurance that the minorities would not be affected, and the receivers' assurances that it was their opinion that the plan was fair to all concerned, together with such facts as the bid of some $500,000 for the majority stock of Southern in the sale on foreclosure of the serial-note indenture, must have led the scattered minority stockholders of Southern and of its subsidiaries to believe that Southern's existence as a functioning corporation would continue under the plan and that there was no necessity for the formation of a separate protective committee to represent the Southern and other minority stockholders' interests which were not represented by committees, so that they might have some voice in deciding whether Southern, Western and Republic, among others, would be continued in operation. The existence of these minorities, lulled into a feeling of security which led them to continue without active representation, either of itself or in conjunction with the Boyd Rule, may have made the plan, as adopted, fraudulent.

██ The Boyd Rule in brief may be described as a rule that, in a corporate reorganization, no junior security may be given participation without providing a new consideration therefor, unless all securities senior to it have received the full equivalent of their rights against the estate. Northern Pacific Ry. Co. v. Boyd, 1913, 228 U.S. 482, 33 S.Ct. 554, 57 L.Ed. 931. So far as the U.O.P. and O.L.D. bondholders are concerned, participation in the assets of the corporations which had been liable on the bonds, by the M.S.O. stockholders through the sales and reorganization plan would be a violation of the Boyd Rule unless the U.O.P. and O.L.D. bondholders received the full equivalent of the principal and interest due them on their bonds. This does not mean, however, that they must have received it in cash. Northern Pacific Ry. Co. v. Boyd, 1913, 228 U.S. 482, 508, 33 S.Ct. 554, 57 L.Ed. 931. They did, in this case, receive the full equivalent inasmuch as they had the opportunity to accept new bonds for the full amount of the principal due on the old bonds, even though at a lower interest rate, plus stock which was preferred, both as to dividends and as to rights on distribution of the corporate assets, for the interest due on the old bonds. If the sale prices were fair, the fact that the cash available in the alternative to the securities was less than the amount due, being approximately a total of 70% of the face amount of the old bonds, would not prevent the offer from being equivalent since the one alternative did provide substantial equivalence. Nor would the fact that the offer was not held open permanently prevent it from being good since some reasonable time period limitation is recognized as essential for the closing of the books on such offers. Jameson v. Guaranty Trust Co. of New York, 7 Cir., 1927, 20 F.2d 808, 814.

However, even if fair as to the dissenting or nondepositing holders of U.O.P. and O.L.D. bonds (whose amount, it may be noted, is very small, both absolutely and in proportion to the amount of the outstanding bonds), the fact remains that very substantial debts of M.S.O. to the other corporations in the group were not provided for by the plan and that, on eventual liquidation, those creditors can expect to receive no more than some 13% of the face amount

of their allowed claims, while the M.S.O. stockholders obtained a share in the new corporation, including the assets which were available for the satisfaction of the creditors' claims and which, through the sales, came into the possession of the new corporation. The old M.S.O. stockholders as such did not provide any new consideration for the shares in the new company received by them, each receiving one share of the B stock of the new corporation for four shares of the stock of the old corporation. It may well be that on the basis of either forced-sale values or going-concern values at the time of the sales, the M.S.O. stockholders, as well as the others who received B stock, received therein only a participation in a hope of future profits of the new corporation which was, at the time of the sales, so remote that no value could be placed upon it or would have been placed upon it by the investing public in excess of a nominal speculative price. That hope the old M.S.O. stockholders did get and they provided nothing to the plan except their old stock. Others, such as the Westervelt Committee, may be said to have provided assets which were not included in the assets of the old corporations. Those assets might make the Boyd Rule inapplicable insofar as the issue of stock to the Westervelt Committee is concerned. They cannot do so so far as the issue to the old M.S.O. stockholders is concerned, for those old M.S.O. stockholders gave up nothing in which they had any interest not subordinate to the M.S.O. creditors, inter-company or otherwise.

It is probably true that the reorganization bar at the time of the promulgation and adoption of the plan in this case in 1929 did not believe that the Boyd Rule was a rule of absolute priority and prohibited such a result as was reached here. It is true also that the provision of shares of stock on the same basis for each of the inter-company creditors as for one of the classes of creditors or claimants participating in the plan would have greatly complicated the inter-company stockholdings. This does not mean, however, that there was no possible alternative to the issue of stock on the same basis, for some plan undoubtedly could have been worked out which would have adjusted the accounts between the corporations and provided additional stock in the new corporation to the minority stockholders on the basis of such an adjustment at the time. This was not done because it would have been somewhat more complicated and because it was not considered at all necessary at the time. At the time it would seem from the amount bid on the Southern States majority stock in the sales that it was expected that eventual recoveries throughout the maze of inter-corporate claims would be sufficient so that some eventual cash recovery would be possible to the minorities in Southern and other corporations in which there were minority interests. The pending unresolved complications then in litigation postponed the possibility of liquidating the inter-corporate claims. The depression of the 1930's destroyed their value as claims, for the assets of the subsidiaries, insofar as they consisted of producing oil properties and equipment, were necessarily liquidated at depression prices. Oil properties are depleted at a rapid rate, most of their eventual total pay-off being returned in a period often as short as three to five years so that, by the end of the depression years and the beginning of recovery in the oil business by the late 1930's, the producing properties which had represented a large part of the assets of the subsidiaries in which there were minority interests at the time of the sales, were completely liquidated.

The end result was that the creditors who had been left in the position of creditors of the estates in liquidation of the subsidiaries, as well as those whose assets were liquidated at the time of the sales after the stock market crash of 1929, could hope to receive only dividends on liquidation while the stockholders of M.S.O. received a participation in the going concern created out of the assets which had formerly made up the estates

of the debtors of those creditors. That participation, although it was as thin as a shoestring for many years, eventually with the recovery of the oil business, the survival of the new company under Glass' astute management, and its expansion under that management in the boom years of the 1940's, the paying-off of the new company's bonds (in large part with the proceeds of liquidation of the various receivership estates advanced to the new company for that purpose) and the eventual retirement of the A stock, became ownership of a highly valuable property.

If the Boyd Rule was violated, as it would appear to have been, at least insofar as the interests of the minority stockholders of Southern, Western and other subsidiaries existed in debts of M.S.O. or of other subsidiaries to whom M.S.O. was indebted, or if the plan was otherwise fraudulent because minority stockholders of those creditor subsidiaries were lulled to sleep, what is the nature of the remedy which can now be made available to those minority stockholders?

Is it to be measured in terms of the present value of the shares received by the M.S.O. shareholders, by the value of their shares, slight as it was at the time of the sales, with interest from that time, by translation through the inter-corporate maze into amounts then due to the minority stockholders of the subsidiaries (See Note A), or in some other manner?

Note A

The Extent to Which Outside Creditor Interests Would Benefit
by the Application of the Boyd Rule

Each item represents a debt of MSO to the particular company listed.

1. Pawnee Osage (solvent) — $ 302.58
   MSP stockholdings — 91.16%
   Am't collectable by outsider stockholders from MSP — 8.84% — 26.57

2. United Oil Producers — 226,650.87
   MSP acquired this receivable of UOP as one of its free assets; hence it washes out.

3. Central States (solvent) — 656.93
   100% owned by Peters which is insolvent. For effect of allocation among Peters' creditors see (12) below.

4. Corona (solvent) — 33,226.16
   100% stock ownership acquired by MSP on sales; hence it washes out.

5. Eureka (solvent) — 44,602.31
   97.99% of stock acquired by MSP on UOP foreclosure. Am't collectable by outsider stockholders from MSP—2% — 892.04

6. Federal (solvent) — 82,856.47—
   Owned 100% by Gulf States to the stock of which MSP acquired a claim, tentatively carried at 75.42 of total capital stock (this claim is unresolved). Gulf States was solvent. Minority interests could collect on the basis of Federal claim. — 20,382.00

7. Gulf States — 82,833.81
   Same as 6
   Minority interests could collect — 20,376.00

8. Marr (solvent) — 80,888.28
   Owned 39.71 by Gulf States
   Claim in settlement
   Purchased by Gulf—same as 6 — 19,898.00

9. Judson (insolvent)                                                        31,638.06

    Owed:  a) Imperial    1,368    .004
            b) Columbia  118,963   .31
            c) Southern  257,498   .676
            d) Sure      3,507    .01

                    381,366   1.00

    a)  .004×31,638 = $126 due Imperial
        This washes out because MSP acquired free assets Imp.
    b)  .31×31,638 = $9,807 due Columbia (solvent)                                    $   520.00
        Of this 5.3% goes to outside shareholders
        The balance of 9,287 goes to Southern, the majority stockholder.
        Carried fwd. to (c)
    c)  .676×31,638 = 21,397 due Southern (insolvent)
           + 9,287 " " thru Columbia

           $30,684 total due Southern
      Southern owed:
           (1) OLD   424,269.20   .576
           (2) Col.   302,722.96   .410
           (3) Reli.    8,845.48   .014

                735,837.64 — 1.00
    (1)  .576×30,684 = 17.684 due OLD
        This washes since MSP acquired OLD's free assets
    (2)  .410×30,684 = 12,670 due Columbia
        Of this amount 5.3% would go to outside shareholders of Columbia               666.00
        The balance, 11,904 would come back to Southern as stockholder of
        Columbia, and would be distributed among Southern's creditors in-
        cluding Columbia. This process would go on indefinitely, but the
        amount accruing to Columbia's minority would be negligible. By
        far the greater am't would "wash out" thru OLD & Reliable.
    (3)  .014×30,684 = $430 due Reliable
        This would largely wash out through MSO and UOP, the principal
        creditors of Reliable.
        Recap: It largely washes out except for a small amount going to
        the Columbia minority.

10. Leahy (solvent)                                                          $  4,587.00
    a)  Owned: 50.46 by Dominion (insolvent)
    b)         49.54 by Peters (insolvent)
    a)  Dominion owed Imperial                                                  36,494
                  MSO                                                              488,796
        Since the free assets of both Dominion creditors were ac-
        quired by MSP on sales the part of the claim allocable to
        Dominion washes out.
    b)  Peters owed Imperial                                                    92,906
           #1                                                                  56,576

                            149,482

Amount allocable to Imperial washes out. Since #1 is rendered solvent, see
item (12), and since MSP acquired a 100% stock interest in that Co., the #1
portion likewise washes out.

11. Peters Leahy (solvent)                                                   $  1,569.00
    Since this company wholly owned by Peters the entire amount would
    go to Peters and is carried forward to item (12).

12. Peters Oil Co. (insolvent)                                              234,680.00
    plus carryover from item (11)                                          236,249.00

    Peters owed:  Imperial  92,906
                #1        56,576
    Was insolvent only by 27,332
    and was owned 100% stockwise by MSP. 27,332 would first be used to give
    the creditors, Imperial and #1, full satisfaction of their claims. The
    amount going to #1 would increase #1's assets by $11,084, thereby mak-
    ing it solvent. The sums accruing to #1's creditors, in the process of
    its becoming solvent, would largely wash out due to the relationship
    between each of the respective creditors and MSP (Chief #1 creditors
    are Reliable and Corona). The amount paid to Imperial would wash
    out. The amount payable to stockholders of Peters would wash out since
    MSP is 100% owner.

13. Southern States (insolvent)                       51,372.29

    Owed: a) OLD   424,269.20   .576
           b) Col.   302,722.96   .410
           c) Reli.     8,845.48   .014

    a) Amount accruing to OLD washes out.

    b) .410×51,372 = 21,063 due Columbia.
        Of this, outside shareholders get .....................................        1,116.00

        The balance goes to SSO — 19,947. The balance returning to SSO would be distributive as before among its creditors and, except for a negligible amount going to the Columbia minority would eventually wash out through allocation to either OLD or Reliable.

    c) The amount owing to Reliable would be distributed to its creditors the largest of which were MSO & UOP and would largely wash out.

14. Sure Oil Co. (solvent)                          $102,159.04

    100% owned by Southern, hence whole sum would go to Southern and result would be same as in (13).
    Columbia minority would get                      2,220.00

15. Western States (insolvent)                     289,934.03

    Insolvent by  185,617.75
             —   83,714.19
               101,903.56

Therefore $101,903 would be distributable among the following creditors to repair the (insolvency) deficit:

Total Owing

| | | | |
|---|---|---|---|
| Imperial | $52,999 | washes out | |
| MSO | 11,142 | " | " |
| OLD | 30,825 | " | " |
| Reliable | 177,471 | largely washes out | |
| Central | 10,798 | washes out | |
| Corona | 16,726 | " | " |
| Marr | 3,432 | " | " |
| Leahy | 8,548 | " | " |
| OLD Op. | 12,259 | largely washes out | |
| SSO | 447,155 | " | " | " |

The balance, 188,031 would be distributable among Western stockholders: Southern would get 73.3% of this or $137,263. The share of the Columbia minority would be (figured as above)            3,019.00

The share of Western minority shareholders       50,768.00

The third alternative appears the most feasible and the most in accord with the spirit of the Boyd Rule. If M.S.O.'s inter-corporate or few general creditors are paid in full, with interest, if the remaining controversies are determined and the allocation of expenses determined with care not to allow such items as Glass' salary against the receiverships or any expenditure for development purposes against receiverships not benefiting thereby, a final result fair to the minorities may be arrived at.

### 2(c) The "Corporate Instrumentality" Doctrine

Objectants contend that all the corporations had claims against Middle States Oil for all their losses since Middle States Oil had required the losses to be incurred by the subsidiaries for its (M.S.O.'s) benefit while the subsidiaries were operated by M.S.O. as its departments or instrumentalities.

Objectants do not point out, however, as to each transaction attacked, the manner in which the transaction was engineered by M.S.O. So far as the transactions were those of Reliable or Southern States Oil before 1924, of course, M.S.O. was not in a position to control either as its subsidiary. So far as the transactions involved corporations which were, at the time of the transactions complained of, under M.S.O.'s stock ownership and control, no facts are pointed out to establish that the corporations were operated in the specific transactions, as departments of M.S.O. or that those who dealt with them so regarded them. Indeed, it is more likely that all were used indiscriminately for the benefit of the Haskell interests to meet problems of the moment, without any plan of control through M.S.O., but rather by reason of Haskell's control of management through whatever channel was open to him, whether or not it involved M.S.O. There

are instances such as the Gladiolus lease sale which might have made M.S.O. liable as well as Reliable if Wichita was required to make the loan for M.S.O.'s purposes. This is by no means clearly established. It may also be that loans made by M.S.O. to Imperial to allow Imperial to pay dividends (of which 90% would be paid to M.S.O.) were for a clearly illegal purpose at the time, which must have been known to M.S.O. through its control of Imperial, and that, therefore, such inter-corporate claims should not have been allowed. Such advances of dividends were deducted from M.S.O.'s claim against Ranger Texas when they were identified as such. That is not the sort of "corporate instrumentality" doctrine for which objectants seem to contend, however. The contention as made is too broad and must be overruled. If the fixing in 1930 of the inter-corporate claims is to be upset, the attack would, of course, be open to renewal as to any specific item involved.

### 2(d) Establishment of Inter-Company Claims

The financial relationships between the various companies prior to receivership were determined, with some reservations, after notice to the corporate entities represented by counsel and to the committees, on the receivers' petition for instructions, on December 14, 1929.

The debits and credits produced a net result as shown in the order, Receivers' Exhibit 123b [1]. (And see schedules attached to Finding 91.)

The pre-receivership accounts between the companies had been reconstructed by the accountants hired to set up company books as part of the effort to resist the tax claims and to obtain tax refunds.

### I. Order.

This cause came on to be heard at this Term upon the petition of Joseph P. Tumulty and Joseph Glass, Receivers of the above named defendant companies, for an order requiring all parties interested to appear on this the 14th day of December, 1929, and show cause, if any there be, why the intercorporate claims as summarized on Exhibit "A", referred to and made a part of the petition of said Receivers, should not be found, determined and adjudicated by this Court, to be valid claims in favor of or against the several defendants as shown by said Exhibit "A", subject to readjustment by further order of this Court from time to time upon further showings by said Receivers, and why the order of this Court, dated May 14, 1925, referring intercorporate claims to Earl B. Barnes, Esquire, Special Master, should not be modified by withdrawing the intercorporate claims from such reference; and was argued by counsel; and thereupon, upon consideration thereof, the Court finds, adjudges and decrees, as follows:

### I.

That said order to show cause has been duly served pursuant to the order of this Court.

### II.

That the intercorporate claims, as summarized in Exhibit "A", attached to and made a part of the petition of the Receivers filed herein, are valid claims in favor of or against the several defendant companies as shown by said Exhibit "A".

### III.

That the intercorporate claims, as summarized in Exhibit "A", attached to Receivers' petition and made a part thereof, be and the same hereby are allowed in favor of or against the several defendant companies as shown by said Exhibit "A", subject to readjustment by further order of this Court from time to time upon further showing of petitioners, Joseph P. Tumulty and Joseph Glass, Receivers, but not otherwise, the Court reserving jurisdiction for such purpose until final decree is entered barring the assertion of further intercorporate claims by said Receivers.

### IV.

That the order heretofore made by this Court on May 14, 1925, referring intercorporate claims to Earl B. Barnes, Esquire, Special Master, be and the same hereby is modified by withdrawing said intercorporate claims from the consideration of said Special Master.

### V.

That for the purpose of enforcing the provisions of this order and for the purpose of entering such further orders and decrees as the Court may deem proper, the term of this Court is hereby extended and exclusive jurisdiction of this cause is hereby retained.

Made and entered this 14th day, of December, 1929.

Glass checked over the books of inter-company accounts when they were typed up and presented to him for review. As to a number of items he raised questions based on his knowledge of the history of the companies obtained during the receivership. He felt, however, that not sufficient time remained to determine the items which he questioned, to retype the schedules and present the matter to the Court before the sales. He, therefore, inserted reservations concerning those matters in the application for instructions on December 9, 1929 and inserted in the proposed order language permitting re-determination of items on the application of the receivers. By telephone he explained to counsel for the corporate entities and counsel for all the committees the nature of the questions to be reserved for later treatment. After the sales, on May 8, 1930, on similar notice, he obtained an order readjusting the inter-company accounts. The principal effect of the readjustment was to eliminate claims of M.S.O. against Dominion and Ranger Texas in substantial amounts. The changes made by the order, Receivers' Exhibit 162,[2] were as shown in Finding of Fact No. 92.

The changes in favor of Dominion and Ranger Texas resulted from the discovery, in the minute books, of the contracts binding Middle States to pay dividends on behalf of these two companies. Credits to Middle States and against the two companies for the payment of such dividends to stockholders of those companies by Middle States were, therefore, eliminated.

Because of the high percentage of interest, either through stock ownership or claims of M.S.O., against the various estates in receivership, these changes, although they, on their face, involve figures running into the millions, actually involve a relatively minor change in the value of the receivables to be sold on the sales. The receiver is probably correct in his opinion that they would not affect the judgment of a prospective bidder on the so-called mongrel assets. The nature

2. Order

This cause came on to be heard at this Term upon the petition of Joseph P. Tumulty and Joseph Glass, Receivers of the above named defendant companies, for an order requiring all parties interested to appear on this the 8th day of May, 1930, and show cause, if any there be, why the intercorporate claims as heretofore allowed by the Court, should not be readjusted, and as summarized on amended Exhibit "A", referred to and made a part of the petition of said Receivers, should not be found, determined and adjudicated by this Court, to be valid claims in favor of or against the several defendants as shown on said amended Exhibit "A", subject to further readjustment by further order of this Court from time to time upon further showings by said Receivers; and there being no opposition and thereupon, upon consideration thereof, the Court finds, adjudges and decrees, as follows:

I.

That said order to show cause has been duly served pursuant to the order of this Court.

II.

That the intercorporate claims, as summarized in amended Exhibit "A", attached to and made a part of the petition of the Receivers filed herein, are valid claims in favor of or against the several defendant companies as shown by said amended Exhibit "A".

III.

That the intercorporate claims, as heretofore allowed by this Court be and the same hereby are readjusted and, as summarized in amended Exhibit "A", attached to Receivers' petition and made a part thereof, be and the same hereby are allowed in favor of or against the several defendant companies as shown by said amended Exhibit "A", subject to further readjustment by further order of this Court from time to time upon further showing of petitioners, Joseph P. Tumulty and Joseph Glass, Receivers, but not otherwise, the Court reserving jurisdiction for such purpose until final decree is entered barring the assertion of further intercorporate claims by said Receivers.

IV.

That for the purpose of enforcing the provisions of this order and for the purpose of entering such further orders and decrees as the Court may deem proper, the term of this Court is hereby extended and exclusive jurisdiction of this cause is hereby retained.

Dated, New York, May 8, 1930.

and direction of the changes, however, are significant in that, since they operated against the interest of M.S.P. rather than in its favor, they serve to contradict the charges of bad faith in the establishment and readjustment of the inter-company claims. There may, of course, have been inter-company claims whose allowance was incorrect because of the existence of a fact situation somewhere in the history of their creation which might have been found in the minute books or in testimony of witnesses then living which could have been corrected had the inter-company claims been tried out individually, item by item, in adversary proceedings. Such an item might well be the claim of M.S.O. against Imperial for money advanced for the payment of dividends by Imperial. It might have been possible to establish that Imperial was in fact insolvent at the time of the payment of the dividends and that M.S.O. knew that it was insolvent and that the payment of such dividends by M.S.O. to the stockholders of Imperial, including M.S.O., was illegal at the time. The establishment of these accounts, however, by more proof than was contained in the rebuilt books, would have been a long and expensive undertaking. If the facts, as known, were honestly presented to the Court after proper notice to the representatives of those interested, as appears to have been the case, the adjudication should be proof against reopening on the mere conjecture that defenses may have existed to some of the items.

## Chilling of Bidding
### Appraisals and Balance Sheets

It is claimed that the sales are invalid or that the receiver is subject to surcharge because the bidding was chilled by reason of the absence of appraisals, balance sheets, and other necessary information upon which to bid intelligently.

The receivers claim that such data was available in the offices of the receivers and that sufficient notice was given to any intending bidders of the availability of such data for use. It is true that no up-to-the-minute balance sheets or appraisals, such as might be expected to be made available in a normal case, were either filed with the Court or put in shape by the receivers. This was the result not of a conspiracy to conceal the asset position but due to the difficulties in resolving all the substantial problems facing the receiverships. A complete inventory of physical properties was obtained in the course of the receivership and balance sheets were built up in the preparation of the tax briefs. These (as well as current operating data) were made available at the receivers' offices for any intending bidders. No intelligent bid could, however, be made without some knowledge of the probable future recoveries on the inter-company claims which affected, in one way or another, through the chain reaction from company to company by creditor or stockholder positions on the so-called "merry-go-round", the value of each of the parcels to be sold at the four sales. The first fixing by the Court of the inter-company liabilities, and that not without some uncertainties as to its finality, was had only a week before the sales. Without the benefit of advice on expected recoveries, available to the committees by constant consultation with Glass and his accountant Lind, for any outsiders to have bid would have been impossible. It appears that no intensive effort was made by the receivers to find outside bidders. There is no evidence, except the receiver's own testimony, as to whether such outside bidders, if found and fully informed, would have made bids in excess of the reorganization committees' bids. There is no reason, however, to doubt Glass' testimony that the value which he now believes he considered should have been placed on the mongrel assets, including the claims in the "merry-go-round", for reorganization purposes, was considerably higher than any outside interests could safely, or would, with any degree of probability, have bid.

The receivers and reorganizers faced an extraordinary, complex situation as to values. They were under constant pres-

sure from the Court to complete a reorganization before the assets of the estates were dissipated by receivership costs. They may have, and probably did, as was normal practice in those days, desired to effect a reorganization to be controlled by the interests represented on the reorganization committee. They went ahead and went through with the sales before there were available final complete and detailed balance sheets based upon the resolving of all the litigation and inter-corporation disputes. They did not, however, make it plain to the minorities involved who were not made parties to the reorganization or to the Court that technical flaws might exist in taking such a course or that the minorities' stocks might become valueless. Indeed, had the oil business prospered in the next few years, it might have been possible to clear up outstanding problems and pay off the minority obligations.

The references to tax claims in the statement filed, while technically correct, would be misleading to anyone who did not also refer to the reports of the receivers and to the receivers to determine the progress made on the income tax claims. While the tax claims would not affect the value of the physical assets, they would greatly affect the worth of the inter-corporate claims.

The statement filed gave the impression that large potential liabilities to the government existed when in fact anyone close to the situation must have known that refunds rather than payments were to be expected, and that in a very short time. That information had been published but was not alluded to in the rather perfunctory notices of sale.

Certainly the tendency of the statement filed would be to chill the sale.

In view of the complexities still unresolved, including the Westervelt claims and the Marr litigation, with all its attendant publicity, however, it is unrealistic to suppose that any notice of sale or any tentative balance sheets could have done more than give prospective purchasers a starting point for inquiry. It was not an ordinary situation, even for the receivership of a holding company and its pyramid, for here we had not only complex inter-company transactions but failure to create complete books, and destruction of much of the books which had been created. The situation was well-known to the judge who must have considered that the disadvantages of longer delay in reorganization outweighed the disadvantages of the lack of technically perfect balance sheets. The judge was by no means a rubber stamp for the receivers, seeking and obtaining from Cannon, without the knowledge of the receivers, a report on the values involved as affecting the plan, in forming his independent judgment of the adequacy of the sale prices.

The feeling persists that failure of the receivers more actively to seek and to inform prospective purchasers, however, in view of the receivers' assurances to the minority interests, made the receivers and the reorganized entity insurers of the fairness of the plan as well as of the adequacy of the bids.

So far as timely notice is concerned, the notice given was sufficient to meet the requirements in an ordinary case. In content, however, as has been indicated, it was inadequate to enable a prospective bidder to formulate an intelligent bid. No matter how much time was afforded, it was practically impossible for a bidder to evaluate the inter-corporate claims which constituted a fairly large part of the assets without intimate knowledge of their history dug up by the receivers and their accountants in the five years before the sales. So with the tax claims. The formal statement filed was not only devoid of details but positively misleading in its implication of large unresolved tax claims when the receivers knew that action on the tax claims was practically complete in their favor.

It is inconceivable, however, that anyone seriously interested in bidding would

not have made further inquiry of the receivers.

The inadequacy of information furnished is some evidence which, taken with Glass' later connection with the new company and great profit therefrom, with the long delays in cleaning up remaining controversies, the advances to the new company by the receiverships, the failure of Glass more vigorously to assert as receiver defenses to the Gulf Coast claim, the reluctance of Glass to furnish information to inquiring stockholders at later dates, and other circumstances, might justify an inference of evil intent on his part. It and they are, however, also susceptible of explanation as good-faith handling of a difficult task with no more than a normal proportion of human error.

Even though Glass did not fix the amounts of the bids, and even though he acted in good faith in furnishing complete information to the committee while advertising only an incomplete picture to a public from which he had no expectation of a bid under the conditions of late 1929, he must be held to have underwritten the fairness of the bids. He had an affirmative duty of encouraging bidding and the faulty information furnished the public was far from a fulfillment of that duty.

So far as any surcharge of the receivers for inadequacy of the bid prices as affecting the interests of the receivership estate of United Oil Producers is concerned, our first question is what is the measure of adequacy of price? Counsel who fixed the amounts to be bid attempted to fix amounts which the Court would hold to be fair if any attempt were made by dissenters to prevent confirmation of the sales or the putting into effect of the plan of reorganization. It was considered by them that under then current practice in corporate reorganizations, two-thirds of going-concern value for recapitalization purposes was fully adequate as a measure of fair value at foreclosure and receivership sales. The amounts bid approximated such a value.

On trial of the objections, the receivers established also that the bids, taken individually, were fair on such sales, having in mind the Ligon valuations of the physical assets and the nature of the so-called mongrel assets. It is true that Ligon's estimates of future recoverable oil, as proved out by experience over the years since they were made, were not 100% accurate, being high particularly on properties of some of Southern's subsidiaries, and low particularly on the three Seminole leases in which Turman had large interests. They were accurate, however, within the usual margins of error for such engineering estimates, and they were a principal basis on which any intending bidder must rely.

Unless, therefore, the receivers are to be required to make good an amount in excess of what could have been obtained on foreclosure and receivership sales had they completely fulfilled their duty of disclosure, and active seeking of prospective bidders, there is here no amount to be surcharged for their failure to fulfill that duty. The amounts bid were fair bid prices. They were to a small degree larger than the cash amounts of the bids, for they included receivers' obligations of some $88,000 to receivers' creditors and something over $500,000 in inter-receivership accounts assumed by the purchasers. More than 90% of the latter amount was, of course, eventually washed out because the purchasers were also acquiring interests in the inter-receivership creditors.

The plan had, however, at least one element of unfairness. It did not provide any safeguard for prompt litigation or compromise of all existing complexities, and for payment in cash or by an interest in the future prospects of the reorganized company for the stake which the minorities had at the time of reorganization. The original provision in the orders for final fees, reserving a portion, might have served that purpose but the reservation was later abandoned and the balance paid. The judge could not have been fully informed of the remaining problems at that time.

Whether the Boyd Rule applies and the minorities were entitled to priority over the old stockholders, or whether they were entitled only to some sort of distributive share, some provision should have been made more effectively to protect them.

That their interests turned out to be slight does not justify ignoring them.

This duty of scrupulous fairness was not met if the judge was not fully informed of the problems still remaining when the order for payment of final fees was presented to him. It was not met if the Master was not fully informed of the inclusion of Glass' salary as president in the overhead, any portion of which was to be borne by the minorities whose interests were still represented by Glass as a receiver. Nor would it be met if any allocation of overhead were presented for approval without full disclosure to the judge of the intention to liquidate any of the subsidiaries in receivership if it included expenses for development of those which were to be kept alive.

It was not met if the full story of the Chatham-Phenix note and Western States and M.S.P.'s respective interests in the handling of the collateral were not made known to the Court when the new Louisiana & Northwest Railroad stock was transferred to M.S.P.

The unresolved controversies must be presented to the Court fairly and on notice to the minorities which may be affected by their resolution before any discharge may be granted to Glass in any of these receiverships.

2(f) Fraudulent Allocation of Overhead

During the receiverships, prior to the sales, advances were made by the various receivership estates for the administrative and overhead expenses.

The charges were adjudicated December 24, 1929, pursuant to a petition for instructions dated December 19, 1929, on notice to the "parties to the cause", that is, the law firm representing the corporate entities and the committees appearing in the cause.

The judge was familiar with the course of the receiverships and had shown an especial concern over the nature and extent of the costs of administration. Notice appears to have been sufficient under the circumstances and no substantial basis has been established by the objectants to question the equity of the percentage allocations (see Receivers' Exhibit 349, copy of which is attached hereto) up to the time of the order, Objectants' Exhibit OB 54.[3]

3. **Order**

This cause came on to be heard at this Term upon the petition of Receivers requiring all parties interested to appear on this 23d day of December, 1929, and show cause, if any there be, why the basis of allocation of the administration charges, as set forth in Schedules identified as Schedules "A" and "B", attached to and made a part of the petition of Receivers herein, should not be adopted as to all such administration charges as are referred to in said petition, heretofore made and hereafter to be made herein, and why readjustments should not be made as between the defendants herein upon the basis of such allocation; and was argued by counsel, and thereupon, upon consideration thereof

It is ordered, adjudged and decreed, that the basis of allocation of administration charges referred to in the petition of Receivers filed herein, and set forth in Schedules identified as Schedules "A" and "B", attached to and made a part of said petition, be and the same hereby is adopted, approved and confirmed, to be effective from date Receivers were appointed to date of their discharge.

Made and entered this 24th day of December, 1929.

Middle States Petroleum Corporation and Affiliated Companies

Percentages Used for Allocation of General Overhead Expenses (8/15/24 – 12/31/36)*

| | Original Percentages Per Court Order in Use From 8/15/24 to 1/1/30 | 1/1/30 Adjustment Due to Reorganization of Four Parent Companies | Percentages in use from 1/1/30 to 3/4/32 | 3/4/32 Adjustment Due to Elimination of Marr Oil Corporation | Percentages in Use from 3/5/32 to 12/31/33 | 1/1/34 Miscellaneous Adjustments |
|---|---|---|---|---|---|---|
| Middle States Petroleum Corporation, | -- | 11.00 | 11.00 | 1.94118 | 12.94118 | |
| Imperial Oil Corporation, | -- | | -- | -- | -- | |
| Middle States Oil Corporation, | 10.00 | —10.00 | -- | -- | -- | |
| Oil Lease Development Company, | 1.00 | — 1.00 | -- | -- | -- | |
| United Oil Producers Corporation, | -- | | -- | -- | -- | |
| Central States Oil and Gas Company, | 1.00 | | 1.00 | .17647 | 1.17647 | |
| Columbia Petroleum Corporation, | -- | | -- | -- | -- | 1.86274 |
| Corona Oil Company, | 1.00 | | 1.00 | .17647 | 1.17647 | |
| Dominion Oil Company, | 1.00 | | 1.00 | .17647 | 1.17647 | |
| Eureka Producing Company, | 3.00 | | 3.00 | .52941 | 3.52941 | |
| Federal Oil Marketing Corporation, | 8.00 | | 8.00 | .41176 | 9.41176 | |
| Gulf States Oil and Refining Corp., | 2.00 | | 2.00 | .35294 | 2.35294 | |
| Hobbs Oil Company, | 1.50 | | 1.50 | .26471 | 1.76471 | |
| Judson Oil Company, | 3.00 | | 3.00 | .52941 | 3.52941 | |
| Leahy Oil Company, | 0.25 | | 0.25 | .04412 | 0.29412 | |
| Marr Oil Corporation, | 15.00 | | 15.00 | 15.0000 | -- | |
| M S O Oil Corporation, | -- | | -- | -- | -- | 1.86274 |
| Midstates Development Corporation, | -- | | -- | -- | -- | |
| Midstates Operating Corporation, | -- | | -- | -- | -- | |
| Number Nine Oil Corporation, | 1.00 | | 1.00 | .17647 | 1.17647 | |
| Number One Oil Company, | 0.25 | | 0.25 | .04412 | 0.29412 | |
| Number Seventy-Seven Oil Company, | -- | | -- | -- | -- | |
| O. L. D. Operating Company, | 0.50 | | 0.50 | .08824 | 0.58824 | |
| Pawnee Osage Oil and Gas Company, | 1.00 | | 1.00 | .17647 | 1.17647 | |
| Peters Leahy Oil Company, | 0.25 | | 0.25 | .04412 | 0.29412 | |
| Peters Oil Company, | -- | | -- | -- | -- | |
| Plains Petroleum Company, Inc., | 5.00 | | 5.00 | .08235 | 5.88235 | .29413 |
| Ranger Texas Oil Company, | 0.25 | | 0.25 | .04412 | 0.29412 | |
| Reliable Securities Corporation, | 1.00 | | 1.00 | .07647 | 1.17647 | |
| Republic Producing Company, | 5.00 | | 5.00 | .08235 | 5.88235 | —4.01961 |
| Southern States Oil Corporation, | 5.00 | | 5.00 | .08235 | 5.88235 | |
| Sure Oil Corporation, | 2.00 | | 2.00 | .05294 | 2.35294 | |
| Turman Oil Company, | 25.00 | | 25.00 | 1.01177 | 29.41177 | |
| Western States Oil Corporation, | 5.00 | | 5.00 | .08235* | 5.88235 | |
| Wichita Petroleum Company, | 2.00 | | 2.00 | .0529* | 2.35294 | |
| Totals, | 100.00 | -- | 100.00 | -- | 100.00000 | -- |

*As to charges after 12/31/29, subject to final determination and final accounting and approval by the Court.

Middle States Petroleum Corporation
and Affiliated Companies

Percentages Used for
Allocation of General Overhead Expenses
(8/15/24 - 12/31/36)*

| Percentages in Use from 1/1/34 to 5/10/34 | 5/11/34 Adjustments Due to Sales of Companies' Oil Properties | Percentages in Use from 5/11/34 to 11/30/34 | 12/31/34 Adjustments Due to Merger of Companies' Assets | Percentages in Use from 12/1/34 to 6/30/35 | 7/1/35 Miscellaneous Adjustments | Percentages in Use from 7/1/35 to 12/31/35 | Percentages in Use from 1/1/36 to 12/31/36 |
|---|---|---|---|---|---|---|---|
| 12.94118 | | 12.94118 | | 12.94118 | -2.94118 | 10.00 | 10.00 |
| - | | - | | - | - | - | - |
| - | | - | | - | - | - | - |
| - | | - | | - | - | - | - |
| - | | - | | - | - | - | - |
| 1.17647 | -0.58824 | 0.58823 | | 0.58823 | 0.01177 | 0.60 | 0.60 |
| 1.86274 | | 1.86274 | | 1.86274 | 0.13726 | 2.00 | 2.00 |
| 1.17647 | | 1.17647 | -1.17647 | - | - | - | - |
| 1.17647 | | 1.17647 | | 1.17647 | -0.57647 | 0.60 | 0.60 |
| 3.52941 | | 3.52941 | | 3.52941 | 2.47059 | 6.00 | 6.00 |
| 9.41176 | | 9.41176 | | 9.41176 | 5.58824 | 15.00 | 16.90 |
| 2.35294 | | 2.35294 | | 2.35294 | 3.64706 | 6.00 | 6.00 |
| 1.76471 | | 1.76471 | -1.76471 | - | - | - | - |
| 3.52941 | | 3.52941 | | 3.52941 | -2.92941 | 0.60 | 0.60 |
| 0.29412 | -0.14706 | 0.14706 | | 0.14706 | 0.45294 | 0.60 | 0.60 |
| - | | - | | - | - | - | - |
| 1.86274 | | 1.86274 | | 1.86274 | -1.86274 | - | - |
| - | | - | 4.11765 | 4.11765 | -0.11765 | 4.00 | 4.00 |
| - | 5.14707 | 5.14707 | | 5.14707 | -3.14707 | 2.00 | 2.00 |
| 1.17647 | | 1.17647 | -1.17647 | - | - | - | - |
| 0.29412 | -0.14706 | 0.14706 | | 0.14706 | 0.65294 | 0.80 | 0.80 |
| - | | - | | - | - | - | - |
| 0.58824 | | 0.58824 | | 0.58824 | 0.01176 | 0.60 | 0.60 |
| 1.17647 | | 1.17647 | | 1.17647 | 0.02353 | 1.20 | 1.20 |
| 0.29412 | -0.14708 | 0.14706 | | 0.14706 | -0.04706 | 0.10 | 0.10 |
| 0.29413 | | 0.29413 | | 0.29413 | -0.09413 | 0.20 | 0.20 |
| 5.88235 | -2.94118 | 2.94117 | | 2.94117 | -0.94117 | 2.00 | 2.00 |
| 0.29412 | | 0.29412 | | 0.29412 | 0.00588 | 0.30 | 0.30 |
| 1.17647 | | 1.17647 | | 1.17647 | 0.02353 | 1.20 | 1.20 |
| 1.86274 | | 1.86274 | | 1.86274 | 0.03726 | 1.90 | - |
| 5.88235 | | 5.88235 | | 5.88235 | 0.11765 | 6.00 | 6.00 |
| 2.35294 | -1.17647 | 1.17647 | | 1.17647 | -0.17647 | 1.00 | 1.00 |
| 29.41177 | | 29.41177 | | 29.41177 | 0.58823 | 30.00 | 30.00 |
| 5.88235 | | 5.88235 | | 5.88235 | -0.98235 | 4.90 | 4.90 |
| 2.35294 | | 2.35294 | | 2.35294 | 0.04706 | 2.40 | 2.40 |
| 100.00000 | - | 100.00000 | - | 100.00000 | - | 100.00 | 100.00 |

After the 1929 order, the receivers continued until 1936 tentative allocations of New York overhead on the basis of the percentages set by the order, subject to final determination by future Court order. Adjustments were made from time to time with changes in corporate structure. Tulsa overhead was allocated on a per-barrel-of-production basis.

The tentative allocations of overhead were reported in the seven accountings filed with the Special Master and approved by him from 1930 until his death in 1933. When the final accountings were filed, the charges against the companies which had been allocated portions of the overhead were still undetermined by Court order.

It has not been satisfactorily shown by the receivers that post 1929 allocations were properly weighted to avoid charging against estates in liquidation expenses benefitting only those corporations to be continued as going concerns.

It has been shown that the tentative allocations included in the "pot" of New York overhead allocated among the receiverships such items as the salary of Glass as president of Middle States Petroleum.

It may well be that the net effect on minorities of erroneous percentages or improper items included in the overhead allocations is relatively small dollarwise. If errors exist, they may well be errors made in good faith. It is of sufficient importance, however, in principle that no discharge should be granted to Glass in any of the receiverships until final determination is had on this issue.

### 2(g) Liquidation

A most serious question is raised as to the legality of the actions of the receivers in deciding to liquidate the operating subsidiaries of Southern, Western and Gulf, in which there were substantial minority interests, without Court approval of the general plan of liquidation or an opportunity to be heard on the part of the minorities either on the general plan of liquidation or on the individual steps taken to carry it out.

It is probable that Southern, Western and Gulf stockholders would expect continued operation in view of the statements in the receivers' letter endorsing the plan. It may have been the intention at that time to continue some of the corporations, although consideration was soon given to complete liquidation of all but Turman, and continuance of operation only through two operating subsidiaries.

If Southern, Western and Gulf were actually insolvent when the decision was taken to wind them up as operating units, their stockholders may have no standing to complain. If they were not, they should at least have been given full information and opportunity to be heard on the course to be taken, rather than leaving to the receivers alone or to M.S.P., their largest creditor and majority stockholder, the decision as to whether liquidation and advance of the proceeds to M.S.P. was necessitated by the depletion of their properties and the undue costs of so geographically widespread an operation.

In the liquidation of the subsidiaries fraud is charged wherever the new company participated directly or indirectly in the sales of the assets. Examination of these sales, however, leads to the conclusion that they were made in good faith and at adequate prices for the properties and securities bought for the periods in which the sales were made.

If these sales are subject to attack, it is not because of the amounts received. Nor is it because the sales were made at least so far as they involved producing oil properties, for such properties are rapidly-wasting assets and may not usually economically be held indefinitely. The clean-up of the odds and ends of oil properties sold in 1934 and 1935 after action was forced by the activities of the tax ferrets was called for by the situation.

The use of the funds derived from all the sales may be another matter, however.

It will be noted that the largest of the advances in receivership are those advanced by Federal, Gulf, Southern, and Western representing income and proceeds of the liquidation of those corporations. Through the assignments to it of the inter-company claims and the claims which had been allowed on the Southern guarantee of the Gulf Coast bonds as well as its stock interest in the receivership companies and its claim against them for a share of the administrative expense, Middle States Petroleum Corporation had an eventual interest in these funds of more than 90% in each case in addition to its unadjudicated claim on the assigned $4,000,000 fraud claim against Gulf States Oil and Refining Corporation and Southern States Oil Corporation.

It will be noted that Gulf States Oil and Refining Corporation and its wholly-owned subsidiary, Federal Oil Marketing Corporation, had advanced more than $838,000. The justification of these advances depends in part on the validity of the determination by the receivers that Federal Oil Marketing Corporation was not of a size to permit of economic operation as a separate unit; likewise as to Western States Oil Corporation, a source of whose funds for the loan was in large part the liquidation of its producing subsidiary, Republic. It may be that they were not of a size to survive independently and it may be that the areas in which Federal Oil Marketing Corporation and Republic operated were too remote to admit of efficient operation under the same management as the other properties in the system.

In view of the amount involved in the Gulf-Federal advances, however, it seems questionable whether this course of liquidation and so large advances to the new corporation, rather than operation in some such manner as one of the new subsidiaries, giving the minority a chance to share in the profits as well as the risks of Middle States Petroleum Corporation's operation, should have been undertaken without specific instructions to that effect by the Court upon full notice and opportunity for hearing. Again, while the explanation of the reasons for taking the course of action of liquidation and advance of the results of liquidation to the new company which was, after all, more than nine-tenths owner, is a probable and plausible explanation, it places on the new company and on the receivers a very heavy burden of fairness and may require disallowance of the new company's claims for allocation of overhead or for interest on earlier overhead allocations, at least for the period since the filing of the last accounting with the Special Master for the period ending December, 1933.

The receivers contend that all that remains to be done on these advances to determine the amount due to the various companies is for the judge to fix a fair interest rate and that they then may be fully accounted for, subject, of course, to the controversy still not fully resolved as to stock-ownership and as to the $4,000,000 claim, etc.

It might be fairer to fix a return based on the earnings of the new company over the period. We do not have the evidence on which such a return could be computed. We do have the rate of return on the new company's bonds, and the advances were used in large part to meet the interest and sinking-fund requirements of the new company's bond issue.

In working out a fair treatment, it must, of course, be kept in mind that the total outside interest in the advances is very greatly less than the total of the advances, amounting, according to the assumption of receivers' Exhibit No. 356, (copy of page 1 of which is attached hereto), to $78,209.62, if the $4,000,000 claim is disallowed, and to $18,876.82 if the $4,000,000 claim is allowed in full.

Status of Advances by Various Companies to
Middle States Petroleum Corporation
as at 12/31/47.*

| | Assuming Disallowance of the Unadjudicated Westervelt Claims for $4,000,000 Against Gulf States and Southern States, Held by Middle States Petroleum Corporation as Assignee of Westervelt, et al.: | | | | Assuming Allowance of the Unadjudicated Westervelt Claims for $4,000,000 Against Gulf States and Southern States, Held by Middle States Petroleum Corporation as Assignee of Westervelt, et al.: | | | |
|---|---|---|---|---|---|---|---|---|
| | Total Amount** | Middle States Petroleum Corporation | | Outsiders' Interest in Advances | Total Amount | Middle States Petroleum Corporation | | Outsiders' Interest in Advances |
| | | % Interest | Amount | | | % Interest | Amount | |
| Columbia Petroleum Corporation | $ 41,553.85 | 94.33 | 39,197.75 | $ 2,356.10 | $ 41,553.85 | 94.33 | $ 39,197.75 | $ 2,356.10 |
| Dominion Oil Company | 18,025.31 | 98.78 | 17,805.40 | 219.91 | 18,025.31 | 98.78 | 17,805.40 | 219.91 |
| Federal Oil Marketing Corporation | 532,730.59 | 92.23 | 491,337.42 | 41,393.17 | 532,730.59 | 99.21 | 528,522.02 | 4,208.57 |
| Gulf States Oil and Refining Corporation | 305,935.04 | 92.23 | 282,163.89 | 23,771.15 | 305,935.04 | 99.21 | 303,518.15 | 2,416.89 |
| Pawnee Osage Oil and Gas Company | 59,021.79 | 91.20 | 53,827.87 | 5,193.92 | 59,021.79 | 91.20 | 53,827.87 | 5,193.92 |
| Plains Petroleum Company, Inc. | 34,279.95 | 98.54 | 33,779.46 | 500.49 | 34,279.95 | 98.54 | 33,779.46 | 500.49 |
| Ranger Texas Oil Company | 540.63 | 95.45 | 516.03 | 24.60 | 540.63 | 95.45 | 516.03 | 24.60 |
| Southern States Oil Corporation | 301,195.59 | 99.37 | 299,298.06 | 1,897.53 | 301,195.59 | 99.70 | 300,292.00 | 903.59 |
| Sure Oil Corporation | 26,765.71 | 98.59 | 26,388.31 | 377.40 | 26,765.71 | 98.59 | 26,388.31 | 377.40 |
| Western States Oil Corporation | 134,530.06 | 98.16 | 132,054.71 | 2,475.35 | 134,530.06 | 98.16 | 132,054.71 | 2,475.35 |
| Totals | $1,454,578.52 | | $1,376,368.90 | $78,209.62 | $1,454,578.52 | | $1,435,901.70 | $18,676.82 |

*Excludes Eureka Producing Company, 100% owned by Middle States Petroleum Corp.; also excludes open account of $3,687.42 owing to Midstates Oil Corporation, 95.55% owned by Middle States Petroleum Corporation. Eureka Producing Company and Midstates Oil Corporation are both solvent, have paid all claims 100% with interest, and all their assets have been discharged from receivership.

**Less net amount due Middle States Petroleum Corporation upon (a) allowed claims, payable directly or indirectly to it, and/or (b) its direct or indirect stock interest in the respective Companies, and/or (c) the allocated share of administrative expense of the respective Companies; plus interest on overpayment, if any, to Middle States Petroleum Corporation; all subject to final determination of such debits and credits and final accounting and approval by the Court.

## Adequacy of Notice
## On
## The Gulf Coast Adjudication

Objectants' attack on the Gulf Coast adjudication is partly based on a claim of inadequate notice. The notice was published, pursuant to Court order, in the New York Evening Post, the official paper at that time, by Court order, for the publication of court notices.

Notice was also, on May 19, 1932, pursuant to the order of the Court, mailed to all stockholders and creditors of Southern and all creditors of Middle States, fourteen days prior to the date set for opening of the trial of the Gulf Coast claims before the Special Master. Hearings closed on June 29, 1932, the Special Master's draft report was submitted on April 20, 1933.

There was no lack of adequate notice and opportunity to intervene on the part of the Southern minority stockholders.

## Allowance of the Claims

Objectants base claims of misconduct on Glass' part upon the allowance in favor of the new company of the Gulf Coast claims against the receivership estates of Middle States Oil Corporation and Southern States Oil Corporation.

It is contended that these claims were intended to be settled and discharged by the plan or reorganization. No such intention can be gathered from the wording of the plan.

It is further contended that defenses in whole or in part were known to the receivers and not revealed to the Special Master or to the Court.

The failure of the receiver to put up a more vigorous defense is no help to the objectants unless caused by his dual position or founded in lack of good faith. He made his dual position clear and had Heinfelden handle the case because of it. Had he carried out his promise of acting on behalf of the receivership rather than the company and handled the case personally, he would still have been open to criticism. The Court is unable to find bad faith or concealment of facts. The defense of invalidity of the guarantees had been considered by Judge Mayer and abandoned. Indeed, objectant seems not to urge it. There is no substantial evidence of any contemplated indemnification of Southern States Oil Corporation by Middle States Oil Corporation, nor of any agreement that Middle States Oil Corporation was to provide the funds.

The corporate instrumentality rule advanced by objectants is particularly inapplicable here, for Middle States Oil Corporation's stock interest in Southern States Oil Corporation did not arise until the serial-note transaction some months after the Westervelt agreement of September, 1923. Nor can the question of contribution arise until payment by one or the other guarantor is made.

Objectants also claim that Middle States Oil Corporation should hold Southern States Oil Corporation harmless on the guaranties because it was understood or agreed that Middle States Oil Corporation was to be the banker and that its failure in this capacity caused the default on the bonds. No such agreement appears.

Nor were the receivers absolutely required to advance the defense of partial failure of consideration for the guaranties due to failure of title to the so-called $12,000,000 claim against Island Oil and Transport Corporation. They may not be considered at fault in this regard, unless Heinfelden failed to use his bona fide judgment on availability of the defense, and the receivers knew or should have known of the lack of good faith.

The receivers here dispute objectants' interpretation of the holding in the Island Oil receivership. The receiver of Gulf States Oil & Refining Corporation had recovered judgment on the $12,000,000 claim against Island Oil and Transport Corporation in the amount of $700,000 plus in the District Court (Southern District of New York). Both sides appealed, Gulf States contending that the amount was inadequate, Island Oil and

Transport Corporation that Gulf States had no standing to sue. The Court of Appeals reversed and dismissed. 34 F. 2d 649. Receivers assert that there was no failure of title to the Island Oil and Transport Corporation claim but only a holding that insofar as it was based on a claim as assignee of the mortgagees' rights under the original contract, it conveyed nothing. Receivers contend that the Westervelt Committee could and did convey title to an interest in the claim through its position as a creditor of the mortgagor-obligee. The Court of Appeals opinion appears to point to that as the only channel through which the claim can be brought down, without, however, holding that the claim as a claim is good.

Later efforts to realize on the claim through such a channel were unsuccessful, not, however, because of lack of title to the claim.

The defense of partial failure of consideration appears untenable and Heinfelden's failure to assert it not the result of any fraudulent intent.

Other defenses urged by objectants appear to be a rehash of those put forward on behalf of the Haskell interests, considered by the Special Master and the Court and overruled.

Absent inadequate notice or fraud upon the Court, the adjudication of the claims on the guaranty of the Gulf Coast Corporation bonds must stand.

### Alleged Failure to Prosecute Claims Against the Former Management

The receivers Mayer and Tumulty, and later Glass and Tumulty, deliberately refrained from instituting action against the Haskells, Saklatvala, Cannon, Ferris, and other officers and directors of the old Haskell management. The decision not to pursue the old management was brought to the attention of the judge. Two principal reasons existed: first, that it was impossible to unsnarl the tangle of affairs between the various corporations without some assistance from some members of the old management, and it was likewise impossible to resist effectively some of the claims put forward against various companies in litigation brought by outsiders, such as the Marr and Vitek litigations, without the cooperation of some of the old management; the second principal reason was the slight prospect of any substantial recovery from those constituting the old management.

The Haskells were virtually without assets and it does not appear that Saklatvala or Cannon had substantial assets, although Saklatvala's family had fairly heavy holdings of some of the securities of the receivership companies. It is highly probable that many of the receivership companies could have obtained judgments against the Haskells, probably also against Saklatvala, Ferris, Cannon, and others who had acted as directors or officers of the corporations while Haskell was manipulating their funds. Saklatvala and Cannon were both employed by the receivers and the record shows that they were the source of considerable information, from their own recollections of the transactions which had been recorded poorly or not at all. Claims against the receivership corporations pressed by the Haskells and their family-held Unity Securities Corporation, and claims of Cannon, were vigorously opposed by the receivers and were defeated. There is an intimation by objectants that failure to pursue the Haskells and Ferris was due to a desire to obtain their cooperation or, at least, the absence of their opposition to a scheme of Glass to acquire control over the reorganized corporation. There is no evidence on which to base any such finding. The decision not to pursue the Haskells and others was a matter of business judgment for the receivers. There was no concealment from the Court or from the investors interested in the old companies of the fact that tremendous swindles had been perpetrated, of which the Haskells were undoubtedly guilty, nor of the fact that the receivers considered it better judgment not to pursue the old management in court actions. The receivers

were not bound to bring actions if they felt, in the honest exercise of their judgment, that no substantial recovery could be had, or if they felt that any possible recovery would be more than outweighed by the disadvantage of not having the testimony available of the old management in seeking to conserve the estate against attacks from outside.

The Court cannot find that Glass or Tumulty was in the conduct of the receiverships in any way allied with the Haskells.

3a. Validity of the Pending So-Called $4,000,000 Fraud Claim

We have had no decision of the $4,000,000 fraud claim. It is highly doubtful whether it is now enforceable in view of the long delay of Middle States Petroleum Corporation in bringing it on for trial, particularly when so many of the witnesses to the 1923 transactions have died.

3b. The Undetermined Ownership of the Gulf States Stock

The delay may also raise a question whether there is any estoppel of Middle States Petroleum Corporation to assert claims to ownership of Gulf States stock against the other claimants of it, Southern States Oil Corporation and Western. If M.S.P. is not estopped, it should be possible for the Court to determine from evidence as to the source of the properties contributed to the formation of Gulf, considered in view of the bond guaranties also contributed by M.S.O. and S.S.O., an equitable division of the Gulf States stock.

3c. M.S.O. Oil Corporation Assets

Likewise it should be possible for the Court to determine on hearing evidence the ownership of the assets of M.S.O. Oil Corporation whose ownership is still unresolved, but is subject to a claim by Western since its properties pledged to secure the Chatham-Phenix note, apparently were substituted for notes belonging to Western.

3d. Allocation of Overhead (See 2(f))

3e. Post Receivership Advances (See 2(g))

3f. Responsibility to Minorities under Boyd Rule

Nor does the participation of the Middle States Oil stockholders in violation of the Boyd Rule provide grounds for surcharge of the receivers, for the sales at a fair price under Court order of the assets in their hands as United Oil Producers receivers protect them from surcharge. However, if the Boyd Rule was violated by the participation of the Middle States Oil stockholders, without their furnishing adequate additional compensation, while creditors received less than the full equivalent of their debts, it was as to those creditors a fraudulent conveyance, and the properties formerly subject to payment of their debts can be followed into the new company.

As pointed out above, so far as the United Oil Producers bondholders are concerned, there is no violation of the Boyd Rule if they were given an option of obtaining their money's worth of securities of the new company in return for the full amount owed them. This the plan did provide in its provision for new bonds for the full amount of principal, and preferred stock for the full amount of interest due on the old bonds. It is true that the interest rate was reduced for the future and the maturities lengthened, but this was compensated for by increase in the security behind the bonds and participation in the earnings of the new company through the preferred stock.

So far as United Oil Producers' claim against Middle States Oil is concerned, it was sold on the sales with the other free assets of United Oil Producers, for a fair price, and any claim under the Boyd Rule as to that debt is washed out on its acquisition by Middle States Petroleum.

The fact that the few non-depositing bondholders are left after the closing of deposits May 14, 1930 with rights only to

distributive cash value fixed as a result of the amounts bid at the sales does not make the transfers to the new corporation fraudulent as to them, since an offer of participation in the reorganization senior to the Middle States Oil stockholders and substantially equivalent to the full debt due them was made to them with notice to them, kept open a reasonable time after the sales, and not availed of by them.

### 3g. Western's Loss on the Chatham-Phenix Note

The purchase by Western of the Chatham-Phenix note of M.S.O. carried out during the receivership under Court order, was an unusual type of investment for receivership funds.

It appeared to be abundantly secured, however, by reason of the then existing opinions of the value of the railroad stock and oil leases which were collateral for the note. The transaction was favorable to the receiverships as a group, moreover, in three respects. It would reduce the rate of interest payable by M.S.O., including the back interest owed the bank. It would increase the rate of return on Western's idle funds. Perhaps most important, it would prevent foreclosure on the collateral and the loss to the group of the control of the railroad and the oil properties which had been substituted for the Peters notes.

It is obvious, however, that the risk of loss in the transaction, in the form it took, was with the Western estate, the chance of gain, if the collateral appreciated, with the M.S.O. estate and later with the new company, Middle States Petroleum, purchaser of M.S.O.'s assets on the sales.

The depression brought a reorganization of the railroad, all but wiping out the value of the railroad stock as collateral.

Western eventually sold the stock, received for the original in the railroad reorganization, to M.S.P. at a price which appears to have been fair at that later time. It had an element of value to M.S. P. aside from its market value, for it helped toward giving M.S.P. complete control of the road as reorganized and toward the goal of sufficient percentage of ownership for consolidation for tax purposes. However, it is not any inadequacy of price at the time, but the holding of the stock for so long a period by the Western receivership, for the benefit of the receiverships as a group, which may well be grounds for holding the receivers and M.S.P. responsible for the losses sustained by Western in the transaction.

The amount realized on the oil properties held as collateral was also affected by the business crash. They paid out far less than expected. Moreover, it is probable that the proceeds should not have been credited by Western on the note account at all, since they appear to have been substituted for notes which belonged to Western when M.S.O. pledged them as collateral.

These questions must be determined on the Western receivership accounting. They are not at issue directly in the U.O.P. accounting. The receiverships are so interwoven, however, that no discharge should be granted to Glass in one case until all remaining controversies are resolved and all can be closed together.

### Inter-Receivership Security Purchases and Sales

Some of the receivership estates, during the receiverships, made purchases of stock or bonds of other receivership companies, which securities were in some instances eventually sold to M.S.P., some became worthless because of insolvency of the corporations. There is no indication that at the time of any sales to M.S. P. less than a fair market value was paid by M.S.P.

The purchase and retention of such securities, however, were for the benefit of the group rather than solely the estate of the purchasing receivership. Where a loss ensued, therefore, as in the purchase of Plains stock by the receivers

of Sure, finding should be made on the Sure accounting as to any responsibility of the receivers or M.S.P. to the Sure estate by reason of the transactions.

It may be that M.S.P. is not responsible for such losses, but may be required to account to the estates of the other companies in receivership in any case in which M.S.P. has made a profit on any individual purchase from them of properties or securities.

### The Cohen Bonds

#### The Cross-Claim of Middle States Petroleum Corporation

In its cross-answer Middle States Petroleum Corporation sets forth a cross-claim against the Estate of William W. Cohen for $17,207.99 with interest. This sum represents the distributive value paid to Cohen in 1935 on $24,700 principal amount of U.O.P. bonds, which Cohen allegedly held as agent or trustee for Reliable Securities Corporation. M.S.P. had no knowledge of ownership of the bonds by Reliable until a few days before the trial of the present accounting.

The Court of Appeals assumed that Cohen had acquired $32,200 principal amount of U.O.P. bonds at some date after the time for deposit had expired, since he had possessed certificates of deposit under the plan for another parcel of $11,000 of U.O.P. bonds and had received securities therefor under the plan. In the light of evidence produced on trial, however, it now appears that in January, 1924, William W. Cohen & Co. held as agent or trustee for Reliable $24,700 of U.O.P. bonds. Later on dissolution of his brokerage firm the bonds were carried in the personal account of Cohen. By 1928 he had acquired an additional $7,500 of the bonds and for all that appears had outright title to them in his own name. Cohen did not deposit any of these bonds under the plan but retained them until 1935, about a year and a half after the death of Haskell, when he presented them to Manufacturers Trust Co., the depositary, for payment of the distributive value. He received $22,-493.31, the distributive value on $32,200 face amount of the bonds. M.S.P. was obliged to reimburse the depositary for the amount advanced to Cohen and now seeks recovery of $17,207.99 the portion of it attributable to the $24,700 bonds allegedly the property of the receiver of Reliable.

In defense to this claim, the objectants register a general denial and set up two statutes of limitations. They argue that the fact the bonds were in the possession of Cohen creates an inference of ownership in him and they further contend that a conclusion that Cohen acted properly would not be inconsistent with the evidence. We cannot agree. It has been shown that in 1924 Cohen or his firm held the bonds in a fiduciary capacity for Reliable. No evidence has been brought to our attention to indicate a change in Cohen's status. The presumption which we must follow is that Cohen continued to hold the bonds in a fiduciary capacity for Reliable. When a relationship is shown to exist, it is presumed to continue unless the contrary is shown. In re A. O. Brown & Co., D.C., 1910, 183 F. 861; Wigmore on Evidence, Sec. 2494. The presumption of ownership based on possession, on which objectants rely, lost any vitality it had when the evidence of Cohen's fiduciary status was submitted.

Objectants plead two statutes of limitations Sec. 48 (6 years) and Sec. 53 (10 years) of the Civil Practice Act, N.Y. Since the fraud involved in M.S.P.'s claim for relief is actual rather than constructive fraud, Sec. 48, and not Sec. 53, is applicable. Pitcher v. Sutton, 1933, 238 App.Div. 291, 264 N.Y.S. 488. That section bars an action to procure a judgment on the ground of fraud only when more than six years have elapsed since the discovery by the claimant of the facts constituting the fraud. Since it appears that M.S.P. was not aware of the fraud which Cohen perpetrated until sometime shortly prior to the trial on this accounting the

six-year statute of limitations is no bar to its recovery of the amount paid as the distributive value on the $24,700 of U.O.P. bonds.

## On Motion For Rehearing

In its opinion filed here on April 17, 1951, the Court directed entry of judgment in favor of M.S.P. on its cross-claim against the estate of William W. Cohen for $17,207.99, with interest. The sum represents the distributive values paid to Cohen in 1935 on $24,700 of United Oil Producers bonds, of which he is alleged to have fraudulently represented himself as owner. The ruling on the cross-claim is the occasion of objectants' motion for rehearing.

Objectants contend that the Court lacked jurisdiction to adjudicate the issues raised by the counterclaim, that the findings of fact do not support the judgment, and that the New York statute of limitations was erroneously applied.

## I. Jurisdiction

Adjudication of the counterclaim, as objectants point out, does not fall within the ancillary jurisdiction of the receivership court. The $24,700 of the U.O.P. bonds on which Cohen received the distributive values, title to which is put in issue by the allegations of the counterclaim, were never in the possession or constructive possession of the receivership court. See Murphy v. John Hofman Co., 1909, 211 U.S. 562, 29 S.Ct. 154, 53 L.Ed. 327, and Wabash R. Co. v. Adelbert College, 1908, 208 U.S. 38, 28 S.Ct. 182, 52 L.Ed. 379.

The Court's exercise of jurisdiction is, however, proper under Rule 13(a) of the Federal Rules of Civil Procedure, 28 U.S.C.A., relating to compulsory counterclaims. Cohen's title to the U.O.P. bonds was an essential issue in the case since ownership of the bonds was the basis of the status of objectants to intervene in the receivership proceedings. Both the receivers and

M.S.P. challenged Cohen's title to the bonds and that of his executors. The counterclaim of M.S.P. arises out of the same transactions[1] as were necessarily involved in the question of objectants' status—that is, Cohen's transactions as regards the U.O.P. bonds. M.S.P., in addition to its denial of title to the bonds in Cohen or his estate, properly seeks affirmative relief by means of counterclaim for alleged fraud in connection with the same bonds. Cf. Moore v. New York Cotton Exchange, 1926, 270 U.S. 593, 46 S.Ct. 367, 70 L.Ed. 750.

To dismiss the counterclaim for want of jurisdiction at this stage of the proceedings would be to thwart the purpose that Rule 13(a) was designed to achieve —avoidance of multiplicity of suits. The Court, at great expense of time, has become, to some degree, familiar with the complexities of this litigation and it would seem desirable from the viewpoint of judicial economy to dispose, to the extent possible, of all of the controversies between the parties.

While it may be doubted that the issue of ownership of the U.O.P. bonds would ordinarily be termed the subject matter of the Kraushaar claim, it is an essential issue in the case since ownership of the bonds by the objectants is necessary to their standing to raise objections, and is sufficiently related to the subject matter of their claim to make M.S.P.'s counterclaim compulsory.

According to Moore, Volume 3 at 33— "(s)ubject to exceptions, (none of which is here applicable) any claim that is logically related to another claim that is being sued on is properly the basis for a compulsory counterclaim; only claims that are unrelated or are related, but within the exceptions, need not be pleaded". It seems that M.S.P.'s counterclaim is logically related to the primary claim of Kraushaar, since the primary claim necessarily involves the ownership issue.

---

1. The word as used in the Rule is subject to the broadest interpretation. See 3 Moore's Federal Practice (2d Ed.) 32, and especially cases cited in Note 4.

On the whole it would be better to call this counterclaim compulsory—(1) because of its logical connection with the subject matter of the primary claim, (2) because the facts on which to enter a judgment are before the Court, (3) because it would be a tremendous waste to compel the parties to present the same facts to another trier in a new proceeding, (4) because neither party is prejudiced by having this Court adjudicate the issues raised in the counterclaim.

The same general result would be achieved by holding the counterclaim permissive under 13(b) and taking cognizance of the diversity of citizenship of the parties from the record in these proceedings.

## II. Theory of Recovery on the Cross-Claim

It appears from the language of the opinion, findings and conclusions, that the Court applied a theory of damage to M.S.P. as successor in interest to Reliable by a fraudulent conversion to Cohen's use of the $24,700 of U.O.P. bonds by Cohen's presentation of them for payment of the distributive values to Cohen in his own name.

This was erroneous, for, if anyone could recover on that theory, only the receivers of Reliable, not M.S.P., could do so.

M.S.P. was not claiming on such a theory, however, but rather in common-law fraud for damage done it by fraudulent misrepresentation of Cohen's right to receive the distributive values under the decrees.

M.S.P. seeks an "emendation" of the findings and conclusions to bolster the basis of recovery for M.S.P. on the cross-claim.

## III. The Statute of Limitations

In answer to the counterclaim, objectants have set up two statutes of limitations, Section 48 (six years) and 53 (ten years) of the Civil Practice Act. Regarding the action in the light most favorable to the counterclaimant as an action to procure a judgment on the ground of fraud, the six-year statute applies. The six-year period would commence to run at such time as M.S.P. discovered, or should have discovered, the fraud alleged in its pleading.

Objectants have vigorously contended in their motion papers and oral argument that M.S.P., through its president Glass, was aware, or should have been aware, of the fraud, if fraud there was, at a time prior to six years before the commencement of the counterclaim action. This contention would appear to have merit.

The $24,700 U.O.P. bonds involved were originally among a block of securities which were held by the brokerage firm of William W. Cohen & Company in the account of Reliable Securities Company (a wholly-owned Middle States Oil subsidiary). It appears from affidavits and annexed exhibits filed in support of this motion that these securities, including the U.O.P. bonds, at the time of the receiverships were "long" in the Reliable account and were free of brokerage liens. Another brokerage account was maintained by the Haskell group, with the Cohen firm in the name of George Kelley. This account showed a substantial debit balance at the end of 1923 but Cohen, making the claim that the Reliable and Kelley accounts were one, was apparently acting on the theory that he could apply the securities "long" in the Reliable account against Kelley's debit balance. In 1926, entries were made in an account entitled "W.W.C. in Liquidation" to reflect a consolidation of Kelley and Reliable, and the block of securities, including the U.O.P. bonds, previously in Reliable, were therein listed. By 1929, the U.O.P. bonds had found their way into another account labeled "William W. Cohen" and, in 1935, they were presented by Cohen to the Manufacturers Trust Company for the payment of distributive values.

The evidence indicates that Glass, in the initial stages of the receivership as counsel to the receivers, Mayer and Tu-

multy and after 1926 as co-receiver, was, or should have been, familiar with the status of the Reliable account with the Cohen firm. The account had been investigated in 1924 by Lybrand, Ross Brothers, Montgomery, and, later, at the instance of Glass' law firm, by Mattison and Davey.

Glass, himself, had written in 1924 to William W. Cohen & Company, demanding payment of a $200,000 loan made by the Reliable Securities Company to Cohen. He received a reply in which Cohen claimed that the $200,000 loan and another for $100,000 had been repaid by crediting $300,000 to the Reliable account. An investigation of this claim of Cohen would have revealed the then status of the account. There is reference in the record to a certain memorandum prepared in October, 1924, by Cannon for Glass, concerning "Cohen's account with the Reliable Securities Corporation". This memorandum has not been produced and its contents remain unknown. But evidence of its existence creates an inference that Glass was, or should have been, acquainted with the dealings between Cohen and Reliable.

If Glass took steps to recover the block of securities which were "long" in Reliable's account with the Cohen firm (and as receiver he was under a duty to recover these assets for the benefit of the estate), we may assume, on the basis of the evidence now before us, that he was informed of Cohen's claim that the Reliable and Kelley accounts were one and that the Reliable securities were consequently subject to a lien arising from Kelley's debit balance. We may conclude that Glass had at hand sufficient information to put him on inquiry as to the status of Reliable's account with Cohen. See Higgins v. Crouse, 1895, 147 N.Y. 411, 42 N.E. 6. And since M.S.P. is bound by the knowledge which was within the reach of Glass, it cannot now be heard to assert that it was unaware until shortly before the trial on the United accounting of the alleged fraud in Cohen's implied representation that he was the owner of the U.O.P. bonds.

Certainly it cannot be said that M.S.P. has borne the burden, by the introduction of preponderant evidence, of showing that it had not been cognizant of the alleged fraud within six years after its perpetration. Unless this burden is borne, the bar of the statute cannot be circumvented. Shultz v. Manufacturers & Traders Trust Co., D.C. W.D.N.Y., 1941, 40 F.Supp. 675, 686, affirmed 2 Cir., 1942, 128 F.2d 889.

As counsel for the receivers stated in the oral argument on this motion, the true inwardness of the situation, so far as these bonds are concerned, will never be known. The lapse of time is too great; the records kept by the Haskell group are too meager. Under these circumstances the application of the statute of limitations promotes a just result.

Moreover, although Cohen failed openly to take affirmative action between his assertion to Willcox in 1924 and his presentation of the bonds in 1935, he was not plainly acting in bad faith so as to constitute actual fraud. Objectants now offer to produce proof that he consulted counsel on the basis of his claim and that he, in good faith, believed that the history of Haskell's handling of the Reliable and Kelley accounts gave Cohen's firm the right to treat them as one. The claim was probably not sustainable in view of Cohen's firm's earlier treatment of Reliable's account as a separate corporate account, but we cannot say that M.S.P. has borne the burden of establishing Cohen's bad faith in the presentation of the bonds.

The counterclaim of the Middle States Petroleum Corporation may be dismissed and the memorandum of decision filed April 17, 1951 may be modified in accordance with the ruling herein.

The motion for rehearing is granted to the extent above indicated.

Conclusion of Law No. 3 may be stricken and the following language inserted in place thereof:

3. Middle States Petroleum Corporation has failed to establish, by a fair preponderance of the evidence, that it did not have knowledge of the alleged fraud of Cohen at its occurrence in 1935 and is, therefore, debarred from recovery on the cross-claim by the applicable New York statute of limitations.

Additional findings may be adopted as follows:

263(a) As at June 30, 1926, Reliable had a cash credit balance of $10,281.60 with William W. Cohen & Company and was "long" with that firm, free and clear of any indebtedness, $24,700 United Oil Producers Corporation bonds and certain other securities.

263(b) On the ledger sheet showing the account of Reliable with William W. Cohen & Company for a period terminating June 30, 1926, appear the words "No Statement JHG 4/30/26". These were the initials of the person who was the cashier of that firm and also had charge of its books during that period.

263(c) As at December 31, 1923, the account of George L. Kelley with William W. Cohen & Company had a cash credit balance of $25,576.80; as at that date William W. Cohen & Company put back as "long" in the Kelley account 3,400 shares of Southern stock and debited the Kelley account $108,625 therefor; so that, as at that date, the final position of the Kelley account was "long" 3,400 shares of Southern, "short" 800 shares of Southern, or net "long" 2,600 shares of Southern; debit balance $108,-625; credit balance $25,576.80; net debit balance $83,048.20.

263(d) As at December 31, 1923, William W. Cohen & Company created an account called "William W. Cohen in Liquidation" by putting therein Kelley's net debit balance of $83,048.20 against Kelley's net "long" position of 2,600 shares of Southern.

263(e) As at June 30, 1926, the cash credit balance of $10,281.60 in Reliable's account, together with the securities "long" in that account, including $24,-700 of United bonds, were transferred from Reliable's account into the "William W. Cohen in Liquidation" account in purported reduction of Kelley's debit balance and as a means of satisfying the same. Thereafter the purported debit balance in said "Liquidation" account was reduced by the collection of interest coupons and the sale of securities until April 26, 1929, at which time the account was closed by the delivery out of $24,700 United bonds and 2,631 shares of Southern stock at the figure of $24,-199 which was then the purported debit balance.

263(f) April 1, 1929, the firm of William W. Cohen & Company was dissolved, and William W. Cohen became a member of the firm of Wachsman & Wassall, its successor. As at April 26, 1929, the $24,700 of United bonds and 2,631 shares of Southern stock were received into an account maintained by William W. Cohen with said successor firm. As at April 30, 1929, that account was "long" $32,200 United bonds, which included the $24,700 of bonds owned by Reliable. As at May 7, 1929, the $32,200 of United bonds were delivered out of said account to William W. Cohen.

271(a) Cohen thereby represented, as to all said $32,200 of United bonds, that he was a person intended to be benefited by the decrees and entitled to such payment under the decrees. M.S.P., relying on said representations, made the payment received by Cohen.

(End of memorandum re motion for rehearing counterclaim; balance of original opinion on other issues follows.)

### The Special Defenses of M.S.P. and the Receivers

On the United accounting, in view of the findings herein, we do not reach the question of whether any claim against M.S.P. is barred by the statute of limitations.

On the other accountings, of course, even though some or any claims against M.S.P. might be so old as to be unen-

forceable separately by suit in view of the New York statute of limitation here applicable under Guaranty Trust Co. of N. Y. v. York, 1945, 326 U.S. 99, 65 S.Ct. 1464, 89 L.Ed. 2079, it may be that any debts so barred may be used as set-offs against M.S.P.'s claims against the various receiverships. See cases cited note 5, 326 U.S. at page 110, 65 S.Ct. at page 1470.

Moreover, in view of the past history of the dealing by the Court with the receivership as a unit, and the continuance of such dealing by the new company, M.S.P., after the sales, through M.S.P.'s active executive head, Glass, who still was to M.S.P.'s knowledge, handling the estates in receivership and acting in transactions with M.S.P. on behalf of the estates in a dual capacity, it is doubtful if any single transaction by M.S.P. with any of the receiverships should be considered as complete for the purpose of laches or limitations until the final balancing of M.S.P.'s accounts with all the estates in receivership in which any outside interest, direct or indirect, continued to exist.

Cohen's estate may possibly be held, however, as to all its holdings estopped to raise objections to any transactions as to which Cohen had actual or constructive notice, in view of his sitting back for so long a period while witnesses passed on and transactions were had in the securities of the new company.

Some of the special defenses of waiver and estoppel are based in part on Cohen's claimed intimate knowledge of facts concerning the Haskell companies and particularly his knowledge acquired while operating as a specialist in United bonds that claims were made by the Haskell management of net worth of the obligor and guarantor far in excess of the amounts received for their assets on the sales.

Perhaps it might be said that anyone familiar with the claims of great value made by the Haskell interests should have immediately attacked the amounts bid or abandoned any later claims of inadequacy. It is hard to see, however, where Cohen has been shown to have any actual knowledge of values beyond that of any investor or speculator in Haskell securities in that period. He must have thought there was some value in some of the securities, for he held some. He knew that market rigging was going on—not unusual in those days.

Knowledge of manipulation—that the governor was going to "do something about Gulf" and preferred treatment in opportunities for profit in the market in Haskell securities, such as the block held by Haskell for Mrs. Cohen with dividends to be paid to her, an option to buy at a fixed price if the market went above that price, but no obligation to complete the purchase if it did not, whatever they may indicate about brokerage ethics in those days, do not establish knowledge on Cohen's part of underlying values.

Even if Cohen was on notice of facts which should have led him to question the prices bid on the sales, the objections based on the alleged conspiracy to defraud would not be barred by the statute of limitations until 6 years after Cohen or his representatives discovered the conspiracy. Nor does there appear to have been sufficient knowledge of facts on Cohen's part to estop his representatives from raising an objection based on the alleged fraud. His representatives acted promptly after their suspicions were aroused, and no basis exists for finding of laches in the absence of an earlier knowledge of the facts on which the alleged conspiracy is based, in spite of the knowledge which objectants and Cohen before them must have had of the steadily shifting ownership of the securities of the new company.

The opinion of the Court of Appeals in this case appears to reject the theory of estoppel by covenant on the part of Cohen, at least so far as his undeposited securities are concerned.

The special defenses of the receivers and M.S.P. are insufficient. The findings herein, of course, make them academic so far as the United accounting is concerned.

They should not, however, be permitted to bar consideration of the controversies still unresolved upon the receivers' accountings in the companion receiverships.

The receiver Tumulty has separately moved for discharge. No malfeasance is charged against him. He has apparently taken no active part in the receiverships since winding up the tax controversies, which were his special province. The division of labor and responsibility between the two receivers placed all other problems in the hands of Judge Mayer and later Glass. Tumulty has been physically incapacitated since at least 1941. No purpose would appear to be served in postponing his discharge in the United accounting pending the determination of the unresolved questions affecting the other receiverships. The motion for discharge of the receiver Tumulty may be granted.

Cohen's estate's interest aside from the balance unpaid of the undeposited bonds is small and in itself would not justify extended litigation. It gives an interest to the objectants, however, to develop the facts on behalf of the far larger total of scattered similar interests of the minorities in the subsidiary and associated companies and on their behalf the Court must pursue to their conclusion the unresolved controversies in these receiverships. Moreover, consideration should be given to some allowance to objectants for their efforts if recoveries are had by minorities as a result of the objections.

Let the motions for surcharge on the United accounting be denied, the counterclaim of M.S.P. on the Cohen bonds be dismissed, the motion for discharge of the receiver Glass be denied without prejudice to its renewal on determination of the other final accountings of all the receiverships in the Phelan cause after presentation to the Court for decision on notice to the objectants and to all other non-depositing stockholders and creditors, of all the unresolved controversies referred to herein or existing between any of the receiverships or between any of the receiverships and M.S.P.

No costs to any party.

Judgment in accordance herewith has been entered.